Fritz Dairy Farm LLC
Mark R. Fritz & Michele E. Fritz
6301 Mackel Rd. N.E.
Minerva, Ohio 44657
(330) 895-2876

January 14, 2013

United States District Court Judge John R. Adams
For the Northern District of Ohio, Eastern Division
C/o John F. Seiberling Federal Building and US Courthouse
2 South Main Street   Akron, Ohio 44308



Re: *Mark R. Fritz; Michele E. Frits &*
*Fritz Dairy Farms, LLC, Plaintiffs vs.*
*Chesapeake Exploration, LLC; Kenyon*
*Energy, LLC & Richard Owen, Defendants*
*Case No. 5:12: CV-01736-JRA*

Honorable Judge R. Adams:

We may disappoint you-and most likely our current counsel.  For that we are sincerely sorry.  Our new counsel, Mr. Leiby and Mr. Hobson are not aware of this letter.

We are simple folks. My husband lived and worked on the family farm all of his life.  My family owned a furniture store in Minerva for 47 years and my family and father grew up just a few miles from our farm during the depression. My husband was the youngest of 10 children.

We have tried to do right by our neighbors and friends and they to us.  If they said they would help us out, they did, and we would do the same for them when needed.  An agreement was not even a matter of a handshake.  It was simply our word as to what was right and expected

*A.  Essential Facts Surrounding Our July 30, 2010 Kenyon Leases*

- *Single 5 Year Lease Term; Smaller Lease Bonus;*
  *Refusal of Long Term Tie Up of Our Land*

We expected the same from Richard Owen, Kenyon Energy and Chesapeake Exploration when we negotiated over the terms of our 2 oil and gas leases in the summer of 2010[1].  After six

---

[1] We are unsure as to the appropriate way of submitting this letter, pleading or motion for relief to this Honorable Court. However we want Your Honor to know that all our statements in this letter are true and correct to our best understanding and belief. We have obtained and attached certified copies of certain important documents, as indicated. All text messages or emails we refer to are true and copies of those on our cell phones or computers. We

{Summary of pleading} - 1

1  or more weeks of back and forth and different lease versions, we decided and became adamant
2  about not wanting to lease or tie up our lands for any long period of time, certainly no longer
   than a single five year primary term. In spite of countless requests by Mr. Owen and others at
3  Kenyon Energy, we made it very clear we only wanted to execute the July 27, 2010 leases that
4  were limited to a single 5 year term.  In making that decision, we understood that Kenyon
   proposed to offer us more lease bonus money for an additional five year option and we
5  understood a neighbor received $250 more per acre for a lease with a 5 year primary term and an
6  option to renew for another or second 5 year term. That simply was not our goal or agreement.
7
8              • *Lease Forms Prepared by Kenyon Energy*

9  As they had done previously for earlier lease drafts, Mr. Owens and Kenyon prepared the final
10 versions of our July 30, 2010 leases, including Lease Exhibit A provisions designed to protect
11 our lands, crops and livestock during exploration and production. One such provision prevented
   the lessee from using water from lands.
12
13             • *2006 Leases with Great Lakes Energy & Single 5 Year Term*
14
       Our land is our life and livelihood and we did not want any rights to our land signed up
15 for longer than 5 years at a time. In 2006, we made the same decision when we leased our other
16 property to Great Lakes Energy for what we intended and understood was a single 5 year term. [2]
   Mr. Owen knew about those leases and asked us to call him when those parcels became available
17 in October, 2011 and he would attempt to get us the best lease terms possible.
18     We also felt that having the dates and terms of our leases roughly coincide would also
19 make it easier for our farm accounting.  To our knowledge, none of our lands have ever been
   drilled or mined for oil, gas or other minerals. In the past, we used whatever lease bonus
20 payments we received to pay for tractor, other equipment or feed needs or commitments.
       You're Honor you can see how the signature pages state the leases were prepared by
21 Kenyon and include Exhibits A and B. And yet, the filed Kenyon Leases are missing Exhibit A
22
23             • *Preparation, Execution, Notarization and*
24                *Kenyon Lease Originals on July 30, 2010*
25
26     About 9:00 am July 30, 2010, Richard Owen brought us two sets of original Kenyon
27 Lease to our house. Kenyon or Mr. Owen had already prepared them in full.  All originals
28 provided for a single 5 year primary term. The provisions at the top of page 2 which otherwise
   created a  5 year renewal option *were crossed through and lined out by Kenyon or Richard Owen*
29 *when given to us that morning.*
30
31 did not have the time to collect certified  copies of all included documents but they are true and correct copies of the
   originals or filed documents.
32 [2] As our misfortunes would have it, EnerVest [the successor to Great Lakes] originally thought so too but then found
   a sentence buried at the leases' end to dispute their 2011 termination.

                        [Summary of pleading] - 2

00002

Mr. Owen said he had another landowner to meet about leasing their land and therefore did not want to accompany us to our bank in Minerva where we planned to have the Kenyon Leases notarized. Mark and I immediately took both original sets of those two leases to our bank in Minerva and had Mrs. Donna Kandel notarize both sets. We specifically signed our initials alongside that paragraph indicating our approval to its deletion, as reproduced above. The drive took less than 10 minutes. After we had the Kenyon Leases notarized, we called Mr. Owen who met us back at our house as we arrived. He took one original fully executed set of the Kenyon Leases. We retained the other original set. Upon leaving that morning, Mr. Owen told us their original set of the Kenyon Leases would be recorded as soon as his superiors reviewed them. He delivered us lease bonus checks drawn on Chesapeake's bank account around August 30, 2010.

- *Discovery of Fraudulent Kenyon Leases*

Over a year passed before we discovered that the recorded Kenyon Leases differed substantially from those we executed on July 30, 2010 and the set we retained that day. Our discovery came about in an unexpected way. During the first week of September, 2011, Elizabeth Bednar, a landman with EnerVest called us about leasing our Great Lakes lands. She also pointed out a discrepancy in the land description of the Kenyon Leases and that I could confirm that fact by viewing the Kenyon Leases filed with the Carroll County Recorder through its records link to the "LandAccess.com website". Prior to our conversation, I had never heard about that website or used that site to view the Carroll County official records.

When I [Michele] looked up the Kenyon leases on the Carroll County Records I was ***shocked*** to find both leases were not the originals that we had handed to Mr. Owen on July 30, 2010. Each had been changed in multiple places. Importantly, each filed Kenyon Lease included a 5 year extension option contrary to Page 2 which Kenyon or Mr. Owen had lined out and we had initialed.[3] The location of the 5 year extension was not even on the same page as our original set. Also, the pagination, margins, font size and paragraph spacing were different from the originals retained in our safe. There were even blanks for the state and county designations of the notary's acknowledgement of the 2nd recorded Kenyon Lease. Our retained original and even the 1st recorded Kenyon Lease had those spaces filled in.

- *Communication Efforts to Correct Kenyon Leases with:*
  *Messrs. ': Owens; Phillip Lowery (President) and Dain Wise*
  *In Hopes of Avoiding Litigation*

I immediately called Mr. Owen about changes made to our July 30, 2010 Kenyon Leases, as well as the acreage error. He finally agreed to meet us in person in early November. But because he was then working in West Virginia he would in the meantime have another Kenyon landman named Nathaniel Hammons contact us. At the meeting in our house, we confronted Mr. Owen with the specific changes made in the recorded Kenyon Leases [which I copied from the

---

[3] We have attached copies of our original Kenyon Leases as **Exhibit A-1** and the wrongful Kenyon Leases filed with the Carroll County Recorder as **Exhibit A-2**.

[Summary of pleading] - 3

00003

Carroll County Recorder's Website to show him] from those retained in our safe. His face turned beet red and left very quickly.

In continued follow-up calls, Mr. Owen refused to address, explain or correct the wrongful changes. Later he chose not to answer or return our telephone calls about the filed versions of our July 30, 2010 Kenyon Leases. We became frustrated and I called Mr. Lowry, Kenyon's president, at its address in North Canton in early December, 2011.  He promised to get back to us -- but never did. Attached as **Exhibit B-1** is a true and correct copy of the letter we sent him.

I then tried to contact Kenyon's in-house counsel. Eventually, I spoke to Mr. Dain Wise and explained how the Kenyon Leases filed in the Carroll County records differed greatly from the leases we negotiated, signed and had notarized.  Mr. Wise gave me his e-mail address and I e-mailed him about the changes in the recorded leases on December, 2011, but to no avail[4]. A true and correct copy of my email to him is attached as **Exhibit B-2**.


- *Left With No Alternative: State Court Litigation*


When we got no response about correcting and amending the recorded leases, other than the release of the one parcel, we decided to do what any natural person would do who knew they were being treated dishonestly and unfairly.  We decided to seek a legal remedy, something we had never done. Michele talked to our neighbors and one neighbor in particular had a somewhat similar experience and recommended we talk to Attorney Ed Wright from New Philadelphia. He also had a lease with Kenyon and discovered that the filed one he found on "landaccess.com" was not the same as that which he and his wife had signed. Mr. Wright represented them in filing a state court lawsuit. We understand they settled right before trial. The settlement details were not filed with the court but newspaper articles picked up the story. In our efforts to find counsel to remedy the wrongs perpetrated upon us, it has appeared to us that few lawyers in Northeastern Ohio have had meaningful experience with oil and gas documents, laws and federal litigation that do not already have conflicts or other reasons for not representing landowners like us.

We employed Mr. Wright. He recommended and prepared a lawsuit for us to file in Ohio state court thinking it involved primarily state law issues as Kenyon Energy, L.L.C. was incorporated in Ohio and had its principal place of business here, our lands are located here, the subject leases were executed in the state and all people who, to our knowledge, dealt with them (landmen, notaries, Kenyon superiors, Mr. Owen etc.) live or primarily work in the state.  In the midst of this, Mr. Wright who is older had knee surgery on both knees.


- *Counsel Edward Wright Inability to Practice in Federal Courts*


When the defendants first sought to remove our original state court case to federal court, Mr. Wright advised us he had not practiced in federal court in a number of years and didn't feel

---

[4] We have attached a copy of Michele's email to him as **Exhibit "B-2"**

[Summary of pleading] - 4

00004

he could continue to represent us there. He wanted our approval for his contacting another attorney, Mr. Robert Soles, to get the case remanded back to state court. Mr. Wright spoke to Mr. Soles about adding Richard Owen to the case because in my research (Michele), I discovered that Mr. Owen and 5 other Kenyon employees/ landmen had stated they were permanent residents of Ohio in applications to become commissioned notaries in Ohio.  In order to become a notary in Ohio anyone not an attorney has to be a *permanent resident* of the state[5].

- *Mr. Owen's Statement of His Being An Ohio Resident*
  *In his Ohio Notary Documents*

Given that information, the higher costs of federal court litigation and perhaps other considerations, Mr. Wright thought it best for Mr. Soles to dismiss our first case.  A certified copy of Mr. Owen's Ohio application and Ohio Notary Certification are attached as **Exhibit C**. Based upon the information of Mr. Owen claiming he was an Ohio resident, Mr. Whitaker filed a second state court suit against Mr. Owen, Kenyon Energy and Chesapeake Exploration.

- *Mr. Owen's Affidavit Statement of His Being an Oklahoma Resident*

However, the Vorys, Slater et al law firm filed a pleading in July 2010 to "remove" the state court litigation to this Honorable Court because, as we have come to understand, we, the plaintiffs live in Ohio and all the defendants are supposedly "citizens" of other states. Thus, there is complete "diversity of jurisdiction" and this Honorable Court can hear the case that is, at its core, an Ohio matter. And in support of its removal pleading, Mr. Owen filed an Affidavit on July 6, 2012, stating he was not a resident of Ohio but instead was a resident of Oklahoma.[6] At that point Mr. Wright released himself from our case. We understood the Sholes firm was extremely busy working on another Chesapeake related litigation involving many parties and had little time for us.

- *Mr. Owen's Recent Statement of His Being a West Virginia*
  *Resident in his West Virginia Notary Documents*

Recently, I discovered that Mr. Owen filed documents in West Virginia in order to become a certified Notary in that state. In those documents he stated he was a resident of West Virginia.

### B.  *Professional Relationship with Attorney Brendan Delay*

Not knowing what to do, we employed Mr. Brendan Delay from a recommendation of another neighbor, Roger and Carolyn Starkey, who employed him to sue Chesapeake for not discussing with or getting  their approval [as required by their lease] prior to locating a well pad site in the middle of their best corn field. Mr. Delay had some initial success in that Columbiana

---

[5] The applicable forms, rules and procedures for becoming an Ohio notary are attached as **Exhibit D**.
[6] We have attached Mr. Owen's Affidavit as **Exhibit "E"**

in the center of their biggest corn field. Mr. Delay enjoyed some early success in that Columbiana County lawsuit when he obtained a temporary restraining order and then an injunction order against Chesapeake. But thereafter the injunction was dissolved and recently Mr. Delay lost a jury trial in that Columbiana court to the Starkey's great dismay.

- *Initial Relationship With Attorney Delay*

Initially and through part of this past fall, we enjoyed a reasonable professional relationship with Mr. Delay. However, a number of things started to occur which caused us to question his commitment to us and his expertise and experience in federal court matters. In November our concerns greatly increased, particularly over his not having subpoenaed or taken the deposition of Mr. Owens, and not having served interrogatories and requests for document production upon Mr. Owens, Kenyon and Chesapeake. We learned about those procedures from those documents the Defendants served on us. Our growing inability to communicate with Mr. Delay, to timely review facts and documents with him, to receive from him pleadings filed with this Honorable Court and to understand the status and progress of our case caused our relationship to sour. Recently we have looked up the Ohio Rules of Professional Responsibility and as we will discuss later we believe Mr. Delay did not follow all of them in dealing with us.

- *Early On, We Requested Mr. Delay Use Mr. Owen's and other Kenyon LandMen's Notary Related Documents With Respect to Jurisdictional And Credibility Issues: Particularly the following:*
  *(a)Mr. Owens & Other Kenyon Landmen's Initial Use of Kenyon's Office Address on Notary Papers as their Personal Residential Address;*
  *(b) Then They Used the local "Residence Inn" as their Ohio Residential Address on their Notary Papers;*
  *(c)Recently Mr. Owen Stated on West Virginia Notary Papers that He is a West Virginia Resident; and*
  *(d) In his Affidavit toe This Honorable Court Last May, Mr. Owen Stated He Was an Oklahoma Resident.*

Important to us were the facts and documents we discovered about Mr. Owens and Kenyon's apparent practice of having its local landmen become notaries in Ohio based upon their *permanent residency here*[7], even if they were also claiming at the same time resident status in one or more other states or would use either a local motel or Kenyon's own office as their Ohio residential address. In those regards, we requested almost at the outset of our relationship that Mr. Delay submit our findings and supporting documents to your Honor.

---

[7] Ohio Revised Code Section 147.01 requires a non-attorney to be a legal resident of Ohio in order to qualify to become a notary public. ORC Section 147.02 (2) also requires an applicant to be citizen of the county in which he or she resides.

[Summary of pleading] - 6

Through additional research, I discovered the following specific inconsistent acts and documents that call into question Mr. Owen's and Kenyon's credibility:

First, Mr. Owen and other Kenyon landman stated on their notary papers they were *permanent residents* of Ohio. We have attached certified copies of those Ohio notary documents as **Exhibit F.**

Second, Mr. Owens and other landmen used Kenyon Energy's office business address ("1425 S. Main St., North Canton, OH) as their own 'Ohio permanent residence address.' I used that 1425 S. Main St. North Canton Ohio address to write Mr. Lowery [ its president ] and that is the Kenyon Energy address set forth in Mr. Owen's September 10, 2010 letter to us (a true and correct copy of which is **attached as Exhibit G**);

Third, Mr. Owen and Nathaniel Hammons [the Kenyon landman who Mr. Owen said would call us in October, 2011 about the unauthorized changes to our Kenyon Leases] subsequently changed their *permanent Ohio addresses* on their Ohio Notary Papers to 5280 Broadmoor Circle, North, Canton. As Mr. Owen stated in his Affidavit filed with this Honorable Court that happens to be the address of a local "Residence Inn".

Fourth, we also discovered that Mr. Owen applied and received his West *Virginia Notary certification on November 9, 2012 by stating he was also a resident* of West Virginia. A copy of those documents is attached as **Exhibit H.**

Thus, from September, 2010 through 2011 and into 2012, Mr. Owens practiced his land man business for Kenyon in Ohio based upon his being an *Ohio permanent resident*; in West Virginia based upon his being a *resident* of that state; and yet supposedly at the same time being a full time or permanent *resident* of Oklahoma according to his affidavit filed before this Honorable Court.

Given our farming background, we didn't then and still don't understand how those inconsistent actions are considered as either honest or forthright and how his affidavit can properly serve as a foundation of jurisdiction before your Honor.

We compiled a list of oil and gas leases which Mr. Owens notarized just for Carroll County, Ohio in 2011and which were filed of record based upon his being a *permanent Ohio resident.* A certified copy of several of those leases is attached as **Exhibit I-1;** we request this Honorable Court take notice of all of them.

Leading up to the most recent hearing before your Honor on December 17, 2012, we requested Mr. Delay [in repeated telephone calls and text messages] to file a pleading that included these *"permanent resident"* and other related documents. As part of that pleading we hoped Mr. Delay would point out how Mr. Owen's irregularities and inconsistencies demonstrate how, for jurisdictional purposes, his statements are unreliable and, in any event, how he is playing fast and loose with this Honorable Court – because at the time of his affidavit, he continued his valid Ohio Notary status in furtherance of his oil and gas leasing business. We

[Summary of pleading] - 7

thought Ohio notaries are to be honorable so they can be depended upon for verifying documents and people's identities.

In spite of our repeated requests made as recent as December 14, 2012, the Friday before the Monday, December 17th hearing before your Honor, Mr. Delay never did file any such pleading.[8]

- ***Mr. Delay Failed to Conduct any Document Discovery of Defendants***

We are not sophisticated in the ways of litigation. Until this case we had never been in federal court. We were not familiar with "discovery" through requests for document and email production. We did not know what was expected of us or of our then attorney Mr. Delay. We assumed he would represent us fully and adequately before this Honorable Court, in a responsible and timely manner, keep us informed of the developments and effectively prosecute our case against the wrongs perpetrated upon us. And yet, we now know that Mr. Delay tendered no production requests of Mr. Owen, Kenyon Energy and Chesapeake – while over the same period of time, the Defendants tendered production requests and interrogatories of us.

- ***Mr. Delay Failed to Take the Deposition of Mr. Owen;***
  ***Did Not Timely Notify or Prepare Us for Our Depositions***

Neither Mark nor I had ever had our deposition taken before this case. With less than 48 hours' notice, my deposition (Michele) was taken on November 15th and Mark's deposition was taken on December 12th. Mr. Delay arrived at our house at 9:30pm on November 14, the day before my deposition. We spent the next 2 -2.5 hours finalizing our Answers to the Defendants' Interrogatories which were more than 40 days late in being answered. Mr. Delay originally arranged to be at our house around 5 pm.

Mr. Delay finally sought at 11:30 pm to prepare me for my deposition scheduled to take place in Akron the next morning at 9:00 am, an approximate 90 minute trip for us to an unfamiliar office.

However, the most important discovery in our thinking us was for our attorney, Mr. Delay, to take the deposition of Mr. Owen. We requested him repeatedly to arrange for and take his deposition in telephone calls, emails and text messages.

- Opposing Counsel Pointed Out to Us Mr. Delay's
  Tardey Attempts at Representing Our Interests.

At Mark's December 12th deposition we learned for the first time from Mr. McGranor's comments how late Mr. Delay was in filing our interrogatory answers and dealing with other case matters. Since the December 17th hearing, we reviewed the Defendants' two status reports [which Mr. Delay never sent us]. They point out several of his numerous delays.

---

[8] Deleted

{Summary of pleading} - 8

00008

In looking back, we realized Mr. Delay failed us in his first appearance representing us in front of your Honor at the August 21st "case management conference". We were ***HORRIFIED*** that Mr. Delay was both late to the hearing and was unprepared to answer his Honor's questions about our case. We subsequently learned that he had never reviewed our case documents-- even though he told me [Michele] 3 days before the hearing by telephone that he had received my document package. After the hearing, our package was, however, returned to us marked "undelivered."

In the package were copies of our original Kenyon Leases, the recorded Kenyon Leases, copies of all the paperwork pertaining to this case, evidence of differing amounts offered to us by Mr. Owen; copies of Mr. Owen's and 5 other Kenyon landmen's Ohio notary commissions.

In Mr. Owen's July 6 2012 Affidavit he stated that his LLC, RGOWEN & Assoc. LLC contracted with Kenyon to do land work and leasing. But that statement fails to point out that Mr. Owen did not incorporate the company until January, 2012, a year and half after negotiating our July 30, 2010 leases and over a year after becoming an Ohio notary based upon his being a *permanent resident of Ohio.*

Mr. Delay had all this information and certified copies of Mr. Owen's Ohio Notary Papers but failed to use them in any case discovery or even to depose Mr. Owen about his account of the Kenyon Leases' negotiations, different provisions, notarizations, telephone calls and meetings

Leading up to the December 17th hearing we again requested Mr. Delay [in repeated telephone calls and text messages] to file these "resident" related documents and hopefully point out how Mr. Owen's irregularities and inconsistencies demonstrate how, for jurisdictional and other purposes, his statements are unreliable and. in any event, he is playing fast and loose with this Honorable Court. We thought Ohio Notaries are to be honorable so they can be depended upon in verifying documents and people's identities.

Altogether, Delay just ignored our requests.

- *Belief Mr. Delay's Inactions Were Prejudicial to Our Case.*

During November and into December, we came to believe Mr. Delay's inactions and other failures substantially prejudiced the merits of our case and the view of this Honorable Court toward it and us through no fault of our own. As a result, we attempted to locate and engage outside counsel.

On December 12, 2012, the day of Mark's depositions, our suspicions were brought to light. Mr. McGranor stated that Mr. Delay had returned our answers to their interrogatories over 45 days late and he had not produced any documents until my November 15th deposition, when I volunteered my copies. Mr. Delay did not inform us about Mark's scheduled deposition until the previous day, December 11, while driving to Minerva for the deposition of the person who notarized our Kenyon Leases. Prior to that call, he hadn't even informed us of her deposition being taken. In retrospect it would have been more convenient for all parties to depose Mark at the same time of the bank notary in Minerva.

(Summary of pleading) - 9

1    On Thursday December 13, I contacted the Clerk of Courts Office for the Akron Office
2  of the Northern District of Ohio and spoke to Heidi, asking how I could enter our "Discovery",
    as to our side of the case in the record.  I understood that all "discovery" had to be filed by
3  midnight Friday, December 14. She put me on hold to speak either to your Honor or your law
4  clerk. She said to file any such "Discovery" we would have to release our attorney and represent
    ourselves.  I tried to get in touch with Mr. Delay both that Thursday and Friday, but to no avail.
5  I left a Thursday voicemail stating I wanted to meet him at the Clerk of Courts office the next
6  morning, in order to enter this information into the record before the cut-off time.
7    Our schedules presented their own issues. Mark had 2 MRI's scheduled for that Friday
   morning at Mercy Medical Hospital; so I made arrangements for a friend to pick him up when
8  his procedures were done and bring him to Akron. Mr. Delay never returned my telephone calls
9  or messages those two days as well on Saturday.
.0    In early December, we determined to seek other counsel who had significant federal court
   litigation and some oil and gas experience. However, we didn't know any attorneys or firms that
11 were not otherwise too busy or conflicted. An out of state attorney we had come across earlier
12 sought to help us find suitable counsel. Although not knowing our case's details, he had a hunch
13 that we made need new counsel because our case seemed to be suffering from my description of
   Mr. Delay's inattention. He researched and then contacted several firms. But they had conflicts,
14 time restraints or other problems preventing their getting involved. Finally, he discovered and
15 put us in touch with Mr. Hobson.
16    The next day, December 14th, Attorneys Hobson and Leiby briefly met with me while I
   was in Akron. They advised me they could not represent us until we released or terminated Mr.
17 Delay and that with such short notice they could not realistically get up to speed on all important
.8 events, details, documents and the case itself and were doubtful they could effectively represent
19 us at the Monday hearing due to such short notice and the lack of actions taken by Mr. Delay.
   Although Mr. Hobson ultimately agreed to appear before your Honor once the firm was free to
20 represent us, he became sick over-night Sunday and Mr. Leiby substituted Monday morning, at
21 the last moment.
22    I e-mailed Mr. Delay on Saturday, December 15, 2012 advising him that we had
   terminated him as our counsel and requesting him not to appear in court at Monday's hearing.
23 We did not want Mr. Delay to be present at, represent us or be able to speak on our behalf at the
24 hearing.  We felt he would only try to color matters to his benefit.
25    At the hearing and after Mr. Leiby requested a continuance as our newly hired
   counsel Mr. Delay, to our bewilderment, took over the lectern. He then re-directed everyone's
26 attention away from his failures and inactions to some settlement efforts of his that even Mr.
27 McGranor was not really aware of.  Mr. Delay did not advise us over the previous week-end of
28 any such settlement discussions or the existence of a December 14th dated "settlement letter"
29 and about which he spoke of to your Honor.  He only handed a copy of it to us shortly before the
   hearing[9].
30
31
32  [9] While claiming he had already mailed the December 14th to us on the 14th—the copy we eventually received had
   a December 17th post mark.

[Summary of pleading] - 10

00010

We felt ambushed by Mr. Delay and his attempt to force a settlement upon us, regardless of its contents or its effect upon our Original Kenyon Leases or the fraudulent Kenyon Leases filed in Carroll County. As we will discuss shortly, the proposed settlement offered us an outcome worse than if we accepted the fraudulent Kenyon Leases and never brought this lawsuit. It would also prevent us from defending our reputation in the community; discussing the merits and outcome of this litigation anyone other than our attorneys, including commenting to the State Bar Association or our neighbors about our litigation experience with Mr. Delay[10]

C.  *Settlement Documents; Significant Downside For Us;*
*Necessary Parties to Resolve Issues; Lack of Jurisdiction*
*Due to Lease Arbitration Clause and/or Diversity Issues*

The week before our last hearing on December 17, 2012 before your Honor was very stressful on a number of fronts. With respect to this case, the Defendants took the deposition of my husband, Mark Fritz, on Wednesday, December 12th. As previously pointed out, did not receive notice of its being scheduled but approximately 24 hours in advance. We had requested Mr. Delay have the deposition taken of Mark in Minerva or Carrollton to minimize the time away from the farm and to avoid extra travel to Akron. Mr. Delay initially agreed the December 11th morning – so I arranged for a deposition place in Carrollton – only to have Mr. Delay agree to its being taken the next morning in Akron- and lying to me the same day of his earlier agreement.

We were also very much concerned over Mr. Delay's not have taken Mr. Owen's deposition in spite of our numerous reminders and requests to do so and our fear that a failure to do so before the December 17th hearing would pose problems. I also was concerned that Mr. Delay had not undertaken other discovery of the Defendants and that we may be barred from submitting evidence or my "discovery" of Mr. Owen's continuing Ohio Notary status based upon his being a *permanent Ohio resident* and his affidavit to your honor that he was a *permanent resident of Oklahoma* in spite of his continuing to live in Ohio hotel/motels and doing land man work for Kenyon here and in West Virginia.

When Mr. Delay did not return any of my telephone calls or text messages from Wednesday of that week onward to December 17th, I decide to try to accomplish the equivalent by contacting the District Court's Clerk's Office about how to file "discovery"—my name for all the documents concerning Mr. Owens and Kenyon Energy's notary practices, among others. That proved unfeasible given the distances involved; my lack of knowledge of the appropriate methods and procedures; time constraints; our desire to employ new counsel who could and would represent our interests fully; and, as it turned out, my need to terminate Mr. Delay's employment via email instead of my mail or a meeting.

---

[10]  We have summarized those matters in Exhibit J.

[Summary of pleading] - 11

On top of those issues, I was concerned over my husband's severely degenerative arthritic lower back, his MRIs scheduled for that Friday and his recent epidurals which had produced no real improvement for him.

Over the Saturday and Sunday proceeding December 17th, I sent Mr. Delay an email message terminating his employment/representation of us and requesting him not to attend Monday's hearing; sought to finalize the employment of the Leiby firm to represent us going forward; and to prepare for the hearing before you honor. Mr. Delay never called us that weekend to discuss our dissatisfaction and termination of his services; what happened after Mark's deposition on December 12th; were there any settlement developments; and what would occur at Monday's hearing – something we expected would occur. Instead we heard nothing from Mr. Delay until Monday morning outside your Honor's Courtroom when he handed us a letter dated the previous Friday, December 14th and from which he read to his Honor.  As we previously said, Mr. Delays seizing the lectern and averting all issues leading up and concerning our termination of his services surprised us. And what happened afterwards bewildered us to the point of our being terribly disappointed and exhausted with everything.

Once we returned home, collected our senses and viewed the proposed documentation submitted to us by Chesapeake we came to the only conclusion possible that we were again being taken advantaged up. The terms and provisions of the settlement proved worse not only than our Original Kenyon Leases but also the fraudulent ones filed in Carroll County.

* Under our Original Kenyon Leases, if Kenyon, Chesapeake or a successor lessee did not drill a well within the 5 year primary term, the leases were terminated for all purposes.

* Under the fraudulent Kenyon Leases, if Kenyon, Chesapeake or a successor lessee did not drill a well within the 5 year primary term, the leases could be renewed for an additional five year period provided we were paid the same lease bonus we received upon signing the leases in July, 2010.

### * 5 Year Primary Term Extended to 7 Years

*Under the proposed Settlement, if Kenyon. Chesapeake or a successor lessee did not drill a well within the 5 year primary term, the leases would not terminate and we would not have to be paid another lease bonus; instead the proposed language extends the primary term another two years. So, instead of having a 5 year initial primary term, Chesapeake proposes we accept an additional 2 years. If that was what your Honor thought we agreed to on December 17th, the terminology and understanding of the contractual effect became mixed—and we did not intend to agree to that result and we will not agree to it upon needed reflection. To accept that result, we would be worse off than we were before we filed this suit.*

- ***Amended (and restated) Lease and Ratification Agreement Proposed***

[Summary of pleading] - 12

00012

*Additionally Chesapeake insists that we execute an Amended Lease and a Ratification type document a <u>ratification agreement was not discussed</u> to our knowledge in court on the 17th. And <u>we did not agree</u> to a ratification agreement and certainly not of the sort proposed recently by Chesapeake.*

- ***Amended Lease and Ratification Agreement Creates New Right for Chesapeake to Drill for and Use Water from our Lands***

*Further, Chesapeake has included provisions in the Amended Lease and Ratification Agreement that permits it, for the first time, to drill and use water from our lands. Again, to our knowledge <u>no right to drill and use water from our lands was discussed</u> in court on the 17th. And <u>we did not agree</u> to it.*

- ***The Ratification Agreement Includes CHK Utica and Total US E &P as Signees- When They are not Parties to this Case***

*Chesapeake's proposed <u>Ratification Agreement also provides for CHK Utica, LLC and TOTAL U.S. E & P, LLC be included as named lease signees.</u> We have signed no agreement with either of those entities and, at this moment, they are not parties to this proceeding, even though upon our review of the Carroll County Records, they are probably needed to resolve the issues presented by our complaint.*

- *Review of Carroll County Records in Light of Amended Lease & Ratification Agreement Shows Beldon & Blake, an Ohio Corporation, is an Owner Of Our Lease Which Under 28 USC 1332 Destroys Diversity*

Chesapeake's proposed Amended Lease and Ratification Agreement's inclusion of CHK Utica, LLC and Total US E& P as newly named parties caused us to review the Carroll County Records which show that Kenyon and Chesapeake Energy conveyed either all or virtually all their ownership interests in our Kenyon Leases to CHK Utica, LLC; Total US E&P, CGas Properties, LP and **Belden & Blake Corporation** pursuant to Assignments, Bill of Sale and Conveyances dated to be effective either as of November 1, 2011. Those assignments were recorded in Volume 77-Page 646; Volume 82-Page 2502 of the Carroll County Records. Since Beldon & Blake was an effective owner of our Kenyon Leases as of November 1, 2011, their being a necessary party to resolve the title, ownership, terms and provisions of our Kenyon Leases would destroy the Honorable Court's diversity of jurisdiction. The proposed Settlement Agreements are attached as **Exhibit K.**

- **Lack of Jurisdiction Due to Kenyon Leases' Arbitration Provisions**

**Your Honor, we re-read the July 30, 2010 Kenyon Leases we signed and also the ones filed in Carroll County as part of review of the proposed Settlement Agreement documents – to which we do not and cannot agree for among other reasons those stated in this letter. In doing so, we happened upon ARBITRATION PROVISIONS IN EACH**

00013

**LEASE WHICH REQUIRE ARBITRATION OF ANY DISPUTE OF THE LEASE TERMS AND PERFORMANCE, AS FOLLOWS:**

"**ARBITRATION: In the event of disagreement between Lessor and Lessee concerning this Lease ......., the resolution of all such disputes shall be determined by arbitration in accordance with rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment.**"

Thus, in conclusion, we respectively request this Honorable Court to recognize that the proposed settlement documents do not encompass or require our agreement; that because of the aforementioned stress, change of circumstances, twilight zone of our being between counsel, and the terms of the settlement agreement being to our disadvantage, we did not settle on those grounds and do not agree to settle with Mr. Owen, Chesapeake and Kenyon Energy. Further, we believe this Honorable Court's Jurisdiction is not effective due to either other parties, including a Ohio corporation (as opposed to a limited liability company) [Belden & Blake] being a necessary party to resolve all disputes involving the Kenyon Lease and further and finally because the Kenyon Leases include clauses that require Arbitration to resolve lease disputes like the instant ones. Had Mr. Delay informed us of those arbitration provisions we would not have brought this action.

Sincerely Yours,



Fritz Dairy Farm, L.L.C.
Mark R. & Michele E. Fritz
6301 Mackel Rd. N.E.
Minerva, Ohio 44657

Cc:  We are mailing a copy of this letter and all attachments today, Tuesday, January 14, 2012 via first class mail to:

Mr. Graynor, Vorys, Slater, Seymour, 52 East Gay Street, PO Box 1008, Columbus, Ohio;
Mr. Brandon Delay, 24500 Center Ridge Road, Suite 160, West Lake, Ohio 44145; and to
Mr. Steven Leiby, 388 S. Main Street, Suite 402, Akron, Ohio.44311

[Summary of pleading] - 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

[Summary of pleading] - 15

**A-1**

**PAID-UP**
**OIL & GAS LEASE**

Lease No. _____

04/10 - OH

This Lease, made this **27th** day of **July, 2010**, by and between **Fritz Dairy Farms, LLC**, of **6301 Mackel Rd., Minerva, OH 44657**, hereinafter collectively called "Lessor," and **Kenyon Energy LLC, 1425 S. Main St.,North Canton, OH 44720**, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment; to use and occupy the subsurface for a wellbore or wellbores to drill across, through and under the Leasehold.

DESCRIPTION. See **Exhibit B** for lands described in **AUGUSTA and WASHINGTON** Township, **CARROLL** County, OHIO .

| | | |
|---|---|---|
| Township 015N; Range 005W; Section:29 | | Parcel #: 0100063000 |
| Township 014N; Range 005W; Section:29 | | Parcel #: 3400296009 |
| Township 014N; Range 005W; Section:29 | | Parcel #: 3400296010 |

**See attached Exhibit 'A' which is unrecorded and Exhibit 'B' attached hereto and made a part hereof.**

and described for the purposes of this agreement as containing a total of **102.8200** Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of **FIVE (5)** years from 12:00 A.M. **July 27, 2010** (effective date) to 11:59 P.M. **July 27, 2015** (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

~~EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.~~ *MRP MEF*

## NO AUTOMATIC TERMINATION OR FORFEITURE

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of **five dollars ($5.00)** per net acre per year payable in advance. **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor a Royalty equal to one-eighth (1/8) of the net revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.

2. GAS: To pay Lessor an amount equal to one-eighth (1/8) of the net revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that is awaiting completion (such as hydraulic fracture stimulation), or that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and

00017

payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means. In the event the leased lands are encumbered by a prior mortgage, then, notwithstanding anything contained herein to the contrary, Lessee shall have the right to suspend the payment of any royalties due hereunder, without liability for interest, until such time as Lessor obtains at its own expense a subordination of the mortgage in a form acceptable to Lessee.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease, and the local property tax assessment calculation of the lands covered by the Lease, or the deeded acreage amount, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well on the Leasehold within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

DISPOSAL AND INJECTION WELLS. Lessor hereby grants to Lessee the right to drill wells and/or re-enter existing wells, including necessary location, roadway and pipeline easements and rights of way, on any part of the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, other than a potable water strata, of air, gas, brine, completion and production fluids, waste water and any hydrocarbon related substances from any source, including, but not limited to wells on the Leasehold or lands pooled or unitized therewith or from properties and lands outside the Leasehold or lands pooled or unitized therewith, and to conduct all operations as may be required, for so long as necessary and required by Lessee for purposes as herein provided. If, at the expiration of the primary term, Lessee is disposing and/or injecting into any subsurface strata underlying the Leasehold or lands pooled or unitized therewith or conducting operations for such disposal and/or injection and this lease is not being maintained by any other provision contained herein and no other payments are being made to Lessor as prescribed hereunder, Lessee shall pay to Lessor the sum of one thousand dollars ($1,000.00) per year,

proportionately reduced to Lessor's ownership in the Leasehold and surface as it bears to the full and undivided estate, beginning on the next anniversary date of this Lease and said payment and term of this Lease, insofar as to terms and provisions contained herein applicable to disposal and injection wells, shall continue annually thereafter for so long as necessary and required by Lessee for purposes as herein provided and until all disposal and/or injection wells located on the Leasehold or on lands pooled or unitized therewith are plugged and abandoned. Lessor agrees that if required by Lessee, regulatory agency or governmental authority having jurisdiction, Lessor shall enter a separate Disposal and Injection Agreement with Lessee for the purposes as herein provided.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein and in the associated Order of Payment (if any). No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

TITLE CURATIVE. Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

See attached Exhibit 'A' which is unrecorded and Exhibit 'B' attached hereto and made a part hereof.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

Fritz Dairy Farms, LLC

By: Mark R. Fritz, Owner

Document prepared by: Kenyon Energy LLC, 1425 S. Main St., North Canton, OH 44720

## CORPORATE ACKNOWLEDGEMENT

STATE OF ___Ohio___ )
                     ) SS:
COUNTY OF ___Carroll___ )

On this, the __30th__ day of __July__ , __2010__ , before me a notary public, the undersigned authority, personally appeared **Mark R. Fritz**, who acknowledged himself to be the **Owner** of **Fritz Dairy Farms LLC**, and that they as such **Owner**, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by themselves as **Fritz Dairy Farms LLC**, a _____ corporation.

IN WITNESS WHEREOF, I here unto set my hand and official seal.

Donna J. Kandel
Notary Public, State Of Ohio
My Commission Expires Sept. 25, 2010

My Commission expires: __9-25-10__

Signature/Notary Public: _Donna J. Kandel_

Name/Notary Public (print): _Donna J Kandel_

Recorder: Return to Kenyon Energy LLC, 1425 S. Main St., North Canton, OH 44720

30929  0CAR

00020

# EXHIBIT "A"

This Exhibit "A" is attached to and made a part of that certain Oil and Gas Lease dated **July 27, 2010**, by and between **Fritz Dairy Farms, LLC**, as Lessor, and **Kenyon Energy LLC**, as Lessee. If any of the following provisions conflict with or are inconsistent with the printed provisions or terms of this Lease, the following provisions shall control.

**FENCE:** Upon Lessor's written request, Lessee shall at its sole cost, expense, and design install fencing for the protection of livestock around any well site(s), tank battery (ies) or facility (ies) installed on the leased premises by Lessee provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations.

**GATE:** Upon the written request of Lessor, Lessee shall install at its sole cost and expense a gate at the entrance of any road constructed by Lessee on the leased premises provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations.

**DAMAGES:** Provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations, Lessee agrees to pay Lessor at a reasonable rate for all surface damages caused by Lessee's operations to growing crops, trees and timber.

**LOCATION APPROVAL:** Provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations, Lessee and Lessor to mutually agree on all drill site, pipeline and access road locations, consent not to be unreasonably withheld, delayed or conditioned by Lessor.

**MARKET ENHANCEMENT:** It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this Lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements.

**FREE GAS - Annual Payment of $2,000 in Lieu of Free Gas Clause:** If, and only if, Lessor is entitled to receive free gas, whether by virtue of the ownership of the surface of the leased premises and either all the oil and gas underlying the same, or an undivided interest in the oil and gas underlying the same, or the express record title right to receive free gas, then upon approval of Lessor's written request for free gas, and after Lessor has obtained 100% written consent from all owners having the legal right to receive revenue from a productive well on the leased premises, and Lessor's execution of Lessee's Delivery of Free Gas and Overburn Gas Agreement, one (1) Lessor may lay a line to any one (1) producing gas well on the leased premises and take up to one hundred thousand (100,000) cubic feet of gas during any single twelve (12) month period for domestic use in one currently existing primary dwelling owned at all times by Lessor and located within a one thousand (1,000') foot radius from said well on the leased premises; subject, however to such well being capable of producing in commercial quantities and of commercial quality suitable for domestic use; the existence and availability of a local distribution company willing to administer, control, monitor, and service such free gas usage to the specifications and requirements of Lessee; subject further to the use, maintenance, operation, production, limited deliverability, and right of shut-in and/or plugging and abandonment by Lessee of its well(s), equipment and pipelines on the leased premises. Lessor shall secure such gas by service line laid to and connected to such well on said leased premises in accordance with all applicable laws, rules and regulations, the point of connection to be designated by Lessee and Lessor shall assume the entire risk and all expenses associated with securing and using such gas and agrees, to the fullest extent of applicable law, to release and indemnify Lessee from and against any and all claims or causes of action arising therefrom or relating thereto. If Lessor in any year uses gas in excess of the quantity provided for herein, Lessor shall pay for all overburn gas at the current established retail rate in the area or at the rate charged by the local distribution company administering the free gas usage, but Lessee assumes no obligation to furnish Lessor with gas in excess of the quantity provided herein. The measurement and regulation of such gas shall be by meter regulators furnished by Lessor, subject to Lessee's approval, and set at the tap on the well. Notwithstanding the foregoing provisions, in the event the leased premises are made a part of a unit or pooled with other acreage and the well(s) has been drilled on another lease, the Lessor hereunder will not be entitled to use wellhead gas, free or otherwise. The rights granted herein related to free gas are not assignable or transferable to a party not currently owning an interest in the leasehold premises. Notwithstanding the foregoing, the specific terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas. Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied. At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant(s) of One Thousand and 00/100 Dollars ($2,000.00) in lieu of providing free gas and said sum shall thereafter permanently discharge Lessee's obligation under this Lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

SIGNED FOR IDENTIFICATION ONLY:

Fritz Dairy Farms, LLC

By: Mark R. Fritz, Owner

## EXHIBIT "B"

This Exhibit "B" is attached to and made part of that certain Oil and Gas Lease dated 7/27/2010, by and between Fritz Dairy Farms, LLC of 6301 Mackel Rd. Minerva, OH 44657 as Lessor and Kenyon Energy LLC, 1425 S. Main St., North Canton, OH 44720, as Lessee, and is made a part of said lease as if incorporated therein.

Property Tax Parcel Identification Number: 01-00063.000

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Section Line |
| On the East by lands now or formerly of | Mackel Road |
| On the South by lands now or formerly of | Small Tracts |
| On the West by lands now or formerly of | Rowlands |

Including lands acquired from Wilson Lee Buxton, by virtue of deed dated 10/13/09, and recorded in Book 56, Page 990 and described for the purposes of this agreement as containing a total of 92.5880 Leasehold acres

Property Tax Parcel Identification Number: 34-00296.009

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Small Tracts |
| On the East by lands now or formerly of | Small Tracts |
| On the South by lands now or formerly of | Carroll County |
| On the West by lands now or formerly of | Kinsington Road |

including lands acquired from Charles D. Carter, Inc., by virtue of deed dated 08/19/09, and recorded in Book 55, Page 886 and described for the purposes of this agreement as containing a total of 5.1160 Leasehold acres

Property Tax Parcel Identification Number: 34-00296.010

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Small Tracts |
| On the East by lands now or formerly of | Small Tracts |
| On the South by lands now or formerly of | Carroll County |
| On the West by lands now or formerly of | Kinsington Road |

including lands acquired from Charles D. Carter, Inc., by virtue of deed dated 08/19/09, and recorded in Book 55, Page 886 and described for the purposes of this agreement as containing a total of 5.1160 Leasehold acres

SIGNED FOR IDENTIFICATION ONLY:

Fritz Dairy Farms, LLC

By: Mark R. Fritz, Owner



A-1

COPY

## PAID-UP
## OIL & GAS LEASE

Lease No. _____

04/10 - OH

This Lease, made this **27th** day of **July, 2010**, by and between **Mark R. Fritz and Michelle E. Fritz, husband and wife**, of **6301 Maekel Rd. NE. Minerva, OH 44657**, hereinafter collectively called "Lessor," and **Kenyon Energy LLC**, 1425 S. Main St.,North Canton, OH 44720, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment; to use and occupy the subsurface for a wellbore or wellbores to drill across, through and under the Leasehold.

DESCRIPTION. See **Exhibit B** for lands described in **AUGUSTA Township, CARROLL County, OHIO**

| | |
|---|---|
| Township 015N; Range 005W; Section:30 | Parcel #: 0100108000 |
| Township 015N; Range 005W; Section:30 | Parcel #: 0100427001 |

### See attached Exhibit 'A' which is unrecorded and Exhibit 'B' attached hereto and made a part hereof.

and described for the purposes of this agreement as containing a total of 39.4635 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of **FIVE (5)** years from 12:00 A.M. **July 27, 2010** (effective date) to 11:59 P.M. **July 27, 2015** (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

00024



~~EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.~~ _initial_

NO AUTOMATIC TERMINATION OR FORFEITURE  **MRF MEF**

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor a Royalty equal to one-eighth (1/8) of the net revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.

2. GAS: To pay Lessor an amount equal to one-eighth (1/8) of the net revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that is awaiting completion (such as hydraulic fracture stimulation), or that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and

payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means. In the event the leased lands are encumbered by a prior mortgage, then, notwithstanding anything contained herein to the contrary, Lessee shall have the right to suspend the payment of any royalties due hereunder, without liability for interest, until such time as Lessor obtains at its own expense a subordination of the mortgage in a form acceptable to Lessee.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease, and the local property tax assessment calculation of the lands covered by the Lease, or the deeded acreage amount, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well on the Leasehold within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

DISPOSAL AND INJECTION WELLS. Lessor hereby grants to Lessee the right to drill wells and/or re-enter existing wells, including necessary location, roadway and pipeline easements and rights of way, on any part of the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, other than a potable water strata, of air, gas, brine, completion and production fluids, waste water and any hydrocarbon related substances from any source, including, but not limited to wells on the Leasehold or lands pooled or unitized therewith or from properties and lands outside the Leasehold or lands pooled or unitized therewith, and to conduct all operations as may be required, for so long as necessary and required by Lessee for purposes as herein provided. If, at the expiration of the primary term, Lessee is disposing and/or injecting into any subsurface strata underlying the Leasehold or lands pooled or unitized therewith or conducting operations for such disposal and/or injection and this lease is not being maintained by any other provision contained herein and no other payments are being made to Lessor as prescribed hereunder, Lessee shall pay to Lessor the sum of one thousand dollars ($1,000.00) per year.

00026

proportionately reduced to Lessor's ownership in the Leasehold and surface as it bears to the full and undivided estate, beginning on the next anniversary date of this Lease and said payment and term of this Lease, insofar as to terms and provisions contained herein applicable to disposal and injection wells, shall continue annually thereafter for so long as necessary and required by Lessee for purposes as herein provided and until all disposal and/or injection wells located on the Leasehold or on lands pooled or unitized therewith are plugged and abandoned. Lessor agrees that if required by Lessee, regulatory agency or governmental authority having jurisdiction, Lessor shall enter a separate Disposal and Injection Agreement with Lessee for the purposes as herein provided.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein and in the associated Order of Payment (if any). No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

TITLE CURATIVE. Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

See attached Exhibit 'A' which is unrecorded and Exhibit 'B' attached hereto and made a part hereof.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

_____ (Seal)
Mark R. Fritz

_____ (Seal)
Michelle E. Fritz

Document prepared by: Kenyon Energy LLC, 1425 S. Main St., North Canton, OH 44720

## ACKNOWLEDGEMENT

STATE OF __Ohio__

COUNTY OF __Carroll__

: SS:

On this, the __30th__ day of __July__, __2010__, before me a notary public, the undersigned officer, personally appeared **Mark R. Fritz and Michelle E. Fritz, husband and wife,**

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I here unto set my hand and official seal

My Commission Expires: __9-25-10__

Signature Notary Public: _____

Name Notary Public (print): __Donna J Kandel__

Donna J. Kandel
Notary Public, State Of Ohio
My Commission Expires Sept. 25, 2010

Recorder: Return to Kenyon Energy LLC, 1425 S. Main St., North Canton, OH 44720

00028

# EXHIBIT "A"

This Exhibit "A" is attached to and made a part of that certain Oil and Gas Lease dated **July 27, 2010**, by and between **Mark R. Fritz and Michelle E. Fritz, husband and wife**, as Lessor, and **Kenyon Energy LLC**, as Lessee. If any of the following provisions conflict with or are inconsistent with the printed provisions or terms of this Lease, the following provisions shall control.

**FENCE:** Upon Lessor's written request, Lessee shall at its sole cost, expense, and design install fencing for the protection of livestock around any well site(s), tank battery (ies) or facility (ies) installed on the leased premises by Lessee provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations.

**GATE:** Upon the written request of Lessor, Lessee shall install at its sole cost and expense a gate at the entrance of any road constructed by Lessee on the leased premises provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations.

**DAMAGES:** Provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations, Lessee agrees to pay Lessor at a reasonable rate for all surface damages caused by Lessee's operations to growing crops, trees and timber.

**LOCATION APPROVAL:** Provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations, Lessee and Lessor to mutually agree on all drill site, pipeline and access road locations, consent not to be unreasonably withheld, delayed or conditioned by Lessor.

**MARKET ENHANCEMENT:** It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this Lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements.

**FREE GAS - Annual Payment of $2,000 in Lieu of Free Gas Clause:** If, and only if, Lessor is entitled to receive free gas, whether by virtue of the ownership of the surface of the leased premises and either all the oil and gas underlying the same, or an undivided interest in the oil and gas underlying the same, or the express record title right to receive free gas, then upon approval of Lessor's written request for free gas, and after Lessor has obtained 100% written consent from all owners having the legal right to receive revenue from a productive well on the leased premises, and Lessor's execution of Lessee's Delivery of Free Gas and Overburn Gas Agreement, one (1) Lessor may lay a line to any one (1) producing gas well on the leased premises and take up to one hundred thousand (100,000) cubic feet of gas during any single twelve (12) month period for domestic use in one currently existing primary dwelling owned at all times by Lessor and located within a one thousand (1,000') foot radius from said well on the leased premises; subject, however to such well being capable of producing in commercial quantities and of commercial quality, suitable for domestic use; the existence and availability of a local distribution company willing to administer, control, monitor, and service such free gas usage to the specifications and requirements of Lessee; and subject further to the use, maintenance, operation, production, limited deliverability, and right of shut-in and/or plugging and abandonment by Lessee of its well(s), equipment and pipelines on the leased premises. Lessor shall secure such gas by service line laid to and connected to such well on said leased premises in accordance with all applicable laws, rules and regulations, the point of connection to be designated by Lessee and Lessor shall assume the entire risk and all expenses associated with securing and using such gas and agrees, to the fullest extent of applicable law, to release and indemnify Lessee from and against any and all claims or causes of action arising therefrom or relating thereto. If Lessor in any year uses gas in excess of the quantity provided for herein, Lessor shall pay for all overburn gas at the current established retail rate in the area or at the rate charged by the local distribution company administering the free gas usage, but Lessee assumes no obligation to furnish Lessor with gas in excess of the quantity provided herein. The measurement and regulation of such gas shall be by meter regulators furnished by Lessor, subject to Lessee's approval, and set at the tap on the well. Notwithstanding the foregoing provisions, in the event the leased premises are made a part of a unit or pooled with other acreage and the well(s) has been drilled on another lease, the Lessor hereunder will not be entitled to use wellhead gas, free or otherwise. The rights granted herein related to free gas are not assignable or transferable to a party not currently owning an interest in the leasehold premises. Notwithstanding the foregoing, the specific terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas. Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied. At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant(s) of One Thousand and 00/100 Dollars ($2,000.00) in lieu of providing free gas and said sum shall thereafter permanently discharge Lessee's obligation under this Lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

SIGNED FOR IDENTIFICATION ONLY:

_____ (Seal)
Mark R. Fritz

_____ (Seal)
Michelle E. Fritz

## EXHIBIT "B"

This Exhibit "B" is attached to and made part of that certain Oil and Gas Lease dated **7/27/2010**, by and between **Mark R. Fritz and Michelle E. Fritz, husband and wife** of **6301 Mackel Rd. NE Minerva, OH 44657** as Lessor and Kenyon Energy LLC, 1425 S. Main St., North Canton, OH 44720, as Lessee, and is made a part of said lease as if incorporated therein.

Property Tax Parcel Identification Number: 01-00427.001

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Section Line |
| On the East by lands now or formerly of | Section Line |
| On the South by lands now or formerly of | Mackel Road |
| On the West by lands now or formerly of | Mackel Road |

including lands acquired from Anthony Walchak, by virtue of deed dated 12/17/91, and recorded in Book 244, Page 224 and described for the purposes of this agreement as containing a total of 27.3465 Leasehold acres

Property Tax Parcel Identification Number: 01-00108.000

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Small Tracts |
| On the East by lands now or formerly of | Schmuck; Flannery |
| On the South by lands now or formerly of | Small Tracts |
| On the West by lands now or formerly of | Macaw Road |

including lands acquired from Anna Fritz, by virtue of deed dated 06/30/09, and recorded in Book 57, Page 1817 and described for the purposes of this agreement as containing a total of 12.1170 Leasehold acres

SIGNED FOR IDENTIFICATION ONLY:

_____ (Seal)
Mark R. Fritz

_____ (Seal)
Michelle E. Fritz

A-2

```
Instrument        Book Page
201000002894 OR    62  163
```

```
201000002894   Jack Simmons
Filed for Record in
CARROLL COUNTY, OHIO
PATRICIA J. OYER, RECORDER
08-13-2010 At 09:02 am.
OIL GAS LS        60.00
OR Book       62 Page  163 -  168
```

## PAID-UP
## OIL & GAS LEASE

Lease No. _____

04/10 - OH

This Lease, made this **27th** day of **July, 2010**, by and between **Fritz Dairy Farms, LLC**, of **6301 Mackel Rd., Minerva, OH 44657**, hereinafter collectively called "Lessor." and **Kenyon Energy LLC**, 1425 S. Main St., North Canton, OH 44720, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

**LEASING CLAUSE.** Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment; to use and occupy the subsurface for a wellbore or wellbores to drill across, through and under the Leasehold.

**DESCRIPTION.** See Exhibit B for lands described in **AUGUSTA** and **WASHINGTON** Township, **CARROLL** County, **OHIO**

| | |
|---|---|
| **Township 015N; Range 005W; Section:29** | Parcel #: 0100063000 |
| **Township 014N; Range 005W; Section:29** | Parcel #: 3400296009 |
| **Township 014N; Range 005W; Section:29** | Parcel #: 3400296010 |

### See attached Exhibit 'A' which is unrecorded and Exhibit 'B' attached hereto and made a part hereof.

and described for the purposes of this agreement as containing a total of 102.8200 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

**LEASE TERM.** This Lease shall remain in force for a primary term of **FIVE (5)** years from 12:00 A.M. **July 27, 2010** (effective date) to 11:59 P.M. **July 27, 2015** (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

00032

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor a Royalty equal to one-eighth (1/8) of the net revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.

2. GAS: To pay Lessor an amount equal to one-eighth (1/8) of the net revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that is awaiting completion (such as hydraulic fracture stimulation), or that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and

payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means. In the event the leased lands are encumbered by a prior mortgage, then, notwithstanding anything contained herein to the contrary, Lessee shall have the right to suspend the payment of any royalties due hereunder, without liability for interest, until such time as Lessor obtains at its own expense a subordination of the mortgage in a form acceptable to Lessee.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease, and the local property tax assessment calculation of the lands covered by the Lease, or the deeded acreage amount, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well on the Leasehold within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

DISPOSAL AND INJECTION WELLS. Lessor hereby grants to Lessee the right to drill wells and/or re-enter existing wells, including necessary location, roadway and pipeline easements and rights of way, on any part of the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, other than a potable water strata, of air, gas, brine, completion and production fluids, waste water and any hydrocarbon related substances from any source, including, but not limited to wells on the Leasehold or lands pooled or unitized therewith or from properties and lands outside the Leasehold or lands pooled or unitized therewith, and to conduct all operations as may be required, for so long as necessary and required by Lessee for purposes as herein provided. If, at the expiration of the primary term, Lessee is disposing and/or injecting into any subsurface strata underlying the Leasehold or lands pooled or unitized therewith or conducting operations for such disposal and/or injection and this lease is not being maintained by any other provision contained herein and no other payments are being made to Lessor as prescribed hereunder, Lessee shall pay to Lessor the sum of one thousand dollars ($1,000.00) per year,

proportionately reduced to Lessor's ownership in the Leasehold and surface as it bears to the full and undivided estate, beginning on the next anniversary date of this Lease and said payment and term of this Lease, insofar as to terms and provisions contained herein applicable to disposal and injection wells, shall continue annually thereafter for so long as necessary and required by Lessee for purposes as herein provided and until all disposal and/or injection wells located on the Leasehold or on lands pooled or unitized therewith are plugged and abandoned. Lessor agrees that if required by Lessee, regulatory agency or governmental authority having jurisdiction, Lessor shall enter a separate Disposal and Injection Agreement with Lessee for the purposes as herein provided.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein and in the associated Order of Payment (if any). No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

TITLE CURATIVE. Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

Instrument                Book Page
201000002894 OR            62  167

See attached Exhibit 'A' which is unrecorded and Exhibit 'B' attached hereto and made a part hereof.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

Fritz Dairy Farms, LLC

*Fritz Dairy Farm LLC*

By: Mark R. Fritz, Owner

*By Mark R. Fritz, Owner*

Document prepared by: Kenyon Energy LLC, 1425 S. Main St., North Canton, OH 44720

## CORPORATE ACKNOWLEDGEMENT

STATE OF  Ohio                              )
                                            ) SS:
COUNTY OF  Carroll                          )

On this, the 30th day of July , 2010 , before me a notary public, the undersigned authority, personally appeared **Mark R. Fritz**, who acknowledged himself to be the **Owner** of **Fritz Dairy Farms LLC**, and that they as such **Owner**, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by themselves as **Fritz Dairy Farms LLC**, a _____ corporation.

IN WITNESS WHEREOF, I here unto set my hand and official seal.

Donna J. Kandel
Notary Public, State Of Ohio
My Commission expires:  9-25-10    My Commission Expires Sept. 25, 2010

Signature/Notary Public:  *Donna J Kandel*

Name/Notary Public (print):  Donna J Kandel

Recorder: Return to Kenyon Energy LLC, 1425 S. Main St., North Canton, OH 44720

36929  0CAR

00036

## EXHIBIT "B"

This Exhibit "B" is attached to and made part of that certain Oil and Gas Lease dated 7/27/2010, by and between Fritz Dairy Farms, LLC of 6301 Mackel Rd. Minerva, OH 44657 as Lessor and Kenyon Energy LLC, 1425 S. Main St., North Canton, OH 44720, as Lessee, and is made a part of said lease as if incorporated therein.

Property Tax Parcel Identification Number: 01-00063.000

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Section Line |
| On the East by lands now or formerly of | Mackel Road |
| On the South by lands now or formerly of | Small Tracts |
| On the West by lands now or formerly of | Rowlands |

including lands acquired from Wilson Lee Buxton, by virtue of deed dated 10/13/09, and recorded in Book 56, Page 990 and described for the purposes of this agreement as containing a total of 92.5880 Leasehold acres

Property Tax Parcel Identification Number: 34-00296.009

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Small Tracts |
| On the East by lands now or formerly of | Small Tracts |
| On the South by lands now or formerly of | Carroll County |
| On the West by lands now or formerly of | Kinsington Road |

including lands acquired from Charles D. Carter, Inc., by virtue of deed dated 08/19/09, and recorded in Book 55, Page 886 and described for the purposes of this agreement as containing a total of 5.1160 Leasehold acres

Property Tax Parcel Identification Number: 34-00296.010

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Small Tracts |
| On the East by lands now or formerly of | Small Tracts |
| On the South by lands now or formerly of | Carroll County |
| On the West by lands now or formerly of | Kinsington Road |

including lands acquired from Charles D. Carter, Inc., by virtue of deed dated 08/19/09, and recorded in Book 55, Page 886 and described for the purposes of this agreement as containing a total of 5.1160 Leasehold acres

## SIGNED FOR IDENTIFICATION ONLY:

Fritz Dairy Farms, LLC

By: Mark R. Fritz, Owner

00037

A-2

Instrument                Book Page
201000002896 OR            62  176

201000002896  Jack Simmons
Filed For Record in
CARROLL COUNTY, OHIO
PATRICIA J. OYER, RECORDER
08-13-2010 At 09:02 am.
OIL GAS LS        60.00
OR Book      62 Page  176 - 181

# PAID-UP
# OIL & GAS LEASE

04/10 - OH

Lease No. _____

This Lease, made this **27th** day of **July, 2010**, by and between **Mark R. Fritz and Michelle E. Fritz, husband and wife,** of **6301 Mackel Rd. NE, Minerva, OH 44657**, hereinafter collectively called "Lessor." and **Kenyon Energy LLC**, 1425 S. Main St.,North Canton, OH 44720, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment; to use and occupy the subsurface for a wellbore or wellbores to drill across, through and under the Leasehold.

DESCRIPTION. See **Exhibit B** for lands described in **AUGUSTA Township, CARROLL** County, **OHIO**

Township 015N; Range 005W; Section:30     Parcel #: 0100108000
Township 015N; Range 005W; Section:30     Parcel #: 0100427001

## See attached Exhibit 'A' which is unrecorded and Exhibit 'B' attached hereto and made a part hereof.

and described for the purposes of this agreement as containing a total of 39.4635 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of **FIVE (5)** years from 12:00 A.M. **July 27, 2010** (effective date) to 11:59 P.M. **July 27, 2015** (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

00038

Instrument        Book Page
201000002896 OR     62  177

## NO AUTOMATIC TERMINATION OR FORFEITURE

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor a Royalty equal to one-eighth (1/8) of the net revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.

2. GAS: To pay Lessor an amount equal to one-eighth (1/8) of the net revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that is awaiting completion (such as hydraulic fracture stimulation), or that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means. In the event the leased lands are encumbered by a prior mortgage, then, notwithstanding anything contained herein to the contrary, Lessee shall have the right to suspend the payment of any royalties due hereunder, without liability for interest, until such time as Lessor obtains at its own expense a subordination of the mortgage in a form acceptable to Lessee.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease, and the local property tax assessment calculation of the lands covered by the Lease, or the deeded acreage amount, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well on the Leasehold within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized thereto to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

DISPOSAL AND INJECTION WELLS. Lessor hereby grants to Lessee the right to drill wells and/or re-enter existing wells, including necessary location, roadway and pipeline easements and rights of way, on any part of the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, other than a potable water strata, of air, gas, brine, completion and production fluids, waste water and any hydrocarbon related substances from any source, including, but not limited to wells on the Leasehold or lands pooled or unitized therewith or from properties and lands outside the Leasehold or lands pooled or unitized therewith, and to conduct all operations as may be required, for so long as necessary and required by Lessee for purposes as herein provided. If, at the expiration of the primary term, Lessee is disposing and/or injecting into any subsurface strata underlying the Leasehold or lands pooled or unitized therewith or conducting operations for such disposal and/or injection and this lease is not being maintained by any other provision contained herein and no other payments are being made to Lessor as prescribed hereunder, Lessee shall pay to Lessor the sum of one thousand dollars ($1,000.00) per year,

proportionately reduced to Lessor's ownership in the Leasehold and surface as it bears to the full and undivided estate, beginning on the next anniversary date of this Lease and said payment and term of this Lease, insofar as to terms and provisions contained herein applicable to disposal and injection wells, shall continue annually thereafter for so long as necessary and required by Lessee for purposes as herein provided and until all disposal and/or injection wells located on the Leasehold or on lands pooled or unitized therewith are plugged and abandoned. Lessor agrees that if required by Lessee, regulatory agency or governmental authority having jurisdiction, Lessor shall enter a separate Disposal and Injection Agreement with Lessee for the purposes as herein provided.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein and in the associated Order of Payment (if any). No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

TITLE CURATIVE. Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

Instrument     Book Page
201000002896 OR    62   180

**See attached Exhibit 'A' which is unrecorded and Exhibit 'B' attached hereto and made a part hereof.**

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

_____ (Seal)
**Mark R. Fritz**

_____ (Seal)
**Michelle E. Fritz**

Document prepared by: Kenyon Energy LLC, 1425 S. Main St., North Canton, OH 44720

## ACKNOWLEDGEMENT

STATE OF _____ )
                                         ) SS:
COUNTY OF _____ )

On this, the _____ day of _____, _____, before me a notary public, the undersigned officer, personally appeared **Mark R. Fritz and Michelle E. Fritz, husband and wife,** _____

known to me (or satisfactorily proven) to be the person(s) whose names(s) is/are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I here unto set my hand and official seal.

                                             Donna J. Kandel
                                     Notary Public, State Of Ohio

My Commission Expires:   9-25-10     My Commission Expires Sept. 25, 2010

Signature/Notary Public:   Donna J Kandel

Name/Notary Public (print):   Donna J Kandel

Return _____ to Kenyon Energy LLC, 1425 S. Main St., North Canton, OH 44720

34387   WCAR

00042

## EXHIBIT "B"

This Exhibit "B" is attached to and made part of that certain Oil and Gas Lease dated <u>7/27/2010</u>, by and between <u>**Mark R. Fritz**</u>
<u>**and Michelle E. Fritz, husband and wife**</u> of <u>6301 Mackel Rd. NE Minerva, OH 44657</u> as Lessor and **Kenyon Energy LLC,**
**1425 S. Main St., North Canton, OH 44720,** as Lessee, and is made a part of said lease as if incorporated therein.

**Property Tax Parcel Identification Number: 01-00427.001**

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Section Line |
| On the East by lands now or formerly of | Section Line |
| On the South by lands now or formerly of | Mackel Road |
| On the West by lands now or formerly of | Mackel Road |

including lands acquired from Anthony Walchak, by virtue of deed dated 12/17/91, and recorded in Book
244, Page 224 and described for the purposes of this agreement as containing a total of 27.3465 Leasehold
acres

**Property Tax Parcel Identification Number: 01-00108.000**

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Small Tracts |
| On the East by lands now or formerly of | Schmuck; Flannery |
| On the South by lands now or formerly of | Small Tracts |
| On the West by lands now or formerly of | Macaw Road |

including lands acquired from Anna Fritz, by virtue of deed dated 06/30/09, and recorded in Book 57, Page
1817 and described for the purposes of this agreement as containing a total of 12.1170 Leasehold acres

**SIGNED FOR IDENTIFICATION ONLY:**

_____ (Seal)
Mark R. Fritz

_____ (Seal)
Michelle E. Fritz

```
                                         Instrument        Book Page
                                         201100005292 OR     74 2444
```

```
201100005292 Kenyon
Filed for Record in
CARROLL COUNTY, OHIO
PATRICIA J. OYER, RECORDER
09-16-2011 At 09:49 am.
PT REL LS        32.00
OR Book      74 Page 2444 - 2444 ✓
```

## PARTIAL RELEASE OF OIL AND GAS LEASE

STATE OF OHIO                    )
                                 )  §
COUNTY OF CARROLL                )

**WHEREAS**, a certain Oil and Gas Lease, dated July 27th, 2010, given by **Mark R. Fritz and Michelle E. Fritz, husband and wife**, Lessor, to **Kenyon Energy LLC, 1425 S. Main St., North Canton, OH 44720**, Lessee,  and covering the following described lands in Augusta Township, Carroll County, Ohio:

Sec 30 - T 15N - R 5W

Parcel #: 0100108000
Parcel #: 0100427001

Lease being recorded in the office of the County Clerk in and for said County, in Book/Page 62/176 reference to which is hereby made; and

**NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS**, That, **Kenyon Energy LLC**, does hereby cancel, release, relinquish and surrender all its right, title and interest in and to the said Oil and Gas Lease **insofar and only insofar** as it covers the following described lands to wit:

Parcel #: 0100108000

**EXECUTED** this 12 day of September, 2011.

Kenyon Energy LLC

By: _____
Philip M. Lowry – as Manager

### CORPORATE ACKNOWLEDGEMENT

STATE OF OKLAHOMA               )
                                )  SS:
COUNTY OF OKLAHOMA              )

On this the 12 th day of September, 20 11, before me the undersigned, a Notary Public in and for said state, personally appeared Philip M. Lowry, personally known to me (or satisfactorily proven), who acknowledged himself to be the Manager of Kenyon Energy LLC and that he as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the limited liability company by himself as such Manager.

**In witness thereof, I hereunto set my hand and official seals.**

My Commission Expires on: _____

_____
Notary Public

Prepared by and Return to:  Kenyon Energy LLC, 1425 S. Main St., North Canton, OH 44720.

00044

B-1

Mark R. and Michele Fritz
6301 Mackel Rd NE
Minerva, OH 44657
December 29, 2011

Phillip M. Lowry
Manager
Kenyon Energy LLC
1425 S. Main St.
North Canton, OH 44720

Dear Mr. Lowry:

This is to inform you that the original leases, were taken to the notary at our Bank,
Consumers National Bank, Minerva, OH 44657, to be verified by her that she was the
notary on the date, July 30, 2010, who had looked over the 2 sets of each original, and
had my husband, Mark R Fritz and myself, Michele E Fritz initial and sign the documents
where needed. Also, the section in our sets that were sent with the landsman, Richard
Owen, had the section with the 5 year term crossed out on both sets when taken to the
notary. But when they were recorded at Carroll County Recorders, that paragraph was
not crossed out, even though the set that he took with him had that paragraph crossed out
and initialed also.

We did not accept the 5 year extension at $750 per acre. We only accepted the 5 year
primary term, but it was not recorded that way.

We are sending you this letter, with the notary's signature and notary stamp verifying that
this was the paperwork that was signed and notarized in her presence at Consumer's
National Bank, on July 30, 2010, and is legal and legitimate.

I do not know what happened to the set that your landsman received from us with the 5
year extension crossed out, but we would not take two sets of each lease to the notary and
have her sign and notarize, if they were not the same leases. She made sure at the time
that we initialed each set of two leases with the 5 year extension crossed out and signed
and initial where needed, and then she signed and notarized each set of two.

This letter is to verify this fact.          Acknowledgement of Notary that everything

                                             contained herein is true and correct.

Very truly yours,

Mark R. and Michele E. Fritz

Donna Kandel(Notary Public)      Donna J. Kandel
                                 Notary Public, State of Ohio
                                 My commission Expires 09-25-2015

Donna J. Kandel
12-27-11

00045

B-2

Subject:  Re: Our Oil and Gas Leases

From:  Dain Wise (dwise@kenyonenergyllc.com)

To:  mmfritz@yahoo.com;

Date:  Friday, January 13, 2012 1:57 PM

Mrs. Fritz,

I have read below and printed your attachments. We are researching our records at this time and I will get back to you sometime early next week with what we have found.

On Fri, Jan 13, 2012 at 11:42 AM, Michele Fritz <░░░░░░░░░@░░░░░.░░> wrote:
Dear Dain Wise:

I had spoken to you last month about the attached leases, which we had signed
with your Kenyonlandsman, Richard Owen, on July 27, 2010. We, referring to my husband and I had negotiated first with Chase Graham starting in June of 2010. He must had been transferred, because then Mr. Owen became our landsman. The price per acre began at $250 per acre with 1/8th royalties. If we signed a 5 year extension he would give us more money for our bonus payment. I have paperwork on this. Then he came back at $400 per acre, crossed that out and made it $500 per acre. Then in July we settled on $750 per acre with just a primary 5 year lease. We decided this because we had another 239 acres coming up in 2011. He said he would work with us then to get the best price possible.
On July 30, 2010 Mr. Owen brought 2 sets of each lease to take to have notarized. The first mistake was we didn't notice on the lease for Mark and Michele Fritz , that he didn't take off the parcel #01-00108.000 for 12.12 acres, that was still under lease with Great Lakes. We were not paid for it either. You can check our tender and figure it was for $750 per acre. The check was for $20,509.88 and the acreage is 27.3965 acres. I also have papers which he wrote, under lease with Great Lakes until 2011. We take the 4 leases, 2 of each to our bank in Minerva. Donna Kandel looked them over page by page, the paragraph with the 5 year extension was already crossed out when Mr. Owen gave us the leases. We initialed that paragraph on all 4 leases. signed as we went through the leases page by page. This was to make sure that everything was the same and we didn't miss anything and have to come back in being summer busy season. She
where needed, she notarized it with the date, county, state signature and her seal. I took paperwork into her pertaining to this issue, and asked her if she remembered this signing, which she did because usually my husband does not handle anything with legalities. He signed his power of attorney over to me before his parents passed, for the mere fact that he doesn't have time. We have a dairy farm, so I handle most of the running for parts banking, shopping, etc. She signed and notarized this paper attached stating to the fact that the originals of the sets that are in our possession were accurate, with the paragraph initialed that crossed out the extension. She put an x on the one lease and wrote initial, which you can see. I did not send or take them to Mr. Lowrey at your North Canton office. We have the originals at the attorneys office with the notarized letter from the notary stating thefact that our leases are the real leases, not the ones that Mr. Owen had recorded at Carroll County Recorders office. Our attorney is Robert Tscholl. He is located at 400 S Main St N. Canton, OH 44720, right down the street from your N Canton office.
The reason we are sending this to you is so you can discuss this with your superiors. I can provide these documents to your N. Canton office, if that could help us settle the matter without taking legal action against Mr. Owen, and Kenyon. Three seperate lawyers have looked at these documents, and all are in agreement that he committed some unfavorable, maybe even if proven, illegal acts by

switching the top pages and extending our leases another 5 years without our permission.
Our goal is to see if we can get these leases voided, without taking legal action against him and
Kenyon.  We would love to have a representative contact us on this matter.  My husband and I are
looking forward to hearing from Kenyon on this issue.  We could always meet at the office in N.
Canton, or someone can come to our home.  I will need to know if this would be possible so I could
set something up with our lawyer, and have him bring the documentation.  Please feel free to contact
me at (330)895-2876.
Yours,
 Michele E Fritz
 6301 Mackel Rd NE
Minerva, OH 44657

00047

Case: 5:12-cv-01736-JRA  Doc #: 2 Filed: 03/08/13  48 of 182.  PageID #: 286

Subject: [No Subject]

From: Costa, Sandra (Scosta@ohiosecretaryofstate.gov)

To: mmfritz@yahoo.com;

Date: Friday, December 7, 2012 12:40 PM


<<20121207_123745_00020.pdf>>


Here's what I have Michele; here's hoping that this is enough.


*Sandra Costa*

Notary Coordinator

Office of the Ohio Secretary of State

Tel: 614 644 4559

scosta@ohiosecretaryofstate.gov

00048

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com



# Notary Application

SCOSTA Logout

Data Entry Screens | Maintenance Screens | Notary Reports | Accounting & Certificates

Notary > Data Entry Screens > Create/Modify Notary > Add/Modify Batch > Add/Update Notary

Print Commission

Print Envelope

Return

## Batch Information

Batch Number  312627      No. of Filings  56       Filing Balance  0

Batch Status  Closed       Payment Amount  840      Amount Balance  0      [Save]

[Print Commission]  [Print Envelope]

### Customer Information

Filing Type  New Notary Fee  15
No Fee  ☐
OHIO Resident  ☑
Gender  Unknown
First Name  Richard      [Find]
Middle Name
Last Name  Owen
Suffix
Address1  5280 Broadmoor Circle  #218
Address2
City  North Canton
County  STARK
State  OH
Zip  44720

### Notary Information

Commission#  2010-RE-346409
Notary Type  Notary Public
Attorney Registration#
Special Type  None
Employer
Address
Commencing Date  09/21/2010
Commission Date  09/21/2010
Expired Date  09/20/2015
Entered Date  09/21/2010
Check Number  1653      Status  Resigned
Comments  RESIGNATION effective 10-1-2012

00049



## Ohio Secretary of State

### Office of the Notary Commission

#### Application for Amendment of Notary Public Information

| Submit application via U.S. Mail: | OR | Submit application in-person: |
|---|---|---|
| Notary Commission | | Client Service Center |
| P.O. Box 1658 | | 180 East Broad St., Suite 103 |
| Columbus, Ohio 43216 | | Columbus, Ohio 43215 |

Choose the block(s) that applies to the amendment desired:
(Please make Check or Money Order payable to SOS/Notary Commission)

☐ Change of Name - $2.00 (Includes revised commission)

☐ Change of Address – No fee (no new certificate will be sent)

☐ Duplicate - $2.00

☒ Resignation of Commission – No fee

| 1. | Current Name on Commission | | | |
|---|---|---|---|---|
| | Richard Owen | | | |
| 2. | New Name for Commission | | | |
| | | | | |

| 3. Current Address on Record | City | State | Zip Code |
|---|---|---|---|
| 5280 Broad Moor Cir #218 | Canton | OH | 44720 |
| 4. New Address for Record | City | State | Zip Code |
| PO Box 50275 | OKC | OK | 73140 |

| 5. Commission Number | 6. Expiration Date |
|---|---|
| 2010-RE-346409 | 20 Sept 15 |
| 7. Contact Telephone Number | 8. County of Residence |
| 330-265-6149 | Stark |
| 9. Email Address (optional) | 10. Effective Date of Resignation |
| | 10-1-2012 |

#### DO NOT NOTARIZE YOUR OWN SIGNATURE

I attest to the accuracy of the amended information provided

11. Signature of Applicant _Richard Owen_

Sworn to and subscribed in my presence this _29_ day of _October_ 20_13_

Notary Public Signature _Thomas P White_

Commission Expiration Code _____

THOMAS R. WHITE
Notary Public State of Ohio
My Commission expires Feb. 10, 2017

Place Official Seal or Stamp in Box Provided

SOS 0402 Page 1 of 2                                                    Last Revised  11/2011



# TED STRICKLAND

## Governor of said State

## To all to whom these Presents shall come, Greeting:

Know Ye, That by virtue of the authority vested in me by the Constitution and Laws of this State, and reposing special Trust and Confidence in **Richard Owen**, I do hereby appoint and commission the above to be a **Notary Public**, for the State of Ohio for the term of Five Years commencing on the 21st day of September, 2010, and expiring on the 20th day of September, 2015, hereby authorizing and empowering said officer to execute and discharge, all and singular, the duties appertaining to said office, and to enjoy all the privileges and immunities thereof.

In Testimony Whereof, I have hereunto subscribed my name and caused the Great Seal of the State of Ohio to be affixed, at Columbus, this 21st day of September, 2010.



By The Governor:

*Ted Strickland*

*Jennifer Brunner*
*Secretary of State*

SCANNED

SOS 1401 (07/07)

# The State of Ohio

_Stark_ County, } ss.

I do hereby swear that I will support the Constitution of the United States of America and Constitution of the State of Ohio, and that I will faithfully discharge the duties of the position to which I have been appointed, according to law, and to the best of my ability.

_Richard Oven_

Sworn to before me, a _Deputy Clerk_
in and for the County aforesaid, this _28_
of _September_ 20 _10_.

A TRUE COPY TESTS
NANCY _____
By _____
Deputy
_____ 2012

_Shelly & born_

_Deputy Clerk_

IMPORTANT - For Notaries: this Public Commission must be recorded in office of County Clerk before notarial acts are performed. (Section 147.05 of the Revised Code of Ohio)

1425 S. Main St.
N. Canton, OH 44720

# 147.01 Appointment and commission of notaries public - notary public for state.

(A) The secretary of state may appoint and commission as notaries public as many persons who meet the qualifications of division (B) of this section as the secretary of state considers necessary.

(B) In order for a person to qualify to be appointed and commissioned as a notary public, the person must satisfy both of the following:

(1) The person has attained the age of eighteen years.

(2) One of the following applies:

(a) The person is a legal resident of this state who is not an attorney admitted to the practice of law in this state by the Ohio supreme court.

(b) The person is a legal resident of this state who is an attorney admitted to the practice of law in this state by the Ohio supreme court.

(c) The person is not a legal resident of this state, is an attorney admitted to the practice of law in this state by the Ohio supreme court, and has the person's principal place of business or the person's primary practice in this state. (C) A notary public shall be appointed and commissioned as a notary public for the state. The secretary of state may revoke a commission issued to a notary public upon presentation of satisfactory evidence of official misconduct or incapacity.

Effective Date: 09-26-2003

00053

**INSTRUCTIONS FOR APPLYING TO RECEIVE**
**NEW NOTARY PUBLIC COMMISSION**
**Effective January 2008 fee is $70 (nonrefundable $15 fee)**
This application is valid for all Ohio Residents.  Once commissioned, Ohio notaries have
jurisdiction throughout the state.

---

A) The process for becoming a Notary:
- Application and arrest record is mailed to the Columbus Bar Association with a check for $70 (made payable to the Columbus Bar Association) *or* Credit Card payments may be made by faxing application/arrest record along with credit card information.
- Study Guide and Test Schedule are e-mailed to you following processing of application and payment.
- You will have 90 days in which to take and pass your test.
- Once the test is passed, you will receive your commission from the Secretary of State.
- Your commission must then be recorded with the Clerk of Courts before you can notarize any documents (you will receive info on how to do this at the test).

---

B) For speediest processing, ensure that you have the following (2) forms completed and included with your $70 fee.  **PRINTING ON ALL FORMS MUST BE DARK & SIGNATURE MUST BE DARK & LEGIBLE - WILL BE RETURNED IF NOT per SECRETARY OF STATE NOTARY OFFICE (Effective 11/12)**
1. Application for Notary Public Commission/**MUST BE NOTARIZED**
2. Arrest Record – Complete the top section only, up to but not including the Agency Requesting Record/**MUST BE SIGNED - Our Office obtains the arrest record.**

**Your $70 Notary Application fee covers application processing and test materials and administration.**

---

CREDIT CARD PAYMENTS
Fax (2) forms from Box B along with Visa or
MasterCard Information to:
**Fax: 614-750-3102**
**Attn: Notary Department**

---

CHECK PAYMENTS
Send (2) forms from Box B, along with a
$70 check payable to
Columbus Bar Association, to:
**COLUMBUS BAR ASSOCIATION**
**NOTARY DEPARTMENT**
**175 S. THIRD ST.  STE 1100**
**COLUMBUS, OHIO 43215**

---

NOTARY SEMINARS WITH TESTING

- Live Notary Seminars are held at the Columbus Bar Association, once a month, from 9-11am. The seminar fee is $45 and includes a review of all notary test materials and current notary policies. It is followed immediately by the Notary Test.

ONLINE NOTARY SEMINARS ONLY
(Does not include test)
- $45 @ www.OhioNotaryInfo.com
- Please pay online

---

NOTARY TESTS ONLY
- Notary Tests only (no seminar) will be held at the Columbus Bar Association, once a month, on the scheduled date at 9am.
Please check the date carefully
- **TEST GIVEN EVERY**
**WEDNESDAY MORNING AT 10:00**

**Call the Columbus Bar Notary**
**Department at 340-2031 with questions.**
**We're here to help!**

APPLICATION FOR **NEW** NOTARY PUBLIC COMMISSION- $70 fee (effective 01/2008)

1.   Name of Applicant _____ (As listed on driver's license)

     Email Address _____ Home Phone # _____

2.   Home Address _____ Zip Code_____

3.   Date of Birth _____  4. Employer _____

5.   Employer Address _____ Business Phone #_____

6.   ARE YOU A RESIDENT OF FRANKLIN COUNTY? _____ FOR HOW LONG? _____

7.   Have you ever been a notary in Ohio? _____ Expiration date of former commission_____

8.   Have you ever had a commission revoked? _____ Have you had an application rejected in the past five years? _____
     (If you answered yes to either question above, please attach a statement of explanation.)

9.   Have you ever been convicted of or plead guilty to a crime resulting in a fine of $100 or more, or imprisonment? _____
     (If yes, please attach a statement of explanation. Failure to include past criminal convictions may result in the denial of your application.)

10.  Have you ever been removed from office for reasons of moral turpitude, or had a business or professional license revoked? _____
     (If yes, please attach a statement of explanation.)

11.  (A) Have you ever sought but been refused a bond? _____ (If yes, please attach a statement of explanation.)

     (B) Have you ever had a claim made against the bond? _____ (If yes, please attach a statement of explanation.)

12.  As a consideration for the certificate of my qualifications to be Notary Public, I hereby represent and agree that as a Notary Public,
     (A) I will perform only such acts as a Notary Public is authorized to do by law.
     (B) I will not charge or accept an amount exceeding the legal fees for such services.
     (C) I will not draw, prepare, or draft for other persons, any legal papers such as deeds, notes, wills, mortgages, chattel mortgages, contracts, partnership agreements, and articles of incorporation, options, and leases, contracts for purchase or sale of real estate, escrow instruments, releases, mechanics liens, affidavits, bulk sales affidavits, or bills of sale.
     (D) I will not certify an affidavit of a person without administering the oath (or affirmation) to such person and then having him/her sign in my presence.
     (E) I will not certify the acknowledgment of any document in the absence of the person so acknowledging his/her signature.
     (F) I will not perform any notarial act after the date of expiration of my commission.
     (G) I will not notarize a document in which I have a financial or business interest.
     (H) I will not perform any notarial act without first obtaining satisfactory evidence of identification.

*The section below must be signed and notarized:*

In Witness Whereof, I have hereunto set my hand this _____ day of _____, 20 _____

     X _____
        (signature of applicant)

     State of Ohio, Franklin County, ss:

     _____, being first duly sworn says that the responses stated in the above application are true.
        (printed name of applicant)

Sworn to before me and subscribed in my presence this _____ day of _____, 20_____

     _____
        (signature of Notary Public)

     _____
        (printed name of Notary Public), Notary Public - State of Ohio

     My commission expires _____

CREDIT CARD # _____

EXP. DATE _____ CARD SECURITY CODE _____ BILLING ADDRESS _____ BILLING ZIP CODE _____

NAME ON CARD _____ SIGNATURE _____

CBA Processing Date: _____     Amount Paid _____     New

I give the Columbus Bar Association permission to seek a copy of my arrest record from the Franklin County Sheriff's Office. I do hereby release the Franklin County Sheriff's Office and all individuals connected therewith from all liability.

## SIGNATURE _____

*(application cannot be processed without a signature)*

DATE _____ 20 ____

NAME _____ ALIAS / _____
           (PRINT OR TYPE IN FULL)        MAIDEN NAME

DATE OF BIRTH _____ SEX _____ RACE _____

SOCIAL SECURITY NUMBER _____

AGENCY REQUESTING RECORD _____ Columbus Bar Association _____

SIGNATURE OF AGENT MAKING REQUEST _____ PO _____

This is a copy of the arrest record on file from 1987 to the present at the Franklin County Sheriff's Office on the above named subject. It is checked by name only, not by fingerprints, and is not verified as to the true identity of the subject in question.

_____

_____ DATE                           CHARGE

_____

_____

_____

_____

_____

DISPOSITIONS
Municipal Court 645-8186
375 S. High St.

Common Pleas Court 525-3650                BY _____
345 S. High St.
SHR-RE-01-G-11/94                          DATE _____

00056

# Prepare for the Notary Public Exam!

## Upcoming Dates

November 17, 2012
December 15, 2012
January 12, 2013
February 23, 2013
March 16, 2013
April 20, 2013
May 11, 2013
June 8, 2013

## Time

All seminars begin at 9:00am.
Pre-registration is not required.
The course lasts approximately
one hour, and the official notary
exam will be given immediately
after the seminar.

## Cost

$45.00 for seminar registration
fee only; $115.00 for seminar
registration fee and notary
application fee (for new and
renewing notary applicants).

## Location

Columbus Bar Association
175 S. 3rd St., Suite 1100
Columbus, OH 43215

Designed to prepare you for the official Ohio notary exam, or
as a refresher course for those of you who have already been
practicing as a notary, the Columbus Bar Association's notary
training seminar is a must! Course topics include:

- *What do I need to know to pass the notary exam?*
- *What happens if I notarize something incorrectly?*
- *Where can I get into trouble?*
- *What fees can I charge for notarial acts?*
- *Where does an Ohio notary have jurisdiction?*
- *How do I establish another person's identity?*
- *How do I issue an oath?*
- *What is the difference between an acknowledgement
  and an affidavit?*
- *You will also receive course materials containing
  helpful examples and a glossary of notary terms*

**Presented by:**
Judge Charles A. Schneider
*Franklin County Common Pleas Court*



**You may also take this course online!**
Visit our website at **www.peoplesbar.org**.

## Notary Public Seminar & Test Registration Form

Name: _____ Telephone # _____

Address: _____ City/State/Zip: _____

Total Enclosed $_____ _____ Visa/Mastercard/AmEx/Discover_____

Exp. Date _____ Card Security Code _____ Billing Address _____ Billing Zip Code _____

Name on Card _____ Authorized Signature _____

Register me for: ☐ 11/17/12 ☐ 12/15/12 ☐ 1/12/13 ☐ 2/23/13 ☐ 3/16/13 ☐ 4/20/13 ☐ 5/11/13 ☐ 6/8/13

Return registration form with payment to:

Columbus Bar Association, 175 S. Third St., Suite 1100, Columbus, OH 43215
FAX CREDIT CARD ORDERS TO 614/750.3102

CBA
COLUMBUS BAR ASSOCIATION

# Notary Survey

*This survey is optional, to help us better serve you.*



Name: _____

Address: _____

Email: _____

❶ I am studying to become a notary for:
- ☐ Work requirement
- ☐ Personal business opportunities
- ☐ Enhancing my qualifications

❷ Which of the following industries best describes your job:
- ☐ Automobile
- ☐ Real estate
- ☐ Health care
- ☐ Legal
- ☐ Banking
- ☐ Other *(please describe)* _____

❸ I would like to learn more about notarizing mortgage documents.        ☐ Yes  ☐ No

❹ I would like to learn more about auto titles: understanding the document, possible fraud issues, and red flags.        ☐ Yes  ☐ No

❺ I am interested in receiving information about:
- ☐ Renewal notifications
- ☐ Discounts on notary stamps and supplies
- ☐ Discounts on educational seminars and materials
- ☐ Notary errors and omissions (E & O) insurance
- ☐ Newsletters
- ☐ Email alerts regarding notary law changes
- ☐ Other *(please specify)*

❻ **Please send me information about the Ohio Notary Association.**        ☐ Yes  ☐ No

00058

# Revised Notary Handbook



## The must-have Notary Handbook features:

- **Ohio Revised Code amended notary law §147.01 and 147.37**
- **State of Ohio auto title forms**
- **Allowable fees charged by a notary public**
- **Notarial journal conveniently located in back of the Handbook**

## Payment Information

| | | | |
|---|---|---|---|
| # Handbooks | X | $9.95 | $ |
| Tax: | | 6.75% | $ |
| Total: | | | $ |

Method of payment: ☐ Check (payable to CBA)   ☐ Credit Card (Visa, MasterCard, AmEx, Discover)

Credit Card Number _____     Expiration Date _____

Name on Card _____     Authorized Signature _____

## Shipping Information

**FREE SHIPPING!**

Name _____

Company Name *(must include if shipped to a business address)*

Street Address _____

City, State  Zip _____

Email address _____     Daytime Phone Number _____

*Price effective 10-2009*

Return this form with payment to Columbus Bar Association,
175 S. Third Street, Ste.1100, Columbus, OH 43215.

CBA
COLUMBUS BAR ASSOCIATION

## It wasn't the notary's fault but it cost him $11,500 anyway.

It was a routine transaction, and there was no way the notary could have known the signatures were forgeries. But they were. And, in the eyes of the court, the notary was at fault. This time the penalty was $8,000 in damages, $3,500 in court costs. Unfair? Sure. But for notaries public in a litigious society like ours, it's just part of the territory.

## Fortunately, We've got the territory covered.

No one can say whether you'll ever be faced with a situation like the one just described. But, as a notary you are vulnerable. And, with major judgments against notaries now reaching tens of thousands of dollars, it's important to have someone in your corner should you find yourself faced with a lawsuit.

## DON'T WAIT! PROTECT YOURSELF WITH NOTARY ERRORS AND OMISSIONS INSURANCE FROM



## TODAY!



*Fundamentally Innovative*

**RLI requires no deductible...**
That's exactly why we're here. We protect notaries...beginning with the very first dollar in damages. In other words, we require no deductible. We pay every dollar of damages and legal costs right up to the policy limit – and that may mean up to $30,000. So, should you ever be sued, you can relax – the chances are you'll never face an out of pocket expense.

**No lengthy exclusions...**
Equally reassuring, you'll find our policies are not watered down with lengthy exclusions. In fact, we pride ourselves on offering the most comprehensive coverage in the industry. Our job is to protect you in case of claim...freeing you to do your job.

**We pay defense costs...**
Having this kind of protection is more important than ever before because lawsuits against notaries are becoming more common every day. Forged, incomplete, or otherwise defective signatures all can cast doubt on the validity or date of a document. And when that happens, someone is to blame. Too often these days, the blame is placed on you – the notary. Worse yet, even if the suit is not valid you may not be spared the need to protect yourself from prosecution. And, without coverage you'll have to pay these defense costs yourself.

Make sure this doesn't happen to you. Your agent can get RLI's affordable coverage for you. Call today.



NOTARY PUBLIC ERRORS AND OMISSIONS INSURANCE

## Individual Notary Public E&O Insurance

- Pays court costs, attorney fees, etc. – up to one half the face amount of the policy.
- Pays judgment up to the face amount of the policy.
- No deductible.
- Written to coincide with Notary's commission.

## Blanket Notary Public E&O Insurance

- Employers are covered at no additional charge.
- No need to advise of changes during policy period.
- Additional notaries are automatically covered.

## Notary E&O Benefits

- No deductible.
- Covers defense costs.
- Protects against errors and omissions.
- Employers covered under blanket policy at no additional charge.
- Additional notaries covered automatically under blanket policy.

## Individual E&O Limits and Term Premiums

| | | | |
|---|---|---|---|
| ☐ | $5,000.00 | $37.50 | / 5-year premium |
| ☐ | $10,000.00 | $62.50 | / 5-year premium |
| ☐ | $25,000.00 | $93.75 | / 5-year premium |
| ☐ | | | / -year premium |

## Blanket E&O Limits and Term Premiums

| | | | |
|---|---|---|---|
| ☐ | $5,000.00 | $7.50 | /per year per Notary |
| ☐ | $10,000.00 | $12.50 | /per year per Notary |
| ☐ | $25,000.00 | $18.75 | /per year per Notary |
| ☐ | | | /per year per Notary |



- A.M. Best's rating: A+, Superior.
- Standard & Poor's rating: A+.
- Year after year RLI has appeared in the Ward's 50, a select group of top insurance companies based on financial safety, consistency and performance.
- 24 hour turn around time on all new business.

## Application

**Individual Policy**

Name _____

Address _____

City _____

State _____ Zip _____

Date of Commission _____

Amount of Coverage $ _____

**Blanket Policy**

Employer's Name _____

Address _____

City _____

State _____ Zip _____

Number of Notaries _____

Amount of Coverage $ _____

☐  Check here if this has been previously faxed.

| Agency Name | | |
|---|---|---|
| CBS Agency, Inc. | | |
| Address | | |
| Street & Number | | |
| 175 S. Third St., Suite 1100 | | |
| City | State | Zip |
| Columbus | OH | 43215 |
| Phone Number | | Agency Code |
| 614/340.2076 | | 47310 |

00061

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FRITZ DAIRY FARM, L.L.C., et al., | ) | |
| | ) | |
| Plaintiffs | ) | Case No.: |
| | ) | |
| v. | ) | Judge: |
| | ) | |
| CHESAPEAKE EXPLORATION, L.L.C., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF RICHARD OWEN
IN SUPPORT OF NOTICE OF REMOVAL**

I, Richard Owen, declare and state on my personal knowledge as follows:

1.  I am the principal of RGOwen & Assoc. LLC.

2.  I am over the age of 21 and competent to make this Declaration. The statements made herein are based on my personal knowledge and familiarity with the facts stated herein.

3.  As part of my position with RGOwen & Assoc LLC, I work as a contractor for Kenyon Energy, LLC. As part of my work, it is customary for me to travel to the location of newly discovered oil and gas plays to evaluate title records and obtain leasehold interests to mineral rights.

4.  Plaintiffs' complaint avers that I am a resident of the state of Ohio and lists 5280 Broadmoor Circle, #218, North Canton, Ohio 44720, as my address. That address is merely the hotel where I temporarily stay—the Residence Inn—while engaging in temporary business in Ohio.

5.  I am a permanent resident of the state of Oklahoma. I reside at 411 Cambridge Rd., Midwest City, Oklahoma 73130.

I declare under penalty of perjury of the laws of the United States that the foregoing is

true and correct. Executed on this $\cancel{27}$ day of June 2012.

*Richard Owen*

RICHARD OWEN

2

4/10/2012 13571338

00064



No. 2011-RE-379739

# JOHN KASICH

## Governor of said State

## To all to whom these Presents shall come, Greeting:

Know Ye, That by virtue of the authority vested in me by the Constitution and Laws of this State, and reposing special Trust and Confidence in **Nathaniel Hammons**, I do hereby appoint and commission the above to be a **Notary Public**, for the State of Ohio for the term of Five Years commencing on the 11th day of July, 2011, and expiring on the 10th day of July, 2016, hereby authorizing and empowering said officer to execute and discharge, all and singular, the duties appertaining to said office, and to enjoy all the privileges and immunities thereof.

In Testimony Whereof, I have hereunto subscribed my name and caused the Great Seal of the State of Ohio to be affixed, at Columbus, this 11th day of July, 2011.

By The Governor:



_____

_____
Secretary of State

SCANNED

SOS 1401 (07/07)

00065



# The State of Ohio

STARK County, } ss.

I do hereby swear that I will support the Constitution of the United States of America and Constitution of the State of Ohio, and that I will faithfully discharge the duties of the position to which I have been appointed, according to law, and to the best of my ability.

Sworn to before me, a Notary Public in and for the County aforesaid, this 15th day of July 20 11 .

Kevin Edwards

IMPORTANT - For Notaries: this Public Commission must be recorded in office of County Clerk before notarial acts are performed. (Section 147.05 of the Revised Code of Ohio)

1425 S. Main St.
North Canton, OH 44720

Kevin Edwards
Notary Public, State of Ohio
My Commission Expires
June 21, 2016



In the name and by the Authority of

# THE STATE OF OHIO

# JOHN KASICH

## Governor of said State

## To all to whom these Presents shall come, Greeting:

Know Ye, That by virtue of the authority vested in me by the Constitution and Laws of this State, and reposing special Trust and Confidence in **Chase Schwabe**, I do hereby appoint and commission the above to be a **Notary Public**, for the State of Ohio for the term of Five Years commencing on the 18th day of January, 2011, and expiring on the 17th day of January, 2016, hereby authorizing and empowering said officer to execute and discharge, all and singular, the duties appertaining to said office, and to enjoy all the privileges and immunities thereof.

In Testimony Whereof, I have hereunto subscribed my name and caused the Great Seal of the State of Ohio to be affixed, at Columbus, this 18th day of January, 2011.

By The Governor:



_____

_____
*Secretary of State*

SCANNED

SOS 1401 (07/07)

00067

NANCY S. BENROLD
CLERK OF COURT
STARK COUNTY, OHIO

The State of Ohio

2011 JAN 25 PM 3: 55

Stark County, } ss.

I do hereby swear that I will support the Constitution of the United States of America and Constitution of the State of Ohio, and that I will faithfully discharge the duties of the position to which I have been appointed, according to law, and to the best of my ability.

Chad Schwab

Sworn to before me, a ___Deputy Clerk___
in and for the County aforesaid, this ___25th___
of ___/___ 20 _11_.

___Deputy Clerk___

___Linda St.gean___

**IMPORTANT** - For Notaries: this Public Commission must be recorded in office of County Clerk before notarial acts are performed.
(Section 147.95 of the Revised Code of Ohio)

Chase Schwabe
1425 S. Main Street
North Canton, OH 44720

A TRUE COPY TESTED
NANCY S. REINBOLD, CLERK
BY ___ Deputy
Date 1.25.12

No. 2011-RE-377574



## JOHN KASICH

### Governor of said State

## To all to whom these Presents shall come, Greeting:

Know Ye, That by virtue of the authority vested in me by the Constitution and Laws of this State, and reposing special Trust and Confidence in **Kevin Edwards**, I do hereby appoint and commission the above to be a **Notary Public**, for the State of Ohio for the term of Five Years commencing on the 22nd day of June, 2011, and expiring on the 21st day of June, 2016, hereby authorizing and empowering said officer to execute and discharge, all and singular, the duties appertaining to said office, and to enjoy all the privileges and immunities thereof.

In Testimony Whereof, I have hereunto subscribed my name and caused the Great Seal of the State of Ohio to be affixed, at Columbus, this 22nd day of June, 2011.

By The Governor:



_____

_____
Secretary of State

SCANNED

SOS 1401 (07/07)



# The State of Ohio

_STARK_ **County,** } ss.

I do hereby swear that I will support the Constitution of the United States of America and Constitution of the State of Ohio, and that I will faithfully discharge the duties of the position to which I have been appointed, according to law, and to the best of my ability.

Sworn to before me, a _NOTARY PUBLIC_ in and for the County aforesaid, this _27_ of _JUNE_ 20 _11_.



Karin E. Meares
Notary Public, State of Ohio
My Commission Expires
November 9, 2015

Karin Meares

**IMPORTANT** - _For Notaries: this Public Commission must be recorded in office of County Clerk before notarial acts are performed (Section 147.05 of the Revised Code of Ohio)_

1425 S. Main St
North Canton, OH 44720

No. 2011-RE-382668



# JOHN KASICH

## Governor of said State

## To all to whom these Presents shall come, Greeting:

Know Ye, That by virtue of the authority vested in me by the Constitution and Laws of this State, and reposing special Trust and Confidence in **Matthew Smith**, I do hereby appoint and commission the above to be a **Notary Public**, for the State of Ohio for the term of Five Years commencing on the 05th day of August, 2011, and expiring on the 04th day of August, 2016, hereby authorizing and empowering said officer to execute and discharge, all and singular, the duties appertaining to said office, and to enjoy all the privileges and immunities thereof.

In Testimony Whereof, I have hereunto subscribed my name and caused the Great Seal of the State of Ohio to be affixed, at Columbus, this 05th day of August, 2011.

By The Governor:



_____

_____
Secretary of State

SOS 1401 (07/07)

# The State of Ohio
## STARK County, } ss.



I do hereby swear that I will support the Constitution of the United States of America and Constitution of the State of Ohio, and that I will faithfully discharge the duties of the position to which I have been appointed, according to law, and to the best of my ability.

_Matthew Smith_

Sworn to before me, a _Notary Public_
in and for the County aforesaid, this _8th_ day
of _August_ 20 _11_ .

_Ken Edwards_

_June 16. 2016_

A TRUE COPY TESTE:
NANCY S. REINBOLD, CLERK
By _____ Deputy
Date _____

IMPORTANT - For Notaries: this Public Commission must be recorded in office of County Clerk before notarial before preformed.
(Section 147.03 of the Revised Code of Ohio)

Matthew Smith
5295 Broadmoor Circle NW
Canton, OH 44709

Kevin Edwards
Notary Public, State of Ohio
My Commission Expires
June 21, 2016

00072

No. 2011-RE-377567



# JOHN KASICH

## Governor of said State

## To all to whom these Presents shall come, Greeting:

Know Ye, That by virtue of the authority vested in me by the Constitution and Laws of this State, and reposing special Trust and Confidence in **Matt Burkholder**, I do hereby appoint and commission the above to be a **Notary Public**, for the State of Ohio for the term of Five Years commencing on the 22nd day of June, 2011, and expiring on the 21st day of June, 2016, hereby authorizing and empowering said officer to execute and discharge, all and singular, the duties appertaining to said office, and to enjoy all the privileges and immunities thereof.

In Testimony Whereof, I have hereunto subscribed my name and caused the Great Seal of the State of Ohio to be affixed, at Columbus, this 22nd day of June, 2011.

By The Governor:



Secretary of State

SCANNED

SOS 1401 (07/07)

00073

NANCY S. REINBOLD
CLERK OF COURTS
STARK COUNTY, OHIO
2011 JUN 28 PM 1:22

# The State of Ohio

Stark County, } ss.

I do hereby swear that I will support the Constitution of the United States of America and Constitution of the State of Ohio, and that I will faithfully discharge the duties of the position to which I have been appointed, according to law, and to the best of my ability.

Martin Jung

Sworn to before me, a Deputy Clerk
in and for the County aforesaid, this 29th
of Jun 20 11.

Deputy Clerk
Patti Septunno

IMPORTANT - For Notaries: this Public Commission must be recorded in office of County Clerk before notarial acts are performed.
(Section 147.05 of the Revised Code of Ohio)

1425 S. Main St
North Canton, OH
44720

A TRUE COPY TESTE:
NANCY S. REINBOLD, CLERK
By ........................ Deputy
Date 1.2.13

Exhibit G



**Kenyon Energy** LLC
*Investing in Ohio's Energy Future*

September 10, 2010

Mark and Michelle Fritz
Fritz Dairy Farms
6301 Mackel Rd
Minerva, OH 44657

RE: Oil and Gas Lease

Dear Mr. and Mrs. Fritz:

Enclosed you will find your copies of the Order of Payment for your Paid-Up oil and gas
lease.

It is a pleasure doing business with you; please feel free to call me if you have any questions
at 330.205.6149.

Sincerely,

Richard Owen
Lease Acquisitions
Kenyon Energy LLC

00075

H

Michele E. Fritz
6301 Mackel Rd. N.E.
Minerva, OH 44657
December 7, 2012

Secretary of State
Notary Department
State Capital Building, Suite 157 K
1900 Kanawha Blvd. E.
Charleston, W. Virginia 25305

Attention Connie:

Enclosed is a check for 2 certified copies of Richard Owen's W. Virginia
Notary Commission. Here is a copy of the information that I found on your
website. I appreciate this very much. I am adding an envelope and making
the check out for $26.00, to cover any extra expenses this may have
incurred.

Thank you,
Have a Wonderful Holiday!

Michele E. Fritz

*Michele E. Fritz*

Fritz Dairy Farm, LLC
6301 Mackel Rd. N.E.
Minerva, OH 44657
(330)895-2876
mmfritz@yahoo.com



### State of West Virginia

**Natalie E. Tennant**
**Secretary of State**

*I, hereby certify that, according to the official records maintained in the office of the Secretary of State, Richard Owen, was appointed a Notary Public by Governor Earl Ray Tomblin with authority to exercise the functions of that office, as provided by law, and shall hold that office for ten years from the 9th day of November, 2011, unless the office is vacated.*



*Given under my hand and the Less Seal of the State of West Virginia this 12th day of November 2012*

**Natalie E. Tennant**
**Secretary of State**

## Briefcase

### Instructions

Please enter your session code and click the spyglass button.

Select the Retrieve link (if available) to download your briefcase items. After downloading, you must first unzip your file with winzip (or comparable utility), then use the latest version of Adobe Reader to view the PDF documents.



Search by Session Code

**Session Code:** 120712PQEZQX

**SESSION ID:** 120712PQEZQX
**CONTACT NAME:** Michele Fritz
**SESSION STATUS:** rocessed
**DATE:** 12/7/2012 12:37:33 PM
**Total Fee** $94.64

| Action | Document Number | Description | Document Status | Fee |
|---|---|---|---|---|
| | 20673510002 | View - Entity (2512344746) | Processed | $5.00 |
| | 20673510003 | Order | Processed | $78.00 |
| | 20673510004 | Notary Order | Processed | $4.00 |
| | 20673510005 | Notary Order | Processed | $4.00 |
| | 20673510006 | Credit Card Surcharge Document | Processed | $3.64 |

TOTAL CONVENIENCE FEE FOR THIS PO REFERENCE NUMBER:$3.64
TOTAL FEE FOR THIS PO REFERENCE NUMBER:$94.64

https://www.sos.ok.gov/client/briefcase.aspx                    1/6/2013

Subject:  Your Requested Information CORP

From:  Secretary of State Webmaster (webmaster@sos.ok.gov)

To:  mmfritz@yahoo.com;

Date:  Friday, December 7, 2012 5:19 PM

Dear Sir/Madam,

The Secretary of State's Office has processed your request.
Follow these steps to retrieve your work:
1) Go to the site:
https://www.sos.ok.gov/client/briefcase.aspx
2) Enter session code 120712PQEZQX in the session code field.
3) Click the spyglass button to Search.
4) Select the document link(s) to download to your desktop.
5) Unzip (decompress) the downloaded file(s).
6) Use the latest version of Adobe Reader to view the Adobe PDF files.
http://www.adobe.com/products/acrobat/readstep2.html

If your email application does not recognize the above link, you may simply copy and paste the above link into your browser.

Thank you for using the Oklahoma Secretary of State web interface.

Sincerely,

Office of the Secretary of State of Oklahoma

00079

FILED - Oklahoma Secretary of State #10001680 03/08/2010 10:35

03/08/2010 09:55 AM
OKLAHOMA SECRETARY OF STATE

SOS

14032200025



NOTARY DIVISION

121 N.W. Sixth Street
P.O. Box 177
Oklahoma City, OK 73101

800-522-3015
405-235-5319

# Western Surety Company

## NOTARIAL BOND

BOND No. **0085607**

Commission No.  10001680

KNOW ALL MEN BY THESE PRESENTS:

That **RICHARD OWEN** of **MIDWEST CITY** in the County of **OKLAHOMA** State of Oklahoma, as Principal, lately appointed Notary Public within and for said State of Oklahoma, and WESTERN SURETY COMPANY, a corporation duly licensed to do business in the State of Oklahoma as Surety, are held and firmly bound unto the State of Oklahoma in the penal sum of ONE THOUSAND DOLLARS ($1,000.00), good and lawful money of the United States, to be paid to the State of Oklahoma, for which payment will and truly to be made, we bind ourselves, our heirs, executors and administrators, jointly and severally, firmly by these presents.

Dated this **03** day of **March** **2010**

Whereas, the above bounden Principal has been appointed to the Office of Notary Public, within and for the State of Oklahoma.

NOW, THE CONDITIONS OF THIS OBLIGATION ARE SUCH, That if said Principal shall faithfully, in all things, perform all duties required by law as a Notary Public within and for said State during the term of said office by virtue of said appointment, then the above obligation to be void, else to remain in full force.

SIGN HERE 👉 _Richard Owen_ Principal

RECEIVED
MAR 08 2010
OKLAHOMA SECRETARY OF STATE

WESTERN SURETY COMPANY

By _Laura Sue Stephens_ Laura Sue Stephens, Authorized Agent

## ACKNOWLEDGMENT OF SURETY

STATE OF OKLAHOMA } ss
County of Oklahoma }

On this **04** day of **March** **2010**, before me, a Notary Public, in and for said County, personally appeared **Laura Sue Stephens**, authorized agent of WESTERN SURETY COMPANY, on behalf of the corporation.

My Commission Expires _____

_Laura Ramsey_ Notary Public

## TO THE NOTARY

Impress Your Seal Here

SIGN HERE 👉

Sign your name on the line below the same as you sign all public documents.

_Richard Owen_

Form 2019-4-2007

**OATH OF OFFICE**
(Okla. Constitution Article XV)

STATE OF OKLAHOMA
County of **OKLAHOMA** } ss

I, **RICHARD OWEN** , do solemnly swear (or affirm) that I will support, obey, and defend the Constitution of the United States, and the Constitution of the State of Oklahoma, and will discharge the duties of my office with fidelity; that I have not paid, or contributed, either directly or indirectly, any money or other valuable thing, to procure my nomination or election (or appointment), except for necessary and proper expenses expressly authorized by law; that I have not knowingly, violated any election law of the State, or procured it to be done by others in my behalf; that I will not knowingly, receive, directly or indirectly, any money or other valuable thing, for the performance or nonperformance of any act or duty pertaining to my office, other than the compensation allowed by law; I further swear (or affirm) that I will faithfully discharge my duties as a Notary Public to the best of my ability.

SIGN HERE (Sign Here) _Richard Owen_
                                                                Principal

Subscribed and sworn to before me this **04** day of **March** , **2010**

_Laura Ramsey_
Notary Public or other officer authorized
to administer oaths or affirmations

My commission expires_____ , _____ Commission # _____
(SEAL)

**LOYALTY OATH**
(51 O.S., Section 36.2A)

STATE OF OKLAHOMA
County of **OKLAHOMA** } ss

I do solemnly swear (or affirm) that I will support the Constitution and the laws of the United States of America and the Constitution and the laws of the State of Oklahoma, and that I will faithfully discharge, according to the best of my ability, the duties of my office or employment during such time as I am a Notary Public.

SIGN HERE _Richard Owen_
                              Affiant

Subscribed and sworn to before me this **04** day of **March** , **2010**

_Laura Ramsey_
Notary Public or other officer authorized
to administer oaths or affirmations

My commission expires_____ , _____ Commission # _____
(SEAL)



## OFFICE OF THE SECRETARY OF STATE

## NOTARY PUBLIC COMMISSION

I, the undersigned Secretary of State of Oklahoma, by the authority of the State of Oklahoma and Title 49 of the Oklahoma Statutes, do hereby appoint and commission the following individual as a Notary Public in and for the State of Oklahoma:

| | |
|---|---|
| **Name** | : RICHARD OWEN |
| **Commission Number** | : 10001680 |
| **City** | : MIDWEST CITY |
| **County** | : OKLAHOMA |
| **Commission Date** | : March 03, 2010 |
| **Expiration Date** | : March 03, 2014 |

*In testimony whereof, I have hereunto set my hand and affixed the Great Seal of the State of Oklahoma at the city of Oklahoma City.*

M. Susan Savage

*Secretary of State*

**NOTARY FILINGS**

Document Number : 13992970010    Filing Date : 3/3/2010

### NOTARY INFORMATION

**Notary Name**                           **Commission Number**
RICHARD OWEN                              10001680

**E-mail**                                **Phone**
W@AOL.COM                                 405-235-5319

**Resident of Oklahoma**
Yes

**Commission Date**      **Commission Status**        **Expiration Date**
3/3/2010                 Active                       3/3/2014

### OKLAHOMA RESIDENCE ADDRESS

411 CAMBRIDGE RD.              **County**
MIDWEST CITY, OK 73130        OKLAHOMA

### SIGNATURE

I am a Citizen of the United States - Yes

I have never been convincted of a felony offense - Yes

I am at least 18 years of Age - Yes

I hereby certify that the information provided on this form is true and correct to the best of my
knowledge and by attaching the signature I agree and understand that the typed electronic
signature shall have the same legal effect as an original signature and is being accepted as my
original signature pursuant to the Oklahoma Uniform Electronic Transactions Act, Title 12A
Oklha. Statutes Section 15-101, et seq.

**RICHARD OWEN**

[End Of Image]

Support Request
**Version 2.5**

## OKLAHOMA Secretary of State Electronic Orders

**Notary Orders Information**
Document Number: 20673510005

| Order Items Information | | | |
|---|---|---|---|
| **Commission Number** | **Quantity** | **Name** | **Order type** |
| 10001680 | 1 | OWEN | Notary Copies |
| Order Item Details | | | |
| 13992970010 | | Notary Copies | |
| | | | |
| 10001680 | 1 | OWEN | Notary Copies |
| Order Item Details | | | |
| 14032200025 | | | |

[End Of Image]

00084

**OKLAHOMA Secretary of State Electronic Orders**

**Entity Orders Information**
Document Number: 20675840003

## Order Items Information

| Filing Number | Quantity | Name | Order type |
|---|---|---|---|
| 3512344746 | 1 | RGOWEN & ASSOC. LLC | Certificate of Good Standing |
| 3512344746 | 1 | RGOWEN & ASSOC. LLC | Information Printout |
| 3512344746 | 1 | RGOWEN & ASSOC. LLC | Long-form Certificate of Fact |
| 3512344746 | 1 | RGOWEN & ASSOC. LLC | Certificate of Fact |

Fact Order Item Details

Status and Registered agent and office

| Filing Number | Quantity | Name | Order type |
|---|---|---|---|
| 3512344746 | 1 | RGOWEN & ASSOC. LLC | Certified copies of a record or document |

Order Item Details

20398720002          Single Copy

| Filing Number | Quantity | Name | Order type |
|---|---|---|---|
| 3512344746 | 1 | RGOWEN & ASSOC. LLC | Certified copies of a record or document |

Order Item Details

18476900002          Single Copy

[End Of Image]

Entity Name: RGOWEN & ASSOC. LLC
Filing Number: 3512344746
Entity Type: Domestic Limited Liability Company
Entity Status: In Existence

EntityAddress:
411 CAMBRIDGE ROAD,  MIDWEST CITY OK73130  USA
Perpetual


Agent Name: OWEN  RICHARD
Agent Address: 411 CAMBRIDGE ROAD, MIDWEST CITY, OK 73130, USA


FILINGS:

| Filing Type | Document # | Status | Filing Date | Effective Date |
|---|---|---|---|---|
| Articles of Organization | 18476900002 | In Existence | 01/27/2012 | 01/27/2012 |
| Annual Reports | 20398720002 | | 10/23/2012 | 10/23/2012 |


NAMES INFORMATION:

Name: RGOWEN & ASSOC. LLC
Name Type: Legal Name
Name Status: In use
Filing Date: January 27, 2012

01/27/2012 03:54 PM
OKLAHOMA SECRETARY OF STATE




18476900002

| PRINT CLEARLY |

# ARTICLES OF ORGANIZATION
# OF AN
# OKLAHOMA LIMITED LIABILITY COMPANY

TO: OKLAHOMA SECRETARY OF STATE
    2300 N Lincoln Blvd., Room 101, State Capitol Building
    Oklahoma City, Oklahoma 73105-4897
    (405) 521-3912

The undersigned, for the purpose of forming an Oklahoma limited liability company pursuant to the provisions of 18 O.S., Section 2004, does hereby execute the following articles:

1.    The name of the limited liability company (**Note:** The name **must** contain either the words **limited liability company** or **limited company** or the abbreviations **LLC, LC, L.L.C.** or **L.C**. The word limited may be abbreviated as Ltd. and the word Company may be abbreviated as Co.):

RgOWEN & ASSOC. LLC

2.    The street address of its principal place of business, wherever located:

| 411 Cambridge Road | Midwest City, | OK | 73130 |
|---|---|---|---|
| Street address | City | State | Zip Code |

3.    The name and street address of the resident agent in the state of Oklahoma:

| Richard Owen | 411 Cambridge Road | Midwest City, | OK | 73130 |
|---|---|---|---|---|
| Name | Street Address (P.O. Boxes are **not** acceptable.) | City | State | Zip Code |

4.    The term of existence:   perpetual

Articles of organization **must** be signed by at least one person **who** need **not** be a member of the limited liability company.

Dated: 1/24/12     RECEIVED

Signature: _Richard Owen_     JAN 27 2012

Type or Print Name: Richard Owen     OKLAHOMA SECRETARY OF STATE

Address: 411 Cambridge Road, Midwest City, OK 73130

(SOS FORM 0073-11/99)

00087



## OFFICE OF THE SECRETARY OF STATE

## CERTIFICATE

*I THE UNDERSIGNED, Secretary of the State of Oklahoma, do hereby certify that I am, by the laws of said state, the custodian of the records of the state of Oklahoma relating to the right of corporations to transact business in this state and am the proper officer to execute this certificate.*

*I FURTHER CERTIFY that RGOWEN & ASSOC. LLC ,27th January, 2012*

*I FURTHER CERTIFY that the following amendments were filed in the Office of the Secretary of State as follows:*

| AMENDMENT | STATUS | DATE |
|---|---|---|
| Annual Reports | | October 23, 2012 |

*I FURTHER CERTIFY that, RICHARD OWEN whose address is 411 CAMBRIDGE ROAD MIDWEST CITY OK 73130 is the registered agent for service of process for said corporation.*

*I FURTHER CERTIFY that RGOWEN & ASSOC. LLC, is a Domestic Limited Liability Company duly organized and existing under and by virtue of the laws of the state of Oklahoma and is in good standing according to the records of this office. This certificate is not to be construed as an endorsement, recommendation or notice of approval of the entity's financial condition or business activities and practices. Such information is not available from this office.*



IN TESTIMONY WHEREOF, I hereunto set my hand and affixed the Great Seal of the State of Oklahoma, done at the City of Oklahoma City, this 7th, day of December, 2012.

_____

Secretary Of State

| DATE | VOLUME | PAGE | INSTRUMENT NO | NAME | INST. DATE |
|---|---|---|---|---|---|
| 11/19/2010 | 64 | 1940 | 201000004561 | MUTTON | 11/10/2010 |
| 11/19/2010 | 64 | 1945 | 201000004562 | MUTTON | 11/11/2010 |
| 11/19/2010 | 64 | 1981 | 201000004568 | DAVID&JOHNNA SIMPSON | 11/15/2010 |
| 11/19/2010 | 64 | 1991 | 201000004569 | BRENDA&JAMES MARTIN | 11/15/2010 |
| 11/19/2010 | 64 | 1996 | 201000004570 | DOUGLAS & MARY PITTS | 11/15/2010 |
| 11/19/2010 | 64 | 1996 | 201000004571 | KENNETH &CHRIS POLAND | 11/15/2010 |
| 11/24/2010 | 64 | 2390 | 201000004665 | MICAH & BECKY HARTONG | 11/17/2010 |
| 11/24/2010 | 64 | 2458 | 201000004677 | PAUL LUANNE DANIEL DANIELLE HADORN | 11/20/2010 |
| 12/16/2010 | 65 | 1561 | 201000005128 | BEN, JOE & CAROL WRIGHT | 12/8/2010 |
| 12/16/2010 | 65 | 1566 | 201000005129 | PHINEAS & MARY ELLEN YODER | 12/8/2010 |
| 12/16/2010 | 65 | 1602 | 201000005136 | GREGORY R & KAREN WRIGHT | 12/6/2010 |
| 12/16/2010 | 65 | 1607 | 201000005137 | RONALD & MELISSA COLLINS | 12/10/2010 |
| 12/16/2010 | 65 | 1622 | 201000005140 | VIRGINIA DELONG | 12/8/2010 |
| 12/16/2010 | 65 | 1636 | 201000005142 | MARJORIE & CHARLES ELLYSON | 12/6/2010 |
| 12/22/2010 | 65 | 2453 | 201000005262 | MELVIN & MARTHA DETWEILER | 12/21/2010 |
| 12/22/2010 | 65 | 2458 | 201000005263 | MERVIN & SAVANNAH DETWEILER | 12/21/2010 |
| 12/22/2010 | 65 | 2486 | 201000005268 | FRED & TRICIA GREEN | 12/14/2010 |
| 1/14/2011 | 66 | 1392 | 201100000239 | NATHANIEL & LORA MILLER | 1/4/2011 |
| 1/14/2011 | 66 | 1397 | 201100000240 | RONALD & LORETTA MANGUN | 1/7/2011 |
| 1/14/2011 | 66 | 1413 | 201100000243 | MARTIN & LUCY DETWEILER | 1/6/2011 |
| 1/24/2011 | 66 | 1883 | 201100000347 | DEREK &JUDY CORBIN | 1/11/2011 |
| 1/24/2011 | 66 | 1888 | 201100000348 | JASON SHAFFER | 1/12/2011 |
| 1/24/2011 | 66 | 1893 | 201100000349 | ERVIN & MARION DETWEILER | 1/10/2011 |
| 1/24/2011 | 66 | 1903 | 201100000351 | KENNETH & LUELLA YODER | 1/5/2011 |
| 1/28/2011 | 66 | 2247 | 201100000443 | BENJAMIN & TAMMIE ERB | 1/22/2011 |
| 2/14/2011 | 67 | 344 | 201100000677 | MICHAEL & SUSAN CHESTNUT | 2/3/2011 |
| 2/14/2011 | 67 | 349 | 201100000678 | ROBERT & MYRA MYERS | 2/4/2011 |
| 2/14/2011 | 67 | 452 | 201100000696 | NATHAN & JOYCE OTT | 1/5/2011 |
| 2/14/2011 | 67 | 472 | 201100000700 | LESTER & MIRIAN OTT | 1/5/2011 |
| 2/18/2011 | 67 | 807 | 201100000772 | JOHN E & PATRICIA OSSLER | 1/24/2011 |
| 2/18/2011 | 67 | 827 | 201100000776 | ROBERT & AUDREY OSSLER | 2/14/2011 |
| 2/18/2011 | 67 | 832 | 201100000777 | WILLIAM & RUTH ANN OSSLER | 2/14/2011 |
| | | | 201100000778 | WILLIAM & RUTH ANN OSSLER | 2/14/2011 |
| 2/25/2011 | 67 | 1277 | 201100000869 | RICHARD GORDON | 2/23/2011 |
| 6/17/2011 | 70 | 2135 | 201100003027 | DAVID & SHEILA LANEY | 6/15/2011 |
| 6/17/2011 | 70 | 2145 | 201100003029 | WANDA,VERNON C & KATHY CUMMINGS | 6/13/2011 |
| 6/17/2011 | 70 | 2152 | 201100003030 | WANDA,VERNON C & KATHY CUMMINGS | 6/13/2011 |
| 6/17/2011 | 70 | 2236 | 201100003046 | ALFRED &ROBIN KRULL | 6/8/2011 |
| 6/17/2011 | 70 | 2252 | 201100003049 | SHERRY & JAY GROOM | 6/10/2011 |
| 6/24/2011 | 70 | 2907 | 201100003174 | ROSEMARY & DON EDWARD BRACE | 6/1/2011 |
| 6/24/2011 | 70 | 2930 | 201100003178 | JOHN & MARY BEADNELL | 6/20/2011 |
| 6/24/2011 | 70 | 2936 | 201100003179 | DOUGLAS EDWARD STACK | 6/21/2011 |
| 6/24/2011 | 70 | 2946 | 201100003181 | FRANK & ELIZABETH CLUBBS | 6/22/2011 |
| 7/8/2011 | 71 | 1021 | 201100003417 | DAVID &KERRY ANGIONE | 6/9/2011 |
| 7/8/2011 | 71 | 1027 | 201100003418 | THOMAS & AMANDA HAUN | 6/29/2011 |
| 7/15/2011 | 71 | 1608 | 201100003554 | YVONNE & DAVID FAVRE | 7/8/2011 |
| 7/22/2011 | 71 | 2441 | 201100003717 | FLOYD MELCHING JR | 7/12/2011 |

```
Instrument            Book Page
201000004561 OR        64 1940
```

201000004561
Filed for Record in
CARROLL COUNTY, OHIO
PATRICIA J. DYER, RECORDER
11-19-2010 At 10:55 am.
OIL GAS LS      52.00
OR Book      64 Page 1940 - 1944

**PAID-UP**
**OIL & GAS LEASE**

04/10 - OH                                                          Lease No. _____

This Lease, made this **10th** day of **November, 2010**, by and between **Delores M. Mutton, a widow,** of **1337 Chapel Road, Carrollton, OH 44615,** hereinafter collectively called "Lessor." and **Chesapeake Exploration, L.L.C.,** 6100 N. Western Ave.,Oklahoma City, OK 73118, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment; to use and occupy the subsurface for a wellbore or wellbores to drill across, through and under the Leasehold.

DESCRIPTION. The Leasehold is located in the Township of **CENTER**, in the County of **CARROLL**, in the State of **OHIO**, and described as follows:
**Township 015N; Range 006W; Section:07      Parcel #: 0900186000**

and is bounded formerly or currently as follows:
| | |
|---|---|
| **On the North by lands now or formerly of** | **Griffeth** |
| **On the East by lands now or formerly of** | **Hadorn** |
| **On the South by lands now or formerly of** | **Burgett** |
| **On the West by lands now or formerly of** | **Roswell** |

### See attached Exhibit 'A' which is unrecorded.

including lands acquired from **Edward R. Mutton and Delores M. Mutton**, by virtue of deed dated **October 20, 2009**, and recorded in Book ____ **56** ____, at Page ____ **1376** ____, and described for the purposes of this agreement as containing a total of **30.9000** Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of **FIVE (5)** years from 12:00 A.M. **November 10, 2010** (effective date) to 11:59 P.M. **November 09, 2015** (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

00091

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor a Royalty equal to one-eighth (1/8) of the net revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.

2. GAS: To pay Lessor an amount equal to one-eighth (1/8) of the net revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that is awaiting completion (such as hydraulic fracture stimulation), or that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

00092

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means. In the event the leased lands are encumbered by a prior mortgage, then, notwithstanding anything contained herein to the contrary, Lessee shall have the right to suspend the payment of any royalties due hereunder, without liability for interest, until such time as Lessor obtains at its own expense a subordination of the mortgage in a form acceptable to Lessee.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease, and the local property tax assessment calculation of the lands covered by the Lease, or the deeded acreage amount, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well on the Leasehold within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

Instrument          Book Page
201000004561 OR      64 1943

DISPOSAL AND INJECTION WELLS. Lessor hereby grants to Lessee the right to drill wells and/or re-enter existing wells, including necessary location, roadway and pipeline easements and rights of way, on any part of the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, other than a potable water strata, of air, gas, brine, completion and production fluids, waste water and any hydrocarbon related substances from any source, including, but not limited to wells on the Leasehold or lands pooled or unitized therewith or from properties and lands outside the Leasehold or lands pooled or unitized therewith, and to conduct all operations as may be required, for so long as necessary and required by Lessee for purposes as herein provided. If, at the expiration of the primary term, Lessee is disposing and/or injecting into any subsurface strata underlying the Leasehold or lands pooled or unitized therewith or conducting operations for such disposal and/or injection and this lease is not being maintained by any other provision contained herein and no other payments are being made to Lessor as prescribed hereunder, Lessee shall pay to Lessor the sum of one thousand dollars ($1,000.00) per year, proportionately reduced to Lessor's ownership in the Leasehold and surface as it bears to the full and undivided estate, beginning on the next anniversary date of this Lease and said payment and term of this Lease, insofar as to terms and provisions contained herein applicable to disposal and injection wells, shall continue annually thereafter for so long as necessary and required by Lessee for purposes as herein provided and until all disposal and/or injection wells located on the Leasehold or on lands pooled or unitized therewith are plugged and abandoned. Lessor agrees that if required by Lessee, regulatory agency or governmental authority having jurisdiction, Lessor shall enter a separate Disposal and Injection Agreement with Lessee for the purposes as herein provided.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein and in the associated Order of Payment (if any). No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

TITLE CURATIVE. Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

**See attached Exhibit 'A' which is unrecorded.**

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

_Delores M. Mutton_ (Seal)
**Delores M. Mutton**

_____ (Seal)

Document prepared by: Chesapeake Exploration, L.L.C., 6100 N. Western Ave., Oklahoma City, OK 73118

## ACKNOWLEDGEMENT

STATE OF _Ohio_ )
                                    ) SS:
COUNTY OF _Carroll_ )

On this, the _10_ day of _Nov_ _2010_ before me a notary public, the undersigned officer, personally appeared **Delores M. Mutton, a widow,**

known to me (or satisfactorily proven) to be the person(s) whose names(s) is/are subscribed to the within instrument, and acknowledged that she executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I here unto set my hand and official seal.

My Commission Expires: _9/20/2015_

Signature/Notary Public: _Richard Owen_

Name/Notary Public (print): _Richard Owen_

Recorder: Return to Chesapeake Exploration, L.L.C., 6100 N. Western Ave., Oklahoma City, OK 73118

37702  OCAR

Richard Owen
Notary Public, State of Ohio
My Commission Expires 09-20-2015

Instrument          Book Page
201100000240 OR      66 1397

201100000240 *Kenyon*
Filed for Record in
CARROLL COUNTY, OHIO
PATRICIA J. DYER, RECORDER
01-14-2011 At 09:57 am.
OIL GAS LS        60.00
OR Book      66 Page 1397 - 1402

## PAID-UP
## OIL & GAS LEASE

04/10 - OH

Lease No. _____

This Lease, made this **7th** day of **January, 2011**, by and between **Ronald E. Mangun and Loretta L. Mangun, husband and wife,** of **2033 Brush Road NE, East Rochester, OH 44625**, hereinafter collectively called "Lessor." and **Chesapeake Exploration, L.L.C.**, 6100 N. Western Ave.,Oklahoma City, OK 73118, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment; to use and occupy the subsurface for a wellbore or wellbores to drill across, through and under the Leasehold.

DESCRIPTION. See Exhibit B for lands described in **AUGUSTA** Township, **CARROLL** County, **OHIO**

| | |
|---|---|
| **Township 015N; Range 005W; Section:21** | **Parcel #: 0100701000** |
| **Township 015N; Range 005W; Section:09** | **Parcel #: 0200095000** |
| **Township 015N; Range 005W; Section:09** | **Parcel #: 0200119001** |

### See attached Exhibit 'A' which is unrecorded and Exhibit 'B' attached hereto and made a part hereof.

and described for the purposes of this agreement as containing a total of 1.3440 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of **FIVE (5)** years from 12:00 A.M. **January 07, 2011** (effective date) to 11:59 P.M. **January 06, 2016** (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

_00096_

Instrument 201100000240 OR    Book Page 66 1398

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor a Royalty equal to one-eighth (1/8) of the net revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.

2. GAS: To pay Lessor an amount equal to one-eighth (1/8) of the net revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that is awaiting completion (such as hydraulic fracture stimulation), or that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and
payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP:  Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE:  If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS:  Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.  In the event the leased lands are encumbered by a prior mortgage, then, notwithstanding anything contained herein to the contrary, Lessee shall have the right to suspend the payment of any royalties due hereunder, without liability for interest, until such time as Lessor obtains at its own expense a subordination of the mortgage in a form acceptable to Lessee.

(J) CHARACTERIZATION OF PAYMENTS:  Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked.  Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease.  Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations.  Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold.  Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS:  If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING.  Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization.  Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created.  Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit.  Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold.  In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease, and the local property tax assessment calculation of the lands covered by the Lease, or the deeded acreage amount, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES.  Lessee shall not drill a well on the Leasehold within 200 feet of any structure located on the Leasehold without Lessor's written consent.  Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent.  Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE.  Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage.  At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date.  The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

Instrument          Book Page
201100000240 OR        66 1400

**DISPOSAL AND INJECTION WELLS.** Lessor hereby grants to Lessee the right to drill wells and/or re-enter existing wells, including necessary location, roadway and pipeline easements and rights of way, on any part of the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, other than a potable water strata, of air, gas, brine, completion and production fluids, waste water and any hydrocarbon related substances from any source, including, but not limited to wells on the Leasehold or lands pooled or unitized therewith or from properties and lands outside the Leasehold or lands pooled or unitized therewith, and to conduct all operations as may be required, for so long as necessary and required by Lessee for purposes as herein provided. If, at the expiration of the primary term, Lessee is disposing and/or injecting into any subsurface strata underlying the Leasehold or lands pooled or unitized therewith or conducting operations for such disposal and/or injection and this lease is not being maintained by any other provision contained herein and no other payments are being made to Lessor as prescribed hereunder, Lessee shall pay to Lessor the sum of one thousand dollars ($1,000.00) per year,

proportionally reduced to Lessor's ownership in the Leasehold and surface as it bears to the full and undivided estate, beginning on the next anniversary date of this Lease and said payment and term of this Lease, insofar as to terms and provisions contained herein applicable to disposal and injection wells, shall continue annually thereafter for so long as necessary and required by Lessee for purposes as herein provided and until all disposal and/or injection wells located on the Leasehold or on lands pooled or unitized therewith are plugged and abandoned. Lessor agrees that if required by Lessee, regulatory agency or governmental authority having jurisdiction, Lessor shall enter a separate Disposal and Injection Agreement with Lessee for the purposes as herein provided.

**TITLE AND INTERESTS.** Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

**LEASE DEVELOPMENT.** There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

**COVENANTS.** This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

**RIGHT OF FIRST REFUSAL.** If at any time within the primary term of this Lease or any continuation or extension thereof, Lessee receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

**ARBITRATION.** In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

**ENTIRE CONTRACT.** The entire agreement between Lessor and Lessee is embodied herein and in the associated Order of Payment (if any). No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

**TITLE CURATIVE.** Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

**SURRENDER.** Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

**SUCCESSORS.** All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

Instrument   Book Page
201100000240 OR  66 1401

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

**See attached Exhibit 'A' which is unrecorded.**

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

_Ronald E. Mangun_ (Seal)
**Ronald E. Mangun**

_Loretta L. Mangun_ (Seal)
**Loretta L. Mangun**

Document prepared by: Chesapeake Exploration, L.L.C., 6100 N. Western Ave., Oklahoma City, OK 73118

## ACKNOWLEDGEMENT

STATE OF *Ohio*  )
          ) SS:
COUNTY OF *Carroll*  )

On this, the _8th_ day of _Jan_ _2011_, before me a notary public, the undersigned officer, personally appeared **Ronald E. Mangun and Loretta L. Mangun, husband and wife,**
known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I here unto set my hand and official seal.

My Commission Expires: _9/20/2015_

Signature/Notary Public: _Richard Owen_

Name/Notary Public (print):

Recorder: Return to Chesapeake Exploration, 6100 N. Western Ave., Oklahoma City, OK 73118

35654 0CAR

Richard Owen
Notary Public, State of Ohio
My Commission Expires 09-20-2015

00100

Instrument          Book Page
201100000240 OR      66 1402

# EXHIBIT "B"

This Exhibit "B" is attached to and made part of that certain Oil and Gas Lease dated **1/7/2011**, by and between **Ronald E. Mangun and Loretta L. Mangun, husband and wife** of **2033 Brush Road NE East Rochester, OH 44625** as Lessor and **Chesapeake Exploration, L.L.C.**, 6100 N. Western Ave., Oklahoma City, OK 73118, as Lessee, and is made a part of said lease as if incorporated therein.

**Property Tax Parcel Identification Number: 02-00119.001**

**and is bounded formerly or currently as follows:**
| | |
|---|---|
| On the North by lands now or formerly of | Kreirhoff |
| On the East by lands now or formerly of | Kreirhoff |
| On the South by lands now or formerly of | Mangun |
| On the West by lands now or formerly of | Kreirhoff |

**including lands acquired from Earnest H. Lutz, Jr. and Grace L. Lutz, husband** and wife, by virtue of deed dated 12/26/1985, and recorded in Book 219, Page 717 and described for the purposes of this agreement as containing a total of 0.5490 Leasehold acres

**Property Tax Parcel Identification Number: 02-00095.000**

**and is bounded formerly or currently as follows:**
| | |
|---|---|
| On the North by lands now or formerly of | Mangun |
| On the East by lands now or formerly of | Country Rd. 43 |
| On the South by lands now or formerly of | Country Rd. 43 |
| On the West by lands now or formerly of | Pennock |

**including lands acquired from Mary Belle Johnson, unmarried; Norma Tingen, married; Martha Allen, married, and Nova Kinsey, married, by virtue of deed dated 10/07/1980, and recorded in Book 203, Page 346 and described for the purposes of this agreement as containing a total of 0.5100 Leasehold acres**

**Property Tax Parcel Identification Number: 01-00701.000**

**and is bounded formerly or currently as follows:**
| | |
|---|---|
| On the North by lands now or formerly of | Wickersham |
| On the East by lands now or formerly of | East Lot Line |
| On the South by lands now or formerly of | Craston |
| On the West by lands now or formerly of | Craston |

**including lands acquired from James J. Murray and Phyllis A. Murray, husband and wife, by virtue of deed dated 10/19/1983, and recorded in Book 213, Page 451 and described for the purposes of this agreement as containing a total of 0.2850 Leasehold acres**

## SIGNED FOR IDENTIFICATION ONLY:

*Ronald E Mangun*     (Seal)
Ronald E. Mangun

*Loretta L. Mangun*     (Seal)
Loretta L. Mangun

00101

Instrument        Book Page
201100000443 OR     66 2247

201100000443 [signature]
Filed for Record in
CARROLL COUNTY, OHIO
PATRICIA J. DYER, RECORDER
01-28-2011 At 09:23 am.
OIL GAS LS        52.00
OR Book      66 Page 2247 - 2251

**PAID-UP**
**OIL & GAS LEASE**                                    Lease No. _____

04/10 - OH

This Lease, made this **22nd** day of **January, 2011**, by and between **Benjamin A. Erb and Fannie P. Erb, husband and wife,** of **2400 Andora NE, Carrollton, OH 44615,** hereinafter collectively called "Lessor." and **Chesapeake Exploration, L.L.C.,** 6100 N. Western Ave.,Oklahoma City, OK 73118, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment; to use and occupy the subsurface for a wellbore or wellbores to drill across, through and under the Leasehold.

DESCRIPTION.  The Leasehold is located in the Township of **WASHINGTON**, in the County of **CARROLL**, in the State of **OHIO**, and described as follows:

Township 014N; Range 005W; Section:22        Parcel #: 3400170000

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Andora Rd. |
| On the East by lands now or formerly of | Schmuck |
| On the South by lands now or formerly of | McCully |
| On the West by lands now or formerly of | Andora Rd. |

### See attached Exhibit 'A' which is unrecorded.

including lands acquired from **Barbara Johnson**, by virtue of deed dated **April 15, 2010**, and recorded in Book **59** , at Page **1451** , and described for the purposes of this agreement as containing a total of **12.7360** Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM.  This Lease shall remain in force for a primary term of **FIVE (5)** years from 12:00 A.M. **January 22, 2011** (effective date) to  11:59 P.M. **January 21, 2016** (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.                                      1

Instrument          Book Page
201100000443 OR      66 2248

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor a Royalty equal to one-eighth (1/8) of the net revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.

2. GAS: To pay Lessor an amount equal to one-eighth (1/8) of the net revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that is awaiting completion (such as hydraulic fracture stimulation), or that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

2.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and

payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means. In the event the leased lands are encumbered by a prior mortgage, then, notwithstanding anything contained herein to the contrary, Lessee shall have the right to suspend the payment of any royalties due hereunder, without liability for interest, until such time as Lessor obtains at its own expense a subordination of the mortgage in a form acceptable to Lessee.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessee agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease, and the local property tax assessment calculation of the lands covered by the Lease, or the deeded acreage amount, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well on the Leasehold within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

*3*

**DISPOSAL AND INJECTION WELLS.** Lessor hereby grants to Lessee the right to drill wells and/or re-enter existing wells, including necessary location, roadway and pipeline easements and rights of way, on any part of the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, other than a potable water strata, of air, gas, brine, completion and production fluids, waste water and any hydrocarbon related substances from any source, including, but not limited to wells on the Leasehold or lands pooled or unitized therewith or from properties and lands outside the Leasehold or lands pooled or unitized therewith, and to conduct all operations as may be required, for so long as necessary and required by Lessee for purposes as herein provided. If, at the expiration of the primary term, Lessee is disposing and/or injecting into any subsurface strata underlying the Leasehold or lands pooled or unitized therewith or conducting operations for such disposal and/or injection and this lease is not being maintained by any other provision contained herein and no other payments are being made to Lessor as prescribed hereunder, Lessee shall pay to Lessor the sum of one thousand dollars ($1,000.00) per year,

proportionately reduced to Lessor's ownership in the Leasehold and surface as it bears to the full and undivided estate, beginning on the next anniversary date of this Lease and said payment and term of this Lease, insofar as to terms and provisions contained herein applicable to disposal and injection wells, shall continue annually thereafter for so long as necessary and required by Lessee for purposes as herein provided and until all disposal and/or injection wells located on the Leasehold or on lands pooled or unitized therewith are plugged and abandoned. Lessor agrees that if required by Lessee, regulatory agency or governmental authority having jurisdiction, Lessor shall enter a separate Disposal and Injection Agreement with Lessee for the purposes as herein provided.

**TITLE AND INTERESTS.** Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

**LEASE DEVELOPMENT.** There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

**COVENANTS.** This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

**RIGHT OF FIRST REFUSAL.** If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

**ARBITRATION.** In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

**ENTIRE CONTRACT.** The entire agreement between Lessor and Lessee is embodied herein and in the associated Order of Payment (if any). No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

**TITLE CURATIVE.** Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

**SURRENDER.** Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

**SUCCESSORS.** All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

4

Instrument                    Book Page
201100000443 OR              66 2251

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

**See attached Exhibit 'A' which is unrecorded.**

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

_____ (Seal)
Benjamin A. Erb

_____ (Seal)
Fannie P. Erb

Document prepared by: Chesapeake Exploration, L.L.C., 6100 N. Western Ave., Oklahoma City, OK 73118

## ACKNOWLEDGEMENT

STATE OF _____OHiO_____ )
                                )  SS:
COUNTY OF ___STarK_____ )

On this, the 23 day of Jan 2011, before me a notary public, the undersigned officer, personally appeared **Benjamin A. Erb and Fannie P. Erb, husband and wife,**
known to me (or satisfactorily proven) to be the person(s) whose names(s) is/are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I here unto set my hand and official seal.

My Commission Expires: _____9/20/2015_____

Signature/Notary Public: _____Richard Owens_____

Name/Notary Public (print): _____

Recorder: Return to Chesapeake Exploration, 6100 N. Western Ave., Oklahoma City, OK 73118

13432  0CAR      5

Instrument          Book  Page
201100000778 OR      67   837

201100000778 *Kenyon*
Filed for Record in
CARROLL COUNTY, OHIO
PATRICIA J. OYER, RECORDER
02-18-2011 At 10:46 am.
OIL GAS LS      52.00
OR Book     67 Page  837 -   841

**PAID-UP**
**OIL & GAS LEASE**

04/10 - OH                                             Lease No. _____

This Lease, made this **14th** day of **February, 2011**, by and between **William P. Ossler and Ruth A. Ossler, husband and wife; Arry Ossler, a widow,** of **7218 Kensington Road, Carrollton, OH 44615,** hereinafter collectively called "Lessor." and **Chesapeake Exploration, L.L.C.,** 6100 N. Western Ave.,Oklahoma City, OK 73118, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment; to use and occupy the subsurface for a wellbore or wellbores to drill across, through and under the Leasehold.

DESCRIPTION. The Leasehold is located in the Township of **AUGUSTA**, in the County of **CARROLL**, in the State of **OHIO**, and described as follows:

Township **015N**; Range **005W**; Section:**22**        Parcel #: **0100391002**

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Ossler |
| On the East by lands now or formerly of | State Route 9 |
| On the South by lands now or formerly of | Ossler |
| On the West by lands now or formerly of | Ossler |

### See attached Exhibit 'A' which is unrecorded.

including lands acquired from **Arry J. Ossler, an unremarried widow,** by virtue of deed dated **June 27, 2007,** and recorded in Book   **39**  , at Page   **2273**  , and described for the purposes of this agreement as containing a total of **10.0461** Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of **FIVE (5)** years from 12:00 A.M. **February 14, 2011** (effective date) to 11:59 P.M. **February 13, 2016** (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE
(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of <u>five dollars ($5.00)</u> per net acre per year payable in advance. **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor a Royalty equal to one-eighth (1/8) of the net revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.

2. GAS: To pay Lessor an amount equal to one-eighth (1/8) of the net revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

Instrument                Book Page
201100000778 OR            67  839

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that is awaiting completion (such as hydraulic fracture stimulation), or that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and
payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means. In the event the leased lands are encumbered by a prior mortgage, then, notwithstanding anything contained herein to the contrary, Lessee shall have the right to suspend the payment of any royalties due hereunder, without liability for interest, until such time as Lessor obtains at its own expense a subordination of the mortgage in a form acceptable to Lessee.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease, and the local property tax assessment calculation of the lands covered by the Lease, or the deeded acreage amount, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

00109

FACILITIES.  Lessee shall not drill a well on the Leasehold within 200 feet of any structure located on the Leasehold without Lessor's written consent.  Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent.  Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE.  Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage.  At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date.  The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

DISPOSAL AND INJECTION WELLS.  Lessor hereby grants to Lessee the right to drill wells and/or re-enter existing wells, including necessary location, roadway and pipeline easements and rights of way, on any part of the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, other than a potable water strata, of air, gas, brine, completion and production fluids, waste water and any hydrocarbon related substances from any source, including, but not limited to wells on the Leasehold or lands pooled or unitized therewith or from properties and lands outside the Leasehold or lands pooled or unitized therewith, and to conduct all operations as may be required, for so long as necessary and required by Lessee for purposes as herein provided.  If, at the expiration of the primary term, Lessee is disposing and/or injecting into any subsurface strata underlying the Leasehold or lands pooled or unitized therewith or conducting operations for such disposal and/or injection and this lease is not being maintained by any other provision contained herein and no other payments are being made to Lessor as prescribed hereunder, Lessee shall pay to Lessor the sum of one thousand dollars ($1,000.00) per year,

proportionately reduced to Lessor's ownership in the Leasehold and surface as it bears to the full and undivided estate, beginning on the next anniversary date of this Lease and said payment and term of this Lease, insofar as to terms and provisions contained herein applicable to disposal and injection wells, shall continue annually thereafter for so long as necessary and required by Lessee for purposes as herein provided and until all disposal and/or injection wells located on the Leasehold or on lands pooled or unitized therewith are plugged and abandoned.  Lessor agrees that if required by Lessee, regulatory agency or governmental authority having jurisdiction, Lessor shall enter a separate Disposal and Injection Agreement with Lessee for the purposes as herein provided.

TITLE AND INTERESTS.  Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title.  Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT.  There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease.  There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants.  Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS.  This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL.  If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions.  Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease.  Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions.  If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer.  Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION.  In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association.  Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment.  All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT.  The entire agreement between Lessor and Lessee is embodied herein and in the associated Order of Payment (if any).  No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

TITLE CURATIVE.  Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

Instrument        Book Page
201100000778 OR     67  841

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

**See attached Exhibit 'A' which is unrecorded.**

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

_William P. Ossler_
**William P. Ossler**

_Ruth A. Ossler_
**Ruth A. Ossler**

_Arry Ossler_
**Arry Ossler**

Document prepared by: Chesapeake Exploration, L.L.C., 6100 N. Western Ave., Oklahoma City, OK 73118

## ACKNOWLEDGEMENT

STATE OF _Ohio_                          )
                                         ) SS:
COUNTY OF _Carroll_                      )

On this, the _16_ day of _Feb_ , _2011_ before me a notary public, the undersigned officer, personally appeared **William P. Ossler and Ruth A. Ossler, husband and wife; Arry Ossler, a widow,**

known to me (or satisfactorily proven) to be the person(s) whose names(s) is/are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I here unto set my hand and official seal.

My Commission Expires: _9/20/2015_

_Richard Owen_
Notary Public, State of Ohio
My Commission Expires (print): _Richard Owen_

to Chesapeake Exploration, L.L.C., 6100 N. Western Ave., Oklahoma City, OK 73118

354  OLOW

5

00111

Instrument                          Book Page
201100003029 OR                     70 2145

201100003029 Kenyon
Filed for Record in
CARROLL COUNTY, OHIO
PATRICIA J. DYER, RECORDER
06-17-2011 At 02:16 pm.
OIL GAS LS           68.00
OR Book      70 Page 2145 - 2151

04/10 - OH

# PAID-UP
# OIL & GAS LEASE

Lease No. _____

This Lease, made this **13th** day of **June, 2011**, by and between **Wanda L. Cummings a/k/a Wanda Cummings,** a widow; **Vernon C. Cummings and Kathy Jo Cummings, husband and wife,** of **2285 Antigua Road SW, Carrollton, OH 44615**, hereinafter collectively called "Lessor." and **Chesapeake Exploration, L.L.C.,** 6100 N. Western Ave.,Oklahoma City, OK 73118, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

**LEASING CLAUSE.** Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair and remove material and equipment; to use and occupy the subsurface for a wellbore or wellbores to drill across, through and under the Leasehold.

**DESCRIPTION.** See **Exhibit B** for lands described in **UNION** Township, **CARROLL** County, **OHIO**

| | | |
|---|---|---|
| **Township 014N; Range 006W;  Section:17** | | **Parcel #: 3300271000** |
| **Township 014N; Range 006W;  Section:11** | | **Parcel #: 3300272000** |
| **Township 014N; Range 006W;  Section:17** | | **Parcel #: 3300273000** |
| **Township 014N; Range 006W;  Section:17** | | **Parcel #: 3300274000** |
| **Township 014N; Range 006W;  Section:17** | | **Parcel #: 3300275000** |
| **Township 014N; Range 006W;  Section:17** | | **Parcel #: 3300276000** |

**See attached Exhibit 'A' which is unrecorded and Exhibit 'B' attached hereto and made a part hereof.**

and described for the purposes of this agreement as containing a total of 277.5800 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

**LEASE TERM.** This Lease shall remain in force for a primary term of **FIVE (5)** years from 12:00 A.M. **June 13, 2011** (effective date) to 11:59 P.M. **June 12, 2016** (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

Instrument          Book Page
201100003029 OR      70 2146

EXTENSION OF PRIMARY TERM.  Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease.  Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof.  Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE
(A) CONSTRUCTION OF LEASE:  The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation.  This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above.  In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE:  This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice.  If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR.  In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:
(A) DELAY RENTAL:  To pay Lessor as Delay Rental, after the first year, at the rate of **five dollars ($5.00)** per net acre per year payable in advance.  **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B) ROYALTY:  To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:
1.  OIL:  To deliver to the credit of Lessor a Royalty equal to one-eighth (1/8) of the net revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.
2.  GAS:  To pay Lessor an amount equal to one-eighth (1/8) of the net revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee.  Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING:  In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that is awaiting completion (such as hydraulic fracture stimulation), or that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN:  In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect.  During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation.  In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES:  Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT:  Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address.  Payment may be tendered by mail or any comparable method (e.g., Federal Express), and

Instrument          Book Page
201100003029 OR      70  2147

payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means. In the event the leased lands are encumbered by a prior mortgage, then, notwithstanding anything contained herein to the contrary, Lessee shall have the right to suspend the payment of any royalties due hereunder, without liability for interest, until such time as Lessor obtains at its own expense a subordination of the mortgage in a form acceptable to Lessee.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease, and the local property tax assessment calculation of the lands covered by the Lease, or the deeded acreage amount, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well on the Leasehold within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessee shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

DISPOSAL AND INJECTION WELLS. Lessor hereby grants to Lessee the right to drill wells and/or re-enter existing wells, including necessary location, roadway and pipeline easements and rights of way, on any part of the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, other than a potable water strata, of air, gas, brine, completion and production fluids, waste water and any hydrocarbon related substances from any source, including, but not limited to wells on the Leasehold or lands pooled or unitized therewith or from properties and lands outside the Leasehold or lands pooled or unitized therewith, and to conduct all operations as may be required, for so long as necessary and required by Lessee for purposes as herein provided. If, at the expiration of the primary term, Lessee is disposing and/or injecting into any subsurface strata underlying the Leasehold or lands pooled or unitized therewith or conducting operations for such disposal and/or injection and this lease is not being maintained by any other provision contained herein and no other payments are being made to Lessor as prescribed hereunder, Lessee shall pay to Lessor the sum of one thousand dollars ($1,000.00) per year,

proportionately reduced to Lessor's ownership in the Leasehold and surface as it bears to the full and undivided estate, beginning on the next anniversary date of this Lease and said payment and term of this Lease, insofar as to terms and provisions contained herein applicable to disposal and injection wells, shall continue annually thereafter for so long as necessary and required by Lessee for purposes as herein provided and until all disposal and/or injection wells located on the Leasehold or on lands pooled or unitized therewith are plugged and abandoned. Lessor agrees that if required by Lessee, regulatory agency or governmental authority having jurisdiction, Lessor shall enter a separate Disposal and Injection Agreement with Lessee for the purposes as herein provided.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein and in the associated Order of Payment (if any). No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

TITLE CURATIVE. Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this Lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

Instrument          Book Page
201100003029 OR      70 2149

See attached Exhibit 'A' which is unrecorded.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

_Wanda L. Cummings_ (signature)
**Wanda L. Cummings**

_Vernon C. Cummings_ (signature)
**Vernon C. Cummings**

_Kathy Jo Cummings_ (signature)
**Kathy Jo Cummings**

Document prepared by: Chesapeake Exploration, L.L.C., 6100 N. Western Ave., Oklahoma City, OK 73118

## ACKNOWLEDGEMENT

ACKNOWLEDGEMENT

STATE OF _Ohio_ }
} ss.
COUNTY OF _Carroll_ }

On this, the _14_ day of _June_ , _2011_ , before me , the undersigned officer, personally appeared Wanda L. Cummings a/k/a Wanda Cummings, a widow; Vernon C. Cummings and Kathy Jo Cummings, husband and wife known to me (or satisfactorily proven) to be the person(s) whose names(s) is/are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I here unto set my hand and official seal.

My Commission expires: _9/20/2015_

Signature/Notary Public: _Richard Owen_

Name/Notary Public (print): _____

Recorder: Return to Chesapeake Exploration, L.L.C., 6100 N. Western Ave., Oklahoma City, OK 73118

13921  0CAR

Richard Owen
Notary Public, State of Ohio
My Commission Expires 09-03-2015

00116

Instrument          Book Page
201100003029 OR      70 2150

# EXHIBIT "B"

This Exhibit "B" is attached to and made part of that certain Oil and Gas Lease dated 6/13/2011, by and between **Wanda L. Cummings a/k/a Wanda Cummings, a widow; Vernon C. Cummings and Kathy Jo Cummings, husband and wife** of **2285 Antigua Road SW Carrollton, OH 44615** as Lessor and Chesapeake Exploration, L.L.C., 6100 N. Western Ave., Oklahoma City, OK 73118, as Lessee, and is made a part of said lease as if incorporated therein.

Property Tax Parcel Identification Number: 33-00275.000

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Long |
| On the East by lands now or formerly of | Cummings; Antigua Road |
| On the South by lands now or formerly of | Antigua Road; Scroll Road |
| On the West by lands now or formerly of | Scroll Road; Bennett; Baris; Tomford and Hallerberg |

Including lands acquired from Homer C. Cummings and Wanda Cummings, husband and wife, by virtue of deed dated 04/04/2001, and recorded in Book 299, Page 436 and described for the purposes of this agreement as containing a total of 52.9300 Leasehold acres

Property Tax Parcel Identification Number: 33-00272.000

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Campbell; Silver Road |
| On the East by lands now or formerly of | Silver Road |
| On the South by lands now or formerly of | Silver Road; Rulledge |
| On the West by lands now or formerly of | Cummings |

Including lands acquired from Wanda L. Cummings, a married woman, by virtue of deed dated 04/04/2001, and recorded in Book 299, Page 433 and described for the purposes of this agreement as containing a total of 36.5100 Leasehold acres

Property Tax Parcel Identification Number: 33-00276.000

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Antigua Road; Long |
| On the East by lands now or formerly of | Antigua Road; Cummings |
| On the South by lands now or formerly of | Antigua Road; Claugus |
| On the West by lands now or formerly of | Antigua Road; Cummings |

Including lands acquired from Wanda L. Cummings, a married woman, by virtue of deed dated 04/04/2001, and recorded in Book 299, Page 433 and described for the purposes of this agreement as containing a total of 75.0000 Leasehold acres

Property Tax Parcel Identification Number: 33-00274.000

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Long |
| On the East by lands now or formerly of | Cummings |
| On the South by lands now or formerly of | Long |
| On the West by lands now or formerly of | Cummings |

Including lands acquired from Wanda L. Cummings, a married woman, by virtue of deed dated 04/04/2001, and recorded in Book 299, Page 436 and described for the purposes of this agreement as containing a total of 43.5000 Leasehold acres

00117

Property Tax Parcel Identification Number: 33-00273.000

and is bounded formerly or currently as follows:
| | |
|---|---|
| On the North by lands now or formerly of | Cummings |
| On the East by lands now or formerly of | Cummings |
| On the South by lands now or formerly of | Claugus |
| On the West by lands now or formerly of | Cummings |

including lands acquired from Wanda L. Cummings, a married woman, by virtue of deed dated 04/04/2001, and recorded in Book 299, Page 433 and described for the purposes of this agreement as containing a total of 43.5000 Leasehold acres

Property Tax Parcel Identification Number: 33-00271.000

and is bounded formerly or currently as follows:
| | |
|---|---|
| On the North by lands now or formerly of | Antigua Road; Long |
| On the East by lands now or formerly of | Antigua Road; Cummings |
| On the South by lands now or formerly of | Antigua Road; Beadnell |
| On the West by lands now or formerly of | Antigua Road; Cummings |

including lands acquired from Wanda L. Cummings, a married woman, by virtue of deed dated 04/04/2001, and recorded in Book 299, Page 433 and described for the purposes of this agreement as containing a total of 26.1400 Leasehold acres

## SIGNED FOR IDENTIFICATION ONLY:


_____
Wanda L. Cummings

_____
Vernon C. Cummings

_____
Kathy Jo Cummings

00118

Instrument      Book Page
201100003717 OR    71 2441

201100003717 *Kenyon*
Filed for Record in
CARROLL COUNTY, OHIO
PATRICIA J. OYER, RECORDER
07-22-2011 At 09:44 am.
OIL GAS LS     52.00
OR Book   71 Page 2441 - 2445

# PAID-UP
# OIL & GAS LEASE

04/10 - OH                                Lease No. _____

This Lease, made this **12th** day of **July, 2011**, by and between **Floyd M. Melching, Jr., a single person**, of **6185 Plymouth Road SE, Carrollton, OH 44615**, hereinafter collectively called "Lessor." and **Chesapeake Exploration, L.L.C.**, 6100 N. Western Ave., Oklahoma City, OK 73118, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment; to use and occupy the subsurface for a wellbore or wellbores to drill across, through and under the Leasehold.

DESCRIPTION. The Leasehold is located in the Township of **PERRY**, in the County of **CARROLL**, in the State of **OHIO**, and described as follows:

    **Township 013N; Range 005W; Section:31**        **Parcel #: 2800207001**

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | **Ghinga** |
| On the East by lands now or formerly of | **Aster Road** |
| On the South by lands now or formerly of | **Atkins; Ghinga** |
| On the West by lands now or formerly of | **Ghinga; Atkins** |

## See attached Exhibit 'A' which is unrecorded.

including lands acquired from **Jarod T. Snair and Toni R. Snair, husband and wife**, by virtue of deed dated **October 24, 2003**, and recorded in Book **313**, at Page **716**, and described for the purposes of this agreement as containing a total of **5.5930** Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of **FIVE (5)** years from 12:00 A.M. **July 12, 2011** (effective date) to 11:59 P.M. **July 11, 2016** (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

00119

Instrument
201100003717 OR

Book Page
71 2442

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor a Royalty equal to one-eighth (1/8) of the net revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.

2. GAS: To pay Lessor an amount equal to one-eighth (1/8) of the net revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that is awaiting completion (such as hydraulic fracture stimulation), or that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

Instrument
201100003717 OR

Book Page
71 2443

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means. In the event the leased lands are encumbered by a prior mortgage, then, notwithstanding anything contained herein to the contrary, Lessee shall have the right to suspend the payment of any royalties due hereunder, without liability for interest, until such time as Lessor obtains at its own expense a subordination of the mortgage in a form acceptable to Lessee.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease, and the local property tax assessment calculation of the lands covered by the Lease, or the deeded acreage amount, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well on the Leasehold within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

Instrument
201100003717 OR

Book Page
71 2444

DISPOSAL AND INJECTION WELLS. Lessor hereby grants to Lessee the right to drill wells and/or re-enter existing wells, including necessary location, roadway and pipeline easements and rights of way, on any part of the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, other than a potable water strata, of air, gas, brine, completion and production fluids, waste water and any hydrocarbon related substances from any source, including, but not limited to wells on the Leasehold or lands pooled or unitized therewith or from properties and lands outside the Leasehold or lands pooled or unitized therewith, and to conduct all operations as may be required, for so long as necessary and required by Lessee for purposes as herein provided. If, at the expiration of the primary term, Lessee is disposing and/or injecting into any subsurface strata underlying the Leasehold or lands pooled or unitized therewith or conducting operations for such disposal and/or injection and this lease is not being maintained by any other provision contained herein and no other payments are being made to Lessor as prescribed hereunder, Lessee shall pay to Lessor the sum of one thousand dollars ($1,000.00) per year, proportionately reduced to Lessor's ownership in the Leasehold and surface as it bears to the full and undivided estate, beginning on the next anniversary date of this Lease and said payment and term of this Lease, insofar as to terms and provisions contained herein applicable to disposal and injection wells, shall continue annually thereafter for so long as necessary and required by Lessee for purposes as herein provided and until all disposal and/or injection wells located on the Leasehold or on lands pooled or unitized therewith are plugged and abandoned. Lessor agrees that if required by Lessee, regulatory agency or governmental authority having jurisdiction, Lessor shall enter a separate Disposal and Injection Agreement with Lessee for the purposes as herein provided.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein and in the associated Order of Payment (if any). No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

TITLE CURATIVE. Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

```
                                         Instrument            Book Page
                                         201100003717 OR        71  2445
```

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

**See attached Exhibit 'A' which is unrecorded.**

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

_Floyd M. Melching Jr_
Floyd M. Melching, Jr.

Document prepared by: Chesapeake Exploration, L.L.C., 6100 N. Western Ave., Oklahoma City, OK 73118

## ACKNOWLEDGEMENT

STATE OF _Ohio_                              )

                                             ) SS:

COUNTY OF _Carroll_                          )

On this, the _14_ day of _July_ _2011_ before me a notary public, the undersigned officer, personally appeared **Floyd M. Melching, Jr., a single person,**
known to me (or satisfactorily proven) to be the person(s) whose names(s) is/are subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I here unto set my hand and official seal.

My Commission Expires:    _9/20/2015_

Signature/Notary Public:  _Richard Owen_

Name/Notary Public (print): _____

Recorder: Return to Chesapeake Exploration, L.L.C., 6100 N. Western Ave., Oklahoma City, OK 73118

15686  0CAR

Richard Owen
Notary Public, State of Ohio
My Commission Expires 09-20-2008

Exhibit J

We looked up the Professional Rules of Conduct in Ohio and discovered some which we think apply to this litigation before your Honor and Mr. Delay's actions or inactions in representing our interests through December 17, 2012 when we appeared in court without our permission and even though we terminated his services on December 15, 2012.

" Preamble: A Lawyer's Responsibilities"

"[1] In all professional functions a lawyer should be competent, prompt, diligent, and loyal. A lawyer should maintain communication with a client concerning the representation. A lawyer should keep in confidence information relating to representation of a client except so far as disclosure is required or permitted by the Ohio Rules of Professional Conduct or other law. "

I.       Client-Lawyer Relationship

"Rule 1.1: Competence"

"A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoughtfulness and preparation reasonably necessary for the representation. "

"Comment"

"Thoroughness and Preparation"

[2] "Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation......."

"Rule 1:3: Diligence"

1

"A lawyer shall act with reasonable diligence and promptness in representing a client."


"Comment"

"[3] A lawyer must control the lawyer's work load so that each matter can be handled competently".



"[4]  Delay and neglect are inconsistent with a lawyer's duty of diligence, undermine public confidence and may prejudice a client's cause. Reasonable diligence and promptness are expected of a lawyer in handling all client matters and will be evaluated in light of all relevant circumstances. The lawyer disciplinary process is particularly concerned with lawyers who consistently fail to carry out obligations to clients or consciously disregard a duty owed to a client. "


Among other things we believe Mr. Delay failed in the following respects to represent us:

- Failure to Provide Copies of Any Pleadings.  Mr. Delay never provided us with copies of any pleadings filed by opposing counsel in the case.

- Failure to Advise Us of Important Deadlines in the Case.  Mr. Delay either did not advise us or did not represent us in complying with the Court's deadlines.

- Specific Failure to Take Depositions of Mr. Owen. Kenyon Energy or Chesapeake.

- Failure to Request Documents and Names of Knowledgeable Employees about Changes to our Lease or the Chain of Handling and Recording of our Leases. Mr. Delay never requested any documents from the defendants before the deadline,

- Untimely Interrogatory Answers.  Mr. Delay mailed us blank copies of the defendant's Interrogatories and Production Requests without any explanation, discussion or directions as to what to do with them.  In fact, he wanted Michele to complete them herself. And Mr. Delay didn't discuss them with her until after 60 days had passed, even when she asked about them.

00125

- <u>No Deposition Preparation.</u>  Mr. Delay didn't meet with us until after 9:30 p.m. the night before Michele Fritz's deposition and didn't tell us that we had to be in Akron at 9:00 a.m. the next morning until about 11:30 p.m. the night before.  It is approximately a 90 minute drive to Akron from our home, especially when you don't even have the address of where you are going.  He had e-mailed me on Tuesday, November 13 after we had gone to bed for the night so I did not find out until Wednesday morning, November 14, about the deposition the following day.  At 9:30pm that night, we spent 2 hours hurriedly revising and completing our Answers to the Defendants' Interrogatories.  He spent only about 30 minutes with us explaining about the next morning's deposition.

- <u>Failure to Timely Inform Us of Significant Events.</u>  He did not advise us of the Defendant's scheduled depositions of the bank officer in Carroll County who notarized our July 27, 2010 Kenyon Energy Oil and Gas Leases until the morning of her deposition, Tuesday, December 11, 2012.

- <u>Refusal to Abide By Our Schedule & Then Lied to Us.</u>  We advised him on Tuesday December 11, 2012, we wanted Mark's deposition taken in Carroll County.  He suggested Michele find a place in the county which I did at the Friendship Center's Room.  In a telephone call that very afternoon to advise him of those arrangements, Mr. Delay then lied to me by saying he never made the request that morning to obtain a place in Carroll County to take Mark's deposition.  He also said Mark's deposition would have to take place in Akron, the next morning, December 12th, at 9:00 a.m. at the Vory's Law Office in Akron.

- <u>Failure to Return Telephone Calls.</u> Mr. Delay did not return our telephone calls to him on many instances, particularly in November and December, 2012.

- <u>Failure to Meet with Us as Scheduled.</u>  On more than 2 occasions Mr. Delay scheduled a meeting with us to discuss important issues in this case, review important documents and plan a case strategy.  Yet  Mr. Delay just didn't show up or even give us notice that he would not be able to make it and reschedule.

- <u>Failure to Prepare and Explain to Us Required Procedures and Discuss Strategy about Prosecuting this Case.</u>  He e-mailed us on Tuesday, November 13 after 8:30 p.m. notifying us of our depositions on Thursday November 15, but yet he did not tell us where the deposition would take place and what time it was scheduled for.  I had already turned the computer off for the evening and did not receive the message until the following morning, Wednesday November 14.  He did the same as far as not notifying us until the day before Mark's December 12, 2012 deposition.  In addition, he first told us it would be taken in Carroll County, but did not tell us otherwise until later that afternoon.  He did not spend more than an hour attempting to prepare us for a deposition when we had never had previously deposed.

3

- <u>Failure to Submit Discovery.</u> Mr. Delay's failure to represent us. I had supplied Mr. Delay with documents usable by him in seeking to have the case remanded back to State Court. He failed to use any of it in the case. For example,    I, Michele Fritz, submitted him certified documents of the Defendant Mr. Owen's Notary Papers in 3 different states.  That was evidence to show Mr. Owen's lack of honesty and truthfulness in explaining why our recorded oil and gas lease documents were so  different from the original set we retained on July 30, 2010. Mr. Owen submitted a Declaration of Notice of Removal, "Exhibit E" stating the contrary.  Mr. Delay also failed to submit any discovery of the Defendants—as required by the court's case management plan, including interrogatories, admissions, document production and depositions.

- <u>Failure to be Prepared.</u>  Mr. Delay failed to conduct any discovery; failed to prepare for the first Case Management Hearing by reviewing any documents ahead of the hearing and failed to meet with us in person in advance of that hearing.

- <u>Misrepresentation to the Court.</u>   Mr. Delay represented to the court that our being farmers lead to us being unavailable for depositions etc. – when that is not true because we made ourselves available on very short notice to him.

4

# RECEIPT

The undersigned hereby acknowledges receipt and acceptance of Ten and 00/100 dollars ($10.00) as consideration paid for an Amendment and Ratification of Oil and Gas Lease dated December 21, 2012 between the undersigned as Lessor and Chesapeake Exploration, L.L.C. as Lessee, covering 102.8200 Leasehold acres in:

**AUGUSTA TOWNSHIP, CARROLL COUNTY**
**Tax Map/Parcel Number(s):**
0100063000.

**WASHINGTON TOWNSHIP, CARROLL COUNTY**
**Tax Map/Parcel Number(s):**
3400296009,          3400296010

Executed this _____ day of _____ 20_____ .

Fritz Dairy Farms, L.L.C.

_____
By: Mark R. Fritz, Owner

73391  0MAS

00128

Lease Number: 34-000127-000

## AMENDMENT AND RATIFICATION
## OF OIL AND GAS LEASE

THIS AMENDMENT AND RATIFICATION OF OIL AND GAS LEASE (this *"Amendment"*) is made as of the 21st day of December, 2012 by and between **Fritz Dairy Farms, L.L.C.**, having an address at **6301 Mackel Rd., Minerva, OH 44657**, (the *"Lessor"*), and **Chesapeake Exploration, L.L.C.**, an Oklahoma limited liability company, with its principal office located at 6100 N. Western Avenue, Oklahoma City, Oklahoma 73118; **CHK Utica, L.L.C.**, a Delaware limited liability company, with its principal office located at 6100 N. Western Avenue, Oklahoma City, Oklahoma 73118; **TOTAL E&P USA, INC.**, a Delaware corporation, with its principal office located at 1201 Louisiana, Suite 1800, Houston, Texas 77002; (collectively, the *"Lessee"*).

### RECITALS

**WHEREAS**, Lessor and Lessee are parties, by execution or by succession, to that certain Oil and Gas Lease dated **July 27, 2010** which Oil and Gas Lease, or a memorandum in lieu thereof, was filed for record in **CARROLL** County, **OHIO** on **August 13, 2010** at **Instrument No. 201000002894, Book 62, Page 163** (the *"Lease"*); and

**WHEREAS**, the Lease covers lands described as Tax Map/Parcel Numbers:

0100063000,           3400296009,           3400296010,

containing a total of approximately **102.8200** acres, more or less, situated in **AUGUSTA and WASHINGTON** Township, **CARROLL** County, **OHIO** and which lands are more particularly described in the Lease (the *"Leased Premises"*); and

**WHEREAS**, Lessor and Lessee, for their mutual benefit, desire to amend and modify the Lease set forth herein.

### AGREEMENT

**NOW THEREFORE**, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and the mutual promises contained herein, Lessor and Lessee agree as follows:

*A portion of a Paragraph of the Lease originally stated the following:*

*This Lease shall remain in force for a primary term of FIVE (5) years from 12:00 A.M. July 27, 2010 (effective date) to 11:59 P.M. July 27, 2015 (last day of primary term)...*

*Said portion of a Paragraph of the Lease is hereby replaced in its entirety with the following:*

73391 0MAS

*This Lease shall remain in force for a primary term of SEVEN and ONE HALF (7 1/2) years from 12:00 A.M. July 27, 2010 (effective date) to 11:59 P.M. January 27, 2018 (last day of primary term)...*

*A Paragraph of the Lease originally stated the following:*

*EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.*

*Said Paragraph is hereby deleted in its entirety.*

*A Paragraph of Exhibit " A " of the Lease originally stated the following:*

*WATER USAGE: Lessee agrees not to use any water from Lessor's wells, ponds, springs, lakes, reservoirs or creeks located on the lease premises without Lessor's written consent.*

*Said Paragraph of Exhibit " A " is hereby replaced in its entirety with the following:*

*WATER QUALITY TESTING: Prior to commencing drilling operations, Lessee, at its sole cost and expense, shall test the water quality of Lessor's water source(s) located within Twenty-five Hundred feet (2,500') of Lessee's well pad that are identified by Lessor as currently utilized for human and/or domestic livestock consumption. Lessor's water sources being tested must have functioning pumps installed.*

*Samples from Lessor's water source(s), covered by this agreement, will be analyzed for Lessee's standard baseline parameter list of general water quality indicators. Testing of Lessor's water supply shall be conducted by an independent testing laboratory, selected by Lessee, having state and/or National Environmental Laboratory Accreditation Program (NELAP) accreditations. Lessor shall be notified prior to any water sampling events, and Lessor or its agents or representatives shall have the right to be present during such events. The results of these tests will be provided to Lessor within 30 days of Lessee's receipt of the final results from the independent testing laboratory unless otherwise required by state or regulatory agency. Only non-invasive means of testing shall be used; Lessee shall not be required to pull pumps, move windmills, etc.*

*In the event the water quality of such water source(s) is reduced as a direct result of Lessee's operations on said Lands, such that the water is unusable for human and/or domestic livestock consumption (as the case may be), Lessee shall evaluate and perform such steps to restore Lessor's water quality of Lessor's water source(s). Lessee shall not be responsible for diminished water quality of Lessor's water source(s) due to causes out of the Lessee's control, including but not limited to seasonal variability and drought conditions.*

73391  0MAS

*The Lease is hereby further amended to include the following:*

*RECLAMATION: To the extent Lessee's drilling operations actually disturb the surface of the leased premises, it is agreed and understood that the Lessee shall repair and restore the surface of the leased premises as nearly as practicable to the condition in which it existed at the time Lessee commenced drilling operations upon the leased premises. Such work shall be completed within a reasonable amount of time after all cessation of drilling, completion, equipping and other related operations upon the leased premises at the sole expense of the Lessee. Lessee shall remove all debris, equipment, and personal property which Lessee placed on the leased premises (except for equipment needed for the operation of producing wells, which shall be removed within six (6) months after a well permanently ceases to produce).*

Lessor ratifies and confirms the Lease, and all of its terms and provisions, as amended above, and does hereby grant, lease and let the Leased Premises unto Lessee subject to and under the terms and provisions of Lease and this Amendment, and hereby agrees and acknowledges that said Lease is valid and shall remain in full force and effect according to the terms and provisions thereof.

Lessor and Lessee agree that this Amendment shall be binding upon them, their heirs, personal representatives, successors and assigns.

This Amendment may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Amendment and all of which, when taken together, will be deemed to constitute one and the same agreement.

If any of the above stated provisions in this Amendment conflict with or are inconsistent with the printed provisions or terms of the Lease, the above stated provisions in this Amendment shall control.

**IN WITNESS WHEREOF**, Lessor and Lessee have caused this Amendment to be duly executed on the date first above written.

LESSOR:

Fritz Dairy Farms, L.L.C.

By: Mark R. Fritz, Owner

ACKNOWLEDGEMENT

STATE OF _____

COUNTY OF _____

On this, the _____ day of _____, _____ before me the undersigned officer, personally appeared _____ known to me to be the _____ of _____ and that he as such _____, being authorized to execute foregoing instrument for the purpose therein contained by signing the name of the _____ by himself as _____.

IN WITNESS WHEREOF, I here unto set my hand and official seal.

My Commission expires: _____

73391  0MAS

00131

LESSEE:

**Chesapeake Exploration, L.L.C.**
an Oklahoma limited liability company


By: _____
      Lester A. Zitkus, Vice President- Land
      Eastern Division



### CORPORATE ACKNOWLEDGMENT

STATE OF OKLAHOMA      }
                       } SS:
COUNTY OF OKLAHOMA  }

On this, the _____ day of _____, 20_____, before me _____the undersigned officer, personally appeared Lester A. Zitkus, who acknowledged himself to be the Vice President – Land, Eastern Division of **Chesapeake Exploration, L.L.C.**, an Oklahoma limited liability company, and that he as such Vice President – Land, Eastern Division, being authorized to do so, executed the foregoing instrument for the purpose therein contained by signing the name of the limited liability company by himself as Vice President – Land, Eastern Division.


IN WITNESS WHEREOF, I hereunto set my hand and official seal.

          My Commission Expires: _____

          Signature/Notary Public: _____

          Name/Notary Public (print): _____

73391 0MAS

LESSEE:

**CHK Utica, L.L.C.**
A Delaware limited liability company

By: _____
        Lester A. Zitkus, Vice President- Land
        Eastern Division

<div align="center">

**CORPORATE ACKNOWLEDGMENT**

</div>

STATE OF OKLAHOMA       }
                            } SS:
COUNTY OF OKLAHOMA    }

On this, the _____ day of _____, 20_____, before me _____the undersigned officer, personally appeared Lester A. Zitkus, who acknowledged himself to be the Vice President – Land, Eastern Division of **CHK Utica, L.L.C.,** an Oklahoma limited liability company, and that he as such Vice President – Land, Eastern Division, being authorized to do so, executed the foregoing instrument for the purpose therein contained by signing the name of the limited liability company by himself as Vice President – Land, Eastern Division.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                    My Commission Expires: _____

                    Signature/Notary Public: _____

                    Name/Notary Public (print): _____

73391  0MAS

00133

LESSEE:

**TOTAL E&P USA, INC.,**
a Delaware corporation

By: _____
     Fabien Colmet Daage
     Vice President, Business Development & Strategy

**CORPORATE ACKNOWLEDGMENT**

STATE OF TEXAS        }
                       } SS:
COUNTY OF HARRIS    }

The foregoing instrument was acknowledged before me this _____ day of _____, 20_____, by Fabien Colmet Daage, Vice President, Business Development & Strategy of **TOTAL E&P USA, INC.,** a Delaware corporation, as the act and deed and on behalf of such corporation.

_____
Notary Public in and for the State of Texas

**Prepared By:**
**Once recorded, please return to: Chesapeake Exploration, L.L.C., Attention: Land –**
**Eastern Division, 6100 N. Western Avenue, Oklahoma City, Oklahoma 73118**

73391  0MAS

00134

# RECEIPT

The undersigned hereby acknowledges receipt and acceptance of Ten and 00/100 dollars ($10.00) as consideration paid for an Amendment and Ratification of Oil and Gas Lease dated December 26, 2012 between the undersigned as Lessor and Chesapeake Exploration, L.L.C. as Lessee, covering 27.3500 Leasehold acres in:

**AUGUSTA TOWNSHIP,  CARROLL COUNTY**

**Tax Map/Parcel Number(s):**
0100427001.

Executed this _____ day of _____ 20_____.

_____
Mark R. Fritz

_____
Michelle E. Fritz

34387  0CAR

Lease Number: 34-000126-000

## AMENDMENT AND RATIFICATION
## OF OIL AND GAS LEASE

THIS AMENDMENT AND RATIFICATION OF OIL AND GAS LEASE (this *"Amendment"*) is made as of the 26th day of December, 2012 by and between **Mark R. Fritz and Michelle E. Fritz, husband and wife**, having an address at **6301 Mackel Rd. NE, Minerva, OH 44657**, (the *"Lessor"*), and **Chesapeake Exploration, L.L.C.**, an Oklahoma limited liability company, with its principal office located at 6100 N. Western Avenue, Oklahoma City, Oklahoma 73118; **CHK Utica, L.L.C.**, a Delaware limited liability company, with its principal office located at 6100 N. Western Avenue, Oklahoma City, Oklahoma 73118; **TOTAL E&P USA, INC.**, a Delaware corporation, with its principal office located at 1201 Louisiana, Suite 1800, Houston, Texas 77002; (collectively, the *"Lessee"*).

### RECITALS

**WHEREAS**, Lessor and Lessee are parties, by execution or by succession, to that certain Oil and Gas Lease dated **July 27, 2010** which Oil and Gas Lease, or a memorandum in lieu thereof, was filed for record in **CARROLL** County, **OHIO** on **August 13, 2010** at **Instrument No. 201000002896, Book 62, Page 176** (the *"Lease"*); and

**WHEREAS**, the Lease covers lands described as:

containing a total of approximately **39.4635** acres, more or less, situated in **AUGUSTA** Township, CARROLL County, OHIO and which lands are more particularly described in the Lease, being all the land covered by the Lease in said Township; and

**WHEREAS**, the Lessor owns a portion of the lands covered by the Lease, currently known as:

**Property Tax Parcel Identification:** 0100427001,

containing a total of approximately 27.3500 acres, more or less, situated in **AUGUSTA** Township, **CARROLL** County, **OHIO** (the "Leased Premises"); and

**WHEREAS,** Lessor and Lessee, for their mutual benefit, desire to amend and modify the Lease set forth herein.

### AGREEMENT

**NOW THEREFORE**, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and the mutual promises contained herein, Lessor and Lessee agree as follows:

*A portion of a Paragraph of the Lease originally stated the following:*

34387  0CAR

00136

*This Lease shall remain in force for a primary term of FIVE (5) years from 12:00 A.M. July 27, 2010 (effective date) to 11:59 P.M. July 27, 2015 (last day of primary term)...*

*Said portion of a Paragraph of the Lease is hereby replaced in its entirety with the following:*

*This Lease shall remain in force for a primary term of SEVEN and ONE HALF (7 1/2) years from 12:00 A.M. July 27, 2010 (effective date) to 11:59 P.M. January 27, 2018 (last day of primary term)...*

*A Paragraph of the Lease originally stated the following:*

*EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.*

*Said Paragraph is hereby deleted in its entirety.*

*A Paragraph of Exhibit " A " of the Lease originally stated the following:*

*WATER USAGE: Lessee agrees not to use any water from Lessor's wells, ponds, springs, lakes, reservoirs or creeks located on the lease premises without Lessor's written consent.*

*Said Paragraph of Exhibit " A " is hereby replaced in its entirety with the following:*

*WATER QUALITY TESTING: Prior to commencing drilling operations, Lessee, at its sole cost and expense, shall test the water quality of Lessor's water source(s) located within Twenty-five Hundred feet (2,500') of Lessee's well pad that are identified by Lessor as currently utilized for human and/or domestic livestock consumption. Lessor's water sources being tested must have functioning pumps installed.*

*Samples from Lessor's water source(s), covered by this agreement, will be analyzed for Lessee's standard baseline parameter list of general water quality indicators. Testing of Lessor's water supply shall be conducted by an independent testing laboratory, selected by Lessee, having state and/or National Environmental Laboratory Accreditation Program (NELAP) accreditations. Lessor shall be notified prior to any water sampling events, and Lessor or its agents or representatives shall have the right to be present during such events. The results of these tests will be provided to Lessor within 30 days of Lessee's receipt of the final results from the independent testing laboratory unless otherwise required by state or regulatory agency. Only non-invasive means of testing shall be used; Lessee shall not be required to pull pumps, move windmills, etc.*

*In the event the water quality of such water source(s) is reduced as a direct result of Lessee's operations on said Lands, such that the water is unusable for human and/or domestic livestock*

34387 0CAR

*consumption (as the case may be), Lessee shall evaluate and perform such steps to restore Lessor's water quality of Lessor's water source(s).  Lessee shall not be responsible for diminished water quality of Lessor's water source(s) due to causes out of the Lessee's control, including but not limited to seasonal variability and drought conditions.*

*The Lease is hereby further amended to include the following:*

*RECLAMATION: To the extent Lessee's drilling operations actually disturb the surface of the leased premises, it is agreed and understood that the Lessee shall repair and restore the surface of the leased premises as nearly as practicable to the condition in which it existed at the time Lessee commenced drilling operations upon the leased premises. Such work shall be completed within a reasonable amount of time after all cessation of drilling, completion, equipping and other related operations upon the leased premises at the sole expense of the Lessee. Lessee shall remove all debris, equipment, and personal property which Lessee placed on the leased premises (except for equipment needed for the operation of producing wells, which shall be removed within six (6) months after a well permanently ceases to produce).*

Lessor ratifies and confirms the Lease, and all of its terms and provisions, as amended above, and does hereby grant, lease and let the Leased Premises unto Lessee subject to and under the terms and provisions of Lease and this Amendment, and hereby agrees and acknowledges that said Lease is valid and shall remain in full force and effect according to the terms and provisions thereof.

Lessor and Lessee agree that this Amendment shall be binding upon them, their heirs, personal representatives, successors and assigns.

This Amendment may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Amendment and all of which, when taken together, will be deemed to constitute one and the same agreement.

If any of the above stated provisions in this Amendment conflict with or are inconsistent with the printed provisions or terms of the Lease, the above stated provisions in this Amendment shall control.

34387  0CAR

00138

**IN WITNESS WHEREOF**, Lessor and Lessee have caused this Amendment to be duly executed on the date first above written.

**LESSOR:**

_____

Mark R. Fritz

_____

Michelle E. Fritz

### ACKNOWLEDGEMENT

STATE OF _____ }
                                } ss.
COUNTY OF _____ }

On this, the _____ day of _____, _____, before me _____, the undersigned officer, personally appeared **Mark R. Fritz and Michelle E. Fritz, husband and wife,** known to me (or satisfactorily proven) to be the person(s) whose names(s)  is/are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I here unto set my hand and official seal.

My Commission expires:     _____

Signature/Notary Public:     _____

Name/Notary Public (print):     _____

34387  0CAR

LESSEE:

**Chesapeake Exploration, L.L.C.**
an Oklahoma limited liability company

By: _____

    Lester A. Zitkus,
    Vice President- Land, Eastern Division


### CORPORATE ACKNOWLEDGMENT

STATE OF OKLAHOMA           }
                               } SS:
COUNTY OF OKLAHOMA       }

On this, the _____ day of _____, 20_____, before me _____the undersigned officer, personally appeared Lester A. Zitkus, who acknowledged himself to be the Vice President – Land, Eastern Division of **Chesapeake Exploration, L.L.C.**, an Oklahoma limited liability company, and that he as such Vice President – Land, Eastern Division, being authorized to do so, executed the foregoing instrument for the purpose therein contained by signing the name of the limited liability company by himself as Vice President – Land, Eastern Division.


IN WITNESS WHEREOF, I hereunto set my hand and official seal.

           My Commission Expires: _____

           Signature/Notary Public: _____

           Name/Notary Public (print): _____

34387  OCAR

00140

**LESSEE:**

**CHK Utica, L.L.C.**
A Delaware limited liability company


By: _____

      Lester A. Zitkus,
      Vice President- Land, Eastern Division


## CORPORATE ACKNOWLEDGMENT

STATE OF OKLAHOMA         }
                        } SS:
COUNTY OF OKLAHOMA     }

On this, the _____ day of _____, 20_____ , before me _____ the undersigned officer, personally appeared Lester A. Zitkus, who acknowledged himself to be the Vice President – Land, Eastern Division of **CHK Utica, L.L.C.**, an Oklahoma limited liability company, and that he as such Vice President – Land, Eastern Division, being authorized to do so, executed the foregoing instrument for the purpose therein contained by signing the name of the limited liability company by himself as Vice President – Land, Eastern Division.


IN WITNESS WHEREOF, I hereunto set my hand and official seal.

      My Commission Expires: _____

      Signature/Notary Public: _____

      Name/Notary Public (print): _____

34387  0CAR

00141

LESSEE:

**TOTAL E&P USA, INC.**
a Delaware corporation

By: _____
      Fabien Colmet Daage
      Vice President, Business Development & Strategy

<div align="center">

**CORPORATE ACKNOWLEDGMENT**

</div>

STATE OF TEXAS       }
                       } SS:
COUNTY OF HARRIS  }

The foregoing instrument was acknowledged before me this ____ day of _____, 20_____, by Fabien Colmet Daage, Vice President, Business Development & Strategy of **TOTAL E&P USA, INC.**, a Delaware corporation, as the act and deed and on behalf of such corporation.


                                        _____
                                        Notary Public in and for the State of Texas

<div align="center">

**Prepared By:**
**Once recorded, please return to: Chesapeake Exploration, L.L.C., Attention: Land – Eastern Division, 6100 N. Western Avenue, Oklahoma City, Oklahoma 73118**

</div>

34387  0CAR

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Agreement") is entered into by and between Fritz Dairy Farms, LLC, Mark R. Fritz and Michele E. Fritz (collectively "Fritz Parties") and Chesapeake Exploration, L.L.C., Richard Owen, and Kenyon Energy, LLC (collectively "Chesapeake Parties"), all of whom are collectively referred to as the "Parties" and each of whom is individually referred to as a "Party," as of this _____ day of January, 2013.

**WHEREAS**, the Fritz Parties entered into Paid Up Oil & Gas Leases with Kenyon Energy, LLC made and effective on July 27, 2010 (the "Leases"); and

**WHEREAS**, disputes and claims arose between the Parties relating to the Leases, including claims that are the subject of the Fritz Parties complaint filed in the Court of Common Pleas of Carroll County Ohio under Case No. 12 CVH 27 184, which was ultimately removed to the United States District Court for the Northern District of Ohio, Eastern Division, under Case 5:12-cv-01736 (the "Lawsuit"); and,

**WHEREAS**, the Fritz Parties asserted in the Lawsuit that, among other things, the Leases as recorded were altered after they signed them (the "Recorded Leases"); and,

**WHEREAS**, the Parties, without admitting to any liability to each other, have agreed to settle and compromise all claims with each other relating or arising out of the Leases and the Recorded Leases;

**NOW, THEREFORE**, in consideration of the promises and covenants contained herein, and other good and valuable consideration, the sufficiency of which is acknowledged, and intended to be legally binding, it is agreed by and among the Parties as follows:

1.  The Chesapeake Parties agree to pay the sum of Ten Thousand And 00/100 Dollars ($10,000.00) to the Fritz Parties upon the latter's execution and recording of amendments to the Recorded Leases containing essentially the terms specified in Section 2 below.

2.  The Recorded Leases, and each of them, shall be amended to provide essentially that:

    A.  The section titled <u>LEASE TERM</u> shall be amended to read "This Lease shall remain in force for a primary term of Seven (7) years from 12:00 A.M. July 27, 2010 (effective date) to 11:29 P.M. July 26, 2017 (last day of primary term) …"

    B.  The section titled <u>EXTENSION OF PRIMARY TERM</u> shall be deleted.

    C.  The section titled <u>DISPOSAL AND INJECTION WELLS</u> shall be amended:

        (1)  Beginning on the third line to read "the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, below those providing water from Lessor's wells, of air, gas, brine …"

-1-

(2)     By adding thereto the following language: "Lessee shall do nothing to interfere with and shall immediately, fully and properly repair any damage to waterlines leading from Lessor's water wells and fully and completely rectify any contamination and the results of any contamination resulting from such damage."

(3)     By adding thereto the following language: "Lessee shall, and shall require its subcontractors to, store, treat and transport all products and by-products used in or extracted by or as a result of any of its activities in a safe manner such that Lessor's lands, water, crops, and livestock shall not be damaged in any manner. In the event Lessee's actions or those of its subcontractors result in any damage to Lessor's lands, water, crops, or livestock, Lessee shall immediately, fully and properly repair any such damage and restore Lessor's lands, water, crops or livestock as nearly as possible to their original condition."

(4)     By adding thereto the following language: "Lessee shall not use for any purpose any well water, pools, or the water table on and under Lessor's lands."

D.     A new section shall be added which shall read "As soon as is reasonably possible, following completion of Lessee's operations or the expiration or other termination of this Lease, whichever shall soonest occur, Lessee shall restore the Leasehold, as nearly as possible, to its original condition and land contour."

3.     The Parties shall pay their own costs, expenses, and legal fees in connection with the Lawsuit and its settlement and dismissal.

4.     In consideration of the promises and covenants set forth in this Agreement and for other good and valuable consideration, the sufficiency of which is hereby acknowledged the Parties, for and on behalf of themselves, their partners, shareholders, attorneys, spouses, family members, officers, employees, agents, members, owners, representatives, affiliates, subsidiaries, and their respective successors and assigns, release, acquit and forever discharge each other of and from any and all claims, actions, expenses and compensation whatsoever which the Parties now have or which may hereafter accrue on account of or in any way growing out of any and all known and unknown, foreseen and unforeseen injuries and/or damages resulting from the Recorded Leases, including all issues raised in the Lawsuit or which could have been raised in the Lawsuit, and with respect to the foregoing, except for the terms of the Recorded Leases amended as above provided and except to enforce the terms of this Agreement.

5.     All matters relating to the terms and negotiation of this Agreement shall be and remain strictly confidential between the Parties hereto, except the terms contained in Section 2 above and except that this Agreement, by its terms, may be disclosed as follows:  (a) to the Parties' auditors, accountants, attorneys, lenders, insurers and financial advisors; (b) to enforce the terms of this Agreement; (c) if disclosure is required by contract, court order, or operation of law; or (d) by mutual written agreement of all the Parties.  To the extent any other person or entity seeks to compel disclosure of this Agreement by any Party, such Party from whom disclosure is sought shall notify the other Parties of such efforts and shall reasonably cooperate in the other Parties' efforts, at the other Parties' sole cost

-2-

and expense, to prevent disclosure or to maintain this Agreement and its terms under seal or protective order.

6. Each of the Parties to this Agreement hereby warrants and represents that this Agreement constitutes the entire agreement of the Parties, that no promises or inducements have been offered except as set forth in this Agreement, and that this Agreement is executed without reliance upon any statement or representation by any of the other Parties to this Agreement or any of their respective representatives or attorneys concerning the nature and extent of any claims, damages or legal liability.

7. Each of the Parties to this Agreement warrants and represents that the individual executing this Agreement on its behalf (A) fully understands this Agreement; (B) is authorized to execute this Agreement on behalf of its respective principal; (C) has carefully read and reviewed this Agreement; and (D) is voluntarily entering into this Agreement.

8. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective agents, employees, servants, successors, heirs, executors, administrators, members, partners, officers, directors, firms, corporations, associations or partnerships associated therewith, and any corporation, partnership, company, or other entity into which any Party may merge, consolidate, or reorganize.

9. This Agreement has been, and shall for all purposes be deemed to have been, executed and delivered within the state of Ohio, and it shall be construed and enforced in accordance with and be governed by the laws of the state of Ohio.

10. The Parties acknowledge and represent that this Agreement evidences the settlement of disputed claims, and that the consideration for such shall not be construed as an admission of liability by either party, as the same is and always has been expressly denied.

11. This Agreement is the entire agreement between the Parties with respect to the subject matter. It supersedes all prior and contemporaneous oral and written agreements and discussions. It may be amended, supplemented or modified only by an agreement in writing and signed by all Parties.

12. If any term of this Agreement is for any reason invalid or unforeseeable, the rest of the Agreement remains fully valid and enforceable. No waiver of any term of this Agreement constitutes a waiver of any other provision, whether similar or dissimilar. No waiver of any term constitutes a continuing waiver of that term. No waiver is binding unless signed in writing by the waiving party.

13. Each Party has cooperated in, and in any construction of this Agreement shall be deemed to have cooperated in, the drafting and preparation of this Agreement.

14. This Agreement may be executed in counterparts, each of which is considered an original, but all of which constitute one and the same instrument.

**IN WITNESS WHEREOF**, the Parties have voluntarily executed this Confidential Settlement Agreement and Release.

-3-

00145

**Fritz Dairy Farms, LLC**

Date: _____, 2013    By: _____
                                        Name:_____
                                        Title:_____

Date: _____, 2013    _____
                                  **Mark R. Fritz**

Date: _____, 2013    _____
                                  **Michele E. Fritz**

**Chesapeake Exploration, L.L.C.**

Date: _____, 2013    By: _____
                                        Name:_____
                                        Title:_____

Date: _____, 2013    _____
                                  **Richard Owen**

**Kenyon Energy, LLC**

Date: _____, 2008    By: _____
                                        Name:_____
                                        Title:_____

-4-

00146

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU
MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS
INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR
SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## ASSIGNMENT, BILL OF SALE AND CONVEYANCE

STATE OF OHIO            §

COUNTY OF CARROLL        §

201100007432 Kenyon
Filed for Record in
CARROLL COUNTY, OHIO
PATRICIA J. DYER, RECORDER
11-18-2011 At 03:50 pm.
ASSIGN LEAS   15536.00
OR Book      76 Page 3827 - 4203

THIS ASSIGNMENT, BILL OF SALE AND CONVEYANCE (this "**Assignment**"),
dated effective as of November 1, 2011 at 7:00 a.m. Central Time (the "**Effective Time**"), is
made by **CHESAPEAKE EXPLORATION, L.L.C.,** an Oklahoma limited liability company,
**CHESAPEAKE APPALACHIA, L.L.C.,** an Oklahoma limited liability company,
**CHESAPEAKE AEC ACQUISITION, L.L.C.,** an Oklahoma limited liability company, and
**OHIO BUCKEYE ENERGY, L.L.C.,** an Ohio limited liability company (collectively,
"**Assignor**") to **CHK UTICA, L.L.C.,** a Delaware limited liability company ("**Assignee**"). This
Assignment is executed and delivered in connection with and pursuant to the terms of that
certain Contribution Agreement between Assignor and Assignee dated November 1, 2011 (the
"**Contribution Agreement**"). Capitalized terms used and not otherwise defined herein shall
have the meanings assigned to such terms in the Contribution Agreement.

1.     Assignment. For and in consideration of Ten Dollars ($10.00) and other good and
valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor
does hereby **GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER,
AND DELIVER** unto Assignee, an undivided fifty percent (50%) (the "**Conveyed Interests**")
of all of Assignor's right, title, and interest in and to the following, subject to the terms and
reservations hereof and specifically, **LESS AND EXCEPT** the Excluded Assets (as hereinafter
defined) (the "**Properties**"):

1.1     (i) all oil and gas leases, leasehold interests, operating rights, working interests,
net revenue interests and similar operating interests, or other rights to Hydrocarbons (whether
producing or non-producing), described in Exhibit "A" attached hereto, in each case, as to all
depths (collectively, all of the foregoing, the "**Leases**"); (ii) the lands covered by the Leases and
all lands pooled or unitized therewith (collectively, the "**Lands**"); and (iii) all expressed or
implied rights-of-way, easements and other surface rights, insofar and only insofar as the same
arise in or under the Leases (collectively, the "**Easements**"; and the interests described in
subparts 1.1(i)-1.1(iii) are collectively referred to as the "**Real Property Interests**");

1.2     (i) all of the wells listed on Exhibit "A" drilled and completed in the Utica Shale
Formation or currently being drilled to the Utica Shale Formation (the "**Wells**"), (ii) all Lease
Owned well heads, casing, tubing, pumps, motors, gauges, valves, heaters and treaters
constituting part of or connected to the Wells, (iii) all Lease Owned automation equipment
constituting part of or connected to the Wells, (iv) all Lease Owned gathering lines and
improvements, water lines, vessels, tanks, boilers, separators, treating equipment, fixtures,
compressors and other equipment used in connection with the Wells, (v) all Lease Owned power
lines, telephone and communication lines used in connection with the Wells, (vi) all Lease
Owned injection wells and water disposal facilities used in connection with the Wells, (vii) all
other Lease Owned appurtenances owned and used in connection with the production, treating,
storing, transportation or marketing of Hydrocarbons from the Wells, and (viii) any and all other
equipment, machinery, fixtures and other tangible personal property and improvements located
on or used in connection with the operation of the Wells (collectively referred to as the
"**Equipment**");

1.3     all presently existing unitization, pooling and/or communitization agreements,
declarations or designations and contractually, statutorily, judicially or administratively created
drilling, spacing and/or production units, insofar as the same are attributable or allocated to the
Real Property Interests or the Wells, and all of the Assignor's interest in and to the properties
covered or units created thereby which are attributable to the Real Property Interests or the
Wells;

1

00147

Instrument
201100007432 OR

Book Page
76 3828

1.4    all presently existing and valid Hydrocarbon sales agreements, operating agreements (excluding any operating rights or duties), gathering agreements, transportation agreements, farmout and farmin agreements, participation agreements, unitization, pooling and communitization agreements, purchase agreements, exploration agreements, area of mutual interest agreements, exchange and processing contracts and agreements and any other contracts, agreements and instruments insofar as the above agreements cover, are attributable to or relate to the Real Property Interests or the Wells, Equipment or any interests pooled, communitized or unitized therewith, including those contracts and agreements described in the Contribution Agreement;

1.5    all Hydrocarbons in, on, under or produced from or attributable to the Wells and the proceeds thereof; and

1.6    copies of the Records to the extent relating to the Properties described in the foregoing subsections (1.1) through (1.5).

It is the intent of Assignor to convey and this Assignment hereby conveys to Assignee, subject to the reservations and conditions herein contained, from and after the Effective Time, the Conveyed Interests, regardless of the omission of any lease or leases, errors in description, any incorrect or misspelled names, or any transcribed or incorrect recording references.

**TO HAVE AND TO HOLD** all and singular such Conveyed Interests together with all rights, titles, interests, estates, remedies, powers, and privileges thereunto appertaining unto Assignee and Assignee's successors and assigns forever; subject to the following matters:

a.    (A) with respect to any Leases and other leasehold interests: royalties and overriding royalties, and (B) with respect to Wells: royalties, overriding royalties and other burdens or encumbrances to the extent they do not, individually or in the aggregate, increase Assignor's Working Interest (without at least a proportionate corresponding increase in Assignor's Net Revenue Interest) in any Well from that described in the Contribution Agreement;

b.    Liens for Taxes for which payment is not due or which are being contested in good faith by appropriate proceedings;

c.    Liens (other than Liens in favor of Assignor or its Affiliates) of mechanics, materialmen, warehousemen, landlords, vendors, and carriers and any similar Liens (other than Liens in favor of Assignor or its Affiliates) arising by operation of Law which, in each instance, arise in the ordinary course, for sums not yet due or which are being contested in good faith by appropriate proceedings;

d.    Liens (other than Liens in favor of Assignor or its Affiliates) under operating agreements, unit agreements, unitization and pooling designations and declarations, gathering and transportation agreements, processing agreements, Hydrocarbon purchase contracts and all of the other Contracts;

e.    easements, surface leases, and other rights and plat restrictions, zoning laws, restrictive covenants and conditions, and building and other land use laws and similar encumbrances, insofar as the same do not materially interfere with the operation, development or use of the affected Property;

f.    all rights to consent by, required notices to, filings with or other actions by Governmental Authorities in connection with the sale, disposition, transfer or conveyance of federal, state, tribal or other governmental oil and gas leases or interests therein or related thereto, which are customarily obtained subsequent to the assignment, disposition or transfer of such oil and gas leases or interests therein, or such operations;

g.    conventional rights of reassignment obligating the lessee to reassign or offer to reassign its interests in any lease prior to a release or abandonment of such lease;

h.    required non-governmental Third Party consents to assignments which have been obtained or waived by the appropriate parties or which need not be obtained prior to an assignment or which cannot be unreasonably withheld, and preferential rights to purchase which

2

have been waived by the appropriate parties or for which the time period for asserting such rights has expired without the exercise of such rights;

     i.     all defects or irregularities (A) arising out of lack of affirmative statement of corporate authorization or a variation in corporate name, (B) that have been cured or remedied by applicable statutes of limitation or statutes for prescription, (C) consisting of the failure to recite marital status in documents or omissions of heirship proceedings, (D) that have been cured by possession under applicable statutes of limitation, or (E) resulting from lack of survey or failure to record releases of liens, production payments or mortgages that have expired by their own terms or the enforcement of which are barred by applicable statutes of limitation;

     j.     rights vested in or reserved to any Governmental Authority to regulate the Properties, to terminate any right, power, franchise, license or permit afforded by such Governmental Authority, or to condemn, expropriate or designate a buyer of any of the Properties;

     k.     any provision in a Lease, surface lease, easement, or other surface use agreement entered into prior to the Effective Time providing a Third Party with rights to an overriding royalty interest or other burdens or payments triggered by the use of the relevant surface property for drilling or other purposes (each a "**Surface Use Burden**"), *provided that*, with respect to the Wells only, such Surface Use Burdens do not reduce Assignor's Net Revenue Interest in such Well from that described in the Contribution Agreement;

     l.     the Royalty Agreement and any and all obligations thereunder and rights created thereby or pursuant thereto; and

     m.     the Contribution Agreement.

2.     Excluded Assets. Assignor specifically excepts from this Assignment and reserves unto itself the following (the "**Excluded Assets**"):

     2.1     Assignor's minute books, financial and income tax records and legal records (other than title records);

     2.2     any existing or future refund of costs, Taxes or expenses borne by Assignor, any Affiliates of Assignor, or its predecessors in title attributable to the period prior to the Effective Time;

     2.3     any and all proceeds from the settlements of contract disputes insofar as said proceeds are attributable to periods of time prior to the Effective Time;

     2.4     all rights and interests of Assignor or any Affiliates of Assignor under (i) any policy, bond or agreement of insurance or indemnity (including any rights, claims or causes of action of Assignor against Third Parties under any indemnities or hold harmless agreements and any indemnities received in connection with Assignor's or any of its Affiliates' prior acquisition of any of the Properties), to the extent and only to the extent such rights and interests relate to the ownership of the Properties prior to the Effective Time and (ii) under any bond;

     2.5     all of Assignor's and its Affiliates' proprietary computer software, patents, trade secrets, copyrights, names, trademarks, logos, and other intellectual property;

     2.6     all accounts receivable and audit rights arising under any of the applicable contracts or otherwise with respect to any of the other items included in this definition of Excluded Assets, to the extent and only to the extent such rights and interests related to the ownership of the Properties prior to the Effective Time;

     2.7     Geological and Geophysical Information and any other information which Assignor is prohibited from sharing by agreement with a Third Party;

     2.8     (A) all mineral fee interests owned by Assignor or any of its Affiliates, (B) all royalty interests and overriding royalty interests owned by Assignor or any of its Affiliates and (C) any wellbores located on the Properties, other than the Wells and Lease-Owned water or disposal wells;

<center>3</center>

00149

2.9    all claims of Assignor or any of its Affiliates for refunds of or loss carry forwards with respect to (A) any other Taxes attributable to any period prior to the Effective Time, (B) income or franchise Taxes or (C) any Taxes attributable to any of the other items included in this definition of the Excluded Assets;

2.10    all "virtual courthouses" of Assignor or any of its Affiliates, all of their respective exclusive use arrangements with title abstract facilities, and all documents and instruments of Assignor or any of its Affiliates that may be protected by an attorney-client privilege, and all data that cannot be disclosed to Assignee or its members as a result of confidentiality arrangements under agreements with Third Parties (other than title opinions and other title records relating to the Properties);

2.11    all surface fee interests (but excluding the Easements), surface leasehold and other surface property interests (but excluding the Easements) and all buildings, offices, improvements, appurtenances, field offices and yards;

2.12    non-Lease Owned equipment such as compressors on the wellheads of the Wells operated by Assignor or its Affiliates owned by or leased from Assignor, its Affiliates or Third Parties;

2.13    automation systems including meters and related telemetry, licensed radio frequencies and associated communications infrastructure including towers, antennas, data links and network circuits, except any Lease Owned equipment;

2.14    all drilling rigs and related equipment, work over rigs and related equipment, tools and other equipment brought onto a well site temporarily for purposes of drilling, reworking or maintaining a well, all vehicles, and any other non-Lease Owned equipment, inventory, machinery, tools and other personal property not currently in use for the operation of a well or wells;

2.15    all assets of Chesapeake Midstream Group and all of the assets of Chesapeake Oilfield Group;

2.16    all non-Leased Owned salt water disposal wells, systems and related equipment; and

2.17    all of the Contributors' retained right, title and interest in and to the Properties after their contributions to the Company of the Conveyed Interests in accordance with the terms hereof and the Contribution Agreement.

3.    Contribution Agreement and Development Agreement. (i) The Conveyed Interests are subject to the terms of that certain Development Agreement between Chesapeake Exploration, L.L.C. and Assignee dated as of even date with the Contribution Agreement, and (ii) this Assignment is made expressly subject to the terms and provisions of the Contribution Agreement, including, without limitation, (A) certain limited remedies provided therein related to the general warranty provided below, (B) the assumption by Assignee of the Assumed Obligations (as defined therein), and (C) the retention by Assignor of the Retained Liabilities (as defined therein).

4.    General Warranty of Title. Assignor does hereby bind itself and its successors and assigns to warrant and forever defend all and singular title conveyed as of the date hereof to the Conveyed Interests unto Assignee and Assignee's successors and assigns, against every Person whomsoever lawfully claiming or to claim the same or any part thereof. Further, Assignee is specifically assigned, and subrogated to, warranties of title which Assignor may have from Assignor's predecessors in interest (other than Affiliates of Assignor) to the extent applicable with respect to the Conveyed Interests and to the extent Assignor may legally assign such rights and grant such subrogation.

5.    Limitations on Representations and Warranties.

5.1    EXCEPT FOR THE EXPRESS AND SPECIFIC REPRESENTATIONS AND WARRANTIES OF ASSIGNOR IN THE CONTRIBUTION AGREEMENT, IN ANY OTHER TRANSACTION DOCUMENTS, AND EXCEPT FOR THE GENERAL WARRANTY OF TITLE CONTAINED IN THIS ASSIGNMENT, ASSIGNEE

4

ACKNOWLEDGES THAT ASSIGNOR HAS NOT MADE, AND ASSIGNOR HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND ASSIGNEE HEREBY EXPRESSLY WAIVES, ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, INCLUDING THOSE RELATING TO (a) PRODUCTION RATES, RECOMPLETION OPPORTUNITIES, DECLINE RATES, GAS BALANCING INFORMATION, OR THE QUALITY, QUANTITY OR VOLUME OF THE RESERVES OF HYDROCARBONS, IF ANY, ATTRIBUTABLE TO THE PROPERTIES OR ASSIGNOR'S INTEREST THEREIN, (b) THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY RECORDS, INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) NOW, HERETOFORE OR HEREAFTER FURNISHED TO ASSIGNEE BY OR ON BEHALF OF ASSIGNOR, AND (c) THE ENVIRONMENTAL OR OTHER CONDITION OF THE PROPERTIES.

5.2     EXCEPT FOR THE EXPRESS AND SPECIFIC REPRESENTATIONS AND WARRANTIES OF ASSIGNOR IN THE CONTRIBUTION AGREEMENT, ANY OTHER TRANSACTION DOCUMENTS, AND EXCEPT FOR THE GENERAL WARRANTY OF TITLE CONTAINED IN THIS ASSIGNMENT, AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ASSIGNOR EXPRESSLY DISCLAIMS AND NEGATES, AND ASSIGNEE HEREBY WAIVES, AS TO PERSONAL PROPERTY, EQUIPMENT, INVENTORY, MACHINERY AND FIXTURES CONSTITUTING A PART OF THE PROPERTIES (a) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (b) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, (c) ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, (d) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM DEFECTS, WHETHER KNOWN OR UNKNOWN, (e) ANY AND ALL IMPLIED WARRANTIES EXISTING UNDER APPLICABLE LAW, AND (f) ANY IMPLIED OR EXPRESS WARRANTY REGARDING ENVIRONMENTAL LAWS, THE RELEASE OF SUBSTANCES, WASTES OR MATERIALS INTO THE ENVIRONMENT, OR PROTECTION OF THE ENVIRONMENT OR HEALTH, IT BEING THE EXPRESS INTENTION OF ASSIGNEE AND ASSIGNOR THAT, EXCEPT AS SET FORTH IN THE CONTRIBUTION AGREEMENT, ANY OTHER TRANSACTION DOCUMENTS, AND EXCEPT FOR THE GENERAL WARRANTY OF TITLE CONTAINED IN THIS ASSIGNMENT, THE PERSONAL PROPERTY, EQUIPMENT, INVENTORY, MACHINERY AND FIXTURES IN WHICH ASSIGNOR HAS ANY INTEREST ARE BEING ACCEPTED BY ASSIGNEE, "AS IS, WHERE IS, WITH ALL FAULTS" AND IN THEIR PRESENT CONDITION AND STATE OF REPAIR.

5.3     ASSIGNOR AND ASSIGNEE AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN WARRANTIES CONTAINED IN THIS SECTION 5 ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSES OF ANY APPLICABLE LAW, RULE OR ORDER.

6.    Miscellaneous.

6.1.    Cooperation. In addition to this Assignment, Assignor shall execute, acknowledge, and deliver to Assignee, in a timely manner and without further consideration, any documents or instruments that Assignee may reasonably require, including, without limitation, further assignments or conveyances required by any state or federal authority, deeds, and consents to further evidence the assignment and conveyance of the Conveyed Interests by Assignor to Assignee.

6.2.    Choice of Law. This Assignment will be interpreted, construed, and enforced in accordance with the laws of the State of Ohio, without giving effect to any rules or principles of conflicts of law that might otherwise refer to the laws of another jurisdiction.

6.3.    Successors and Assigns. This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

5

00151

Instrument
201100007432 OR
Book Page
76 3832

6.4.    Counterparts. This Assignment may be executed in multiple counterparts, each of which will be an original instrument, but all of which will constitute one assignment.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGES FOLLOW]**

00152

Instrument
201100007432 OR

Book Page
76 3833

IN WITNESS WHEREOF, Assignor has executed this instrument on the date of the acknowledgment annexed hereto, but effective for all purposes as of the Effective Time.

**ASSIGNOR:**

CHESAPEAKE EXPLORATION, L.L.C.,
an Oklahoma limited liability company

By: _____
Douglas J. Jacobson
Executive Vice President

CHESAPEAKE APPALACHIA, L.L.C.,
an Oklahoma limited liability company

By: _____
Douglas J. Jacobson
Executive Vice President

CHESAPEAKE AEC ACQUISITION, L.L.C.,
an Oklahoma limited liability company

By: _____
Douglas J. Jacobson
Executive Vice President

OHIO BUCKEYE ENERGY, L.L.C.,
an Ohio limited liability company

By: _____
Douglas J. Jacobson
Executive Vice President

**ASSIGNOR ACKNOWLEDGMENT**

STATE OF OKLAHOMA     §
                      §
COUNTY OF OKLAHOMA    §

The foregoing instrument was acknowledged before me this 5ᵗ ᴺ ᴼᵛ ᴱᴹᴮᴱᴿ, 2011 by Douglas J. Jacobson, Executive Vice President of Chesapeake Exploration, L.L.C., an Oklahoma limited liability company, Chesapeake Appalachia, L.L.C., an Oklahoma limited liability company, Chesapeake AEC Acquisition, L.L.C., an Oklahoma limited liability company and Ohio Buckeye Energy, L.L.C., an Ohio limited liability company, on behalf of said limited liability companies.

_____
Notary Public

My Commission Expires: 6·11·15
Commission Number: 03008905

IN WITNESS WHEREOF, Assignee has executed this instrument on the date of the acknowledgment annexed hereto, but effective for all purposes as of the Effective Time.

**ASSIGNEE:**

CHK UTICA, L.L.C.,
a Delaware limited liability company

By: CHESAPEAKE EXPLORATION, L.L.C.,
    its sole managing member

By: _____
    Domenic J. Dell'Osso, Jr.
    Executive Vice President & Chief Financial Officer

**ASSIGNEE ACKNOWLEDGMENT**

STATE OF OKLAHOMA §
§
COUNTY OF OKLAHOMA §

The foregoing instrument was acknowledged before me this 5th November, 2011 by Domenic J. Dell'Osso, Jr., Executive Vice President and Chief Financial Officer of Chesapeake Exploration, L.L.C., an Oklahoma limited liability company, the sole managing member of CHK Utica, L.L.C., a Delaware corporation, on behalf of said limited liability company.

_____
Notary Public

My Commission Expires: 6-11-15
Commission Number: 03008905

LINN D. YOUSEY
NOTARY
# 03008905
EXP. 06/11/15
PUBLIC
STATE OF OKLAHOMA

This instrument was prepared by
Chesapeake Utica, L.L.C.
6100 N. Western Avenue
Oklahoma City, OK 731118

Book Page
76  3835

Instrument
201100007432  OR

## Exhibit "A"

Attached to and made a part of that certain Assignment, Bill of Sale and Conveyance
dated effective November 1, 2011 from Chesapeake Exploration, L.L.C., Chesapeake
Appalachia, L.L.C., Chesapeake AEC Acquisition, L.L.C., and Ohio Buckeye Energy,
L.L.C., as Assignor to CHK Utica, L.L.C., as Assignee

| Property Number | Well Name | Location | County | State | API # |
|---|---|---|---|---|---|
| 833636 | Bailey 35-12-4 6H | 35-12N-4W | Carroll | OH | 3401922089 |
| 833490 | West 4-15-5 3H | 4-15N-5W | Carroll | OH | 3401922082 |
| 833124 | Bucey 3H | 21-14N-4W | Carroll | OH | 3401922074 |
| 833530 | Burgett 7-15-6 8H RS | 7-15N-6W | Carroll | OH | 3401922085 |
| 833516 | Coniglio 7-14-4 6H | 7-14N-4W | Carroll | OH | 3401922084 |
| 833486 | Shaw 20-14-5 5H | 20-14N-5W | Carroll | OH | 3401922081 |
| 833017 | Calvin Mangun 8H | 22-15N-5W | Carroll | OH | 3401922073 |
| 833129 | Neider 3H | 10-14N-5W | Carroll | OH | 3401922075 |
| 833130 | Harvey 8H | 16-14N-5W | Carroll | OH | 3401922076 |
| 833353 | White 8H | 17-13N-5W | Carroll | OH | 3401922088 |

**EXHIBIT "A"**

Attached to and made a part of that certain Assignment, Bill of Sale and Conveyance dated effective November 1, 2011 from Chesapeake Exploration, L.L.C., Chesapeake Appalachia, L.L.C., Chesapeake AEC Acquisition, L.L.C., and Ohio Buckeye Energy, L.L.C., as Assignor to CHK Utica, L.L.C., as Assignee

| Lease Number | Lessor | Lessee | Lease Date | Township | Book | Page | Instrument | County | State |
|---|---|---|---|---|---|---|---|---|---|
| 34-000087-000 | REPELLA INVESTMENTS, LLC | KENYON ENERGY, LLC | 5/14/2010 | UNION | 60 | 1519 | 201000001865 | CARROLL | OH |
| 34-000101-000 | HOWARD W SPAHR AND DONNA | KENYON ENERGY LLC | 7/29/2010 | CENTER | 61 | 2604 | 201000002766 | CARROLL | OH |
| 34-000105-000 | THEODORE R SUMMER, JR | KENYON ENERGY, LLC | 7/26/2010 | WASHINGTON | 61 | 2364 | 201000002701 | CARROLL | OH |
| 34-000117-000 | LEONARD A LATTIN AND VERONICA | KENYON ENERGY, LLC | 7/14/2010 | PERRY | 61 | 2353 | 201000002699 | CARROLL | OH |
| 34-000119-000 | RICHARD L TOALSTON AND LAURA | KENYON ENERGY, LLC | 6/5/2010 | EAST | 61 | 578 | 201000002313 | CARROLL | OH |
| 34-000124-000 | LONNIE D LUCAS AND JENNIFER | KENYON ENERGY LLC | 7/14/2010 | CENTER | 61 | 2359 | 201000002700 | CARROLL | OH |
| 34-000126-000 | MARK R FRITZ AND MICHELLE | KENYON ENERGY, LLC | 7/27/2010 | AUGUSTA | 62 | 176 | 20100002896 | CARROLL | OH |
| 34-000127-000 | FRITZ DAIRY FARMS, LLC | KENYON ENERGY, LLC | 7/27/2010 | AUGUSTA WASHINGTON | 62 | 163 | 201000002894 | CARROLL | OH |
| 34-000131-000 | WARREN H WEFLER, A SINGLE MAN | KENYON ENERGY, LLC | 5/17/2010 | AUGUSTA | 60 | 1515 | 201000001864 | CARROLL | OH |

Instrument
201100007432 OR

Book Page
76 4076

00156

Instrument     Book Page
201100007779 OR     77  746

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## AMENDED AND RESTATED
## ASSIGNMENT, BILL OF SALE AND CONVEYANCE

STATE OF OHIO                    §

COUNTY OF CARROLL         §

201100007779
Filed for Record in
CARROLL COUNTY, OHIO
PATRICIA J. OYER, RECORDER
12-08-2011 At 01:36 pm.
ASSIGN LEAS     18508.00
OR Book        77 Page  746 - 1225

THIS AMENDED AND RESTATED ASSIGNMENT, BILL OF SALE AND CONVEYANCE (this "**Assignment**"), dated effective as of November 1, 2011 at 7:00 a.m. Central Time (the "**Effective Time**"), is made by **CHESAPEAKE EXPLORATION, L.L.C.**, an Oklahoma limited liability company, **CHESAPEAKE APPALACHIA, L.L.C.**, an Oklahoma limited liability company, **CHESAPEAKE AEC ACQUISITION, L.L.C.**, an Oklahoma limited liability company, and **OHIO BUCKEYE ENERGY, L.L.C.**, an Ohio limited liability company (collectively, "**Assignor**") to **CHK UTICA, L.L.C.**, a Delaware limited liability company ("**Assignee**"). This Assignment is executed and delivered in connection with and pursuant to the terms of that certain Contribution Agreement between Assignor and Assignee dated November 1, 2011 (as amended, the "**Contribution Agreement**"), and modifies, amends, restates and replaces, without duplication, the Prior Assignment (as defined in Section 6.5 below). Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Contribution Agreement.

1.     Assignment.  For and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby **GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER, AND DELIVER** unto Assignee, an undivided seventy-two percent (72%) (the "**Conveyed Interests**") of all of Assignor's interest in and to the following, subject to the terms and reservations hereof and specifically, **LESS AND EXCEPT** the Excluded Assets (as hereinafter defined) (the "**Properties**"):

1.1     (i) all oil and gas leases, leasehold interests, operating rights, working interests, net revenue interests and similar operating interests, or other rights to Hydrocarbons (whether producing or non-producing), described in Exhibit "A" attached hereto, in each case, as to all depths (collectively, all of the foregoing, the "**Leases**"); (ii) the lands covered by the Leases and all lands pooled or unitized therewith (collectively, the "**Lands**"); and (iii) all expressed or implied rights-of-way, easements and other surface rights, insofar and only insofar as the same arise in or under the Leases (collectively, the "**Easements**"; and the interests described in subparts 1.1(i)-1.1(iii) are collectively referred to as the "**Real Property Interests**");

1.2     (i) all of the wells listed on Exhibit "A" drilled and completed in the Utica Shale Formation or currently being drilled to the Utica Shale Formation (the "**Wells**"), (ii) all Lease Owned well heads, casing, tubing, pumps, motors, gauges, valves, heaters and treaters constituting part of or connected to the Wells, (iii) all Lease Owned automation equipment constituting part of or connected to the Wells, (iv) all Lease Owned gathering lines and improvements, water lines, vessels, tanks, boilers, separators, treating equipment, fixtures, compressors and other equipment used in connection with the Wells, (v) all Lease Owned power lines, telephone and communication lines used in connection with the Wells, (vi) all Lease Owned injection wells and water disposal facilities used in connection with the Wells, (vii) all other Lease Owned appurtenances owned and used in connection with the production, treating, storing, transportation or marketing of Hydrocarbons from the Wells, and (viii) any and all other equipment, machinery, fixtures and other tangible personal property and improvements located on or used in connection with the operation of the Wells (collectively referred to as the "**Equipment**");

1.3     all presently existing unitization, pooling and/or communitization agreements, declarations or designations and contractually, statutorily, judicially or administratively created drilling, spacing and/or production units, insofar as the same are attributable or allocated to the

1

00157

Real Property Interests or the Wells, and all of the Assignor's interest in and to the properties covered or units created thereby which are attributable to the Real Property Interests or the Wells;

    1.4    all presently existing and valid Hydrocarbon sales agreements, operating agreements (excluding any operating rights or duties), gathering agreements, transportation agreements, farmout and farmin agreements, participation agreements, unitization, pooling and communitization agreements, purchase agreements, exploration agreements, area of mutual interest agreements, exchange and processing contracts and agreements and any other contracts, agreements and instruments insofar as the above agreements cover, are attributable to or relate to the Real Property Interests or the Wells, Equipment or any interests pooled, communitized or unitized therewith, including those contracts and agreements described in the Contribution Agreement;

    1.5    all Hydrocarbons in, on, under or produced from or attributable to the Wells and the proceeds thereof; and

    1.6    copies of the Records to the extent relating to the Properties described in the foregoing subsections (1.1) through (1.5).

It is the intent of Assignor to convey and this Assignment hereby conveys to Assignee, subject to the reservations and conditions herein contained, from and after the Effective Time, the Conveyed Interests, regardless of the omission of any lease or leases, errors in description, any incorrect or misspelled names, or any transcribed or incorrect recording references.

**TO HAVE AND TO HOLD** all and singular such Conveyed Interests together with all rights, titles, interests, estates, remedies, powers, and privileges thereunto appertaining unto Assignee and Assignee's successors and assigns forever; subject to the following matters:

    a.    (A) with respect to any Leases and other leasehold interests: royalties and overriding royalties, and (B) with respect to Wells: royalties, overriding royalties and other burdens or encumbrances to the extent they do not, individually or in the aggregate, increase Assignor's Working Interest (without at least a proportionate corresponding increase in Assignor's Net Revenue Interest) in any Well from that described in the Contribution Agreement;

    b.    Liens for Taxes for which payment is not due or which are being contested in good faith by appropriate proceedings;

    c.    Liens (other than Liens in favor of Assignor or its Affiliates) of mechanics, materialmen, warehousemen, landlords, vendors, and carriers and any similar Liens (other than Liens in favor of Assignor or its Affiliates) arising by operation of Law which, in each instance, arise in the ordinary course, for sums not yet due or which are being contested in good faith by appropriate proceedings;

    d.    Liens (other than Liens in favor of Assignor or its Affiliates) under operating agreements, unit agreements, unitization and pooling designations and declarations, gathering and transportation agreements, processing agreements, Hydrocarbon purchase contracts and all of the other Contracts;

    e.    easements, surface leases, and other rights and plat restrictions, zoning laws, restrictive covenants and conditions, and building and other land use laws and similar encumbrances, insofar as the same do not materially interfere with the operation, development or use of the affected Property;

    f.    all rights to consent by, required notices to, filings with or other actions by Governmental Authorities in connection with the sale, disposition, transfer or conveyance of federal, state, tribal or other governmental oil and gas leases or interests therein or related thereto, which are customarily obtained subsequent to the assignment, disposition or transfer of such oil and gas leases or interests therein, or such operations;

    g.    conventional rights of reassignment obligating the lessee to reassign or offer to reassign its interests in any lease prior to a release or abandonment of such lease;

2

h. required non-governmental Third Party consents to assignments which have been obtained or waived by the appropriate parties or which need not be obtained prior to an assignment or which cannot be unreasonably withheld, and preferential rights to purchase which have been waived by the appropriate parties or for which the time period for asserting such rights has expired without the exercise of such rights;

i. all defects or irregularities (A) arising out of lack of affirmative statement of corporate authorization or a variation in corporate name, (B) that have been cured or remedied by applicable statutes of limitation or statutes for prescription, (C) consisting of the failure to recite marital status in documents or omissions of heirship proceedings, (D) that have been cured by possession under applicable statutes of limitation, or (E) resulting from lack of survey or failure to record releases of liens, production payments or mortgages that have expired by their own terms or the enforcement of which are barred by applicable statutes of limitation;

j. rights vested in or reserved to any Governmental Authority to regulate the Properties, to terminate any right, power, franchise, license or permit afforded by such Governmental Authority, or to condemn, expropriate or designate a buyer of any of the Properties;

k. any provision in a Lease, surface lease, easement, or other surface use agreement entered into prior to the Effective Time providing a Third Party with rights to an overriding royalty interest or other burdens or payments triggered by the use of the relevant surface property for drilling or other purposes (each a "**Surface Use Burden**"), *provided that*, with respect to the Wells only, such Surface Use Burdens do not reduce Assignor's Net Revenue Interest in such Well from that described in the Contribution Agreement;

l. the Royalty Agreement and any and all obligations thereunder and rights created thereby or pursuant thereto; and

m. the Contribution Agreement.

2. Excluded Assets. Assignor specifically excepts from this Assignment and reserves unto itself the following (the "**Excluded Assets**"):

2.1 Assignor's minute books, financial and income tax records and legal records (other than title records);

2.2 any existing or future refund of costs, Taxes or expenses borne by Assignor, any Affiliates of Assignor, or its predecessors in title attributable to the period prior to the Effective Time;

2.3 any and all proceeds from the settlements of contract disputes insofar as said proceeds are attributable to periods of time prior to the Effective Time;

2.4 all rights and interests of Assignor or any Affiliates of Assignor under (i) any policy, bond or agreement of insurance or indemnity (including any rights, claims or causes of action of Assignor against Third Parties under any indemnities or hold harmless agreements and any indemnities received in connection with Assignor's or any of its Affiliates' prior acquisition of any of the Properties), to the extent and only to the extent such rights and interests relate to the ownership of the Properties prior to the Effective Time and (ii) under any bond;

2.5 all of Assignor's and its Affiliates' proprietary computer software, patents, trade secrets, copyrights, names, trademarks, logos, and other intellectual property;

2.6 all accounts receivable and audit rights arising under any of the applicable contracts or otherwise with respect to any of the other items included in this definition of Excluded Assets, to the extent and only to the extent such rights and interests related to the ownership of the Properties prior to the Effective Time;

2.7 Geological and Geophysical Information and any other information which Assignor is prohibited from sharing by agreement with a Third Party;

2.8 (A) all mineral fee interests owned by Assignor or any of its Affiliates, (B) all royalty interests and overriding royalty interests owned by Assignor or any of its Affiliates and

3

(C) any wellbores located on the Properties, other than the Wells and Lease-Owned water or disposal wells;

2.9     all claims of Assignor or any of its Affiliates for refunds of or loss carry forwards with respect to (A) any other Taxes attributable to any period prior to the Effective Time, (B) income or franchise Taxes or (C) any Taxes attributable to any of the other items included in this definition of the Excluded Assets;

2.10    all "virtual courthouses" of Assignor or any of its Affiliates, all of their respective exclusive use arrangements with title abstract facilities, and all documents and instruments of Assignor or any of its Affiliates that may be protected by an attorney-client privilege, and all data that cannot be disclosed to Assignee or its members as a result of confidentiality arrangements under agreements with Third Parties (other than title opinions and other title records relating to the Properties);

2.11    all surface fee interests (but excluding the Easements), surface leasehold and other surface property interests (but excluding the Easements) and all buildings, offices, improvements, appurtenances, field offices and yards;

2.12    non-Lease Owned equipment such as compressors on the wellheads of the Wells operated by Assignor or its Affiliates owned by or leased from Assignor, its Affiliates or Third Parties;

2.13    automation systems including meters and related telemetry, licensed radio frequencies and associated communications infrastructure including towers, antennas, data links and network circuits, except any Lease Owned equipment;

2.14    all drilling rigs and related equipment, work over rigs and related equipment, tools and other equipment brought onto a well site temporarily for purposes of drilling, reworking or maintaining a well, all vehicles, and any other non-Lease Owned equipment, inventory, machinery, tools and other personal property not currently in use for the operation of a well or wells;

2.15    all assets of Chesapeake Midstream Group and all of the assets of Chesapeake Oilfield Group;

2.16    all non-Leased Owned salt water disposal wells, systems and related equipment; and

2.17    all of the Contributors' retained right, title and interest in and to the Properties after their contributions to the Company of the Conveyed Interests in accordance with the terms hereof and the Contribution Agreement.

3.      Contribution Agreement and Development Agreement. (i) The Conveyed Interests are subject to the terms of that certain Development Agreement between Chesapeake Exploration, L.L.C. and Assignee dated as of even date with the Contribution Agreement, and (ii) this Assignment is made expressly subject to the terms and provisions of the Contribution Agreement, including, without limitation, (A) certain limited remedies provided therein related to the general warranty provided below, (B) the assumption by Assignee of the Assumed Obligations (as defined therein), and (C) the retention by Assignor of the Retained Liabilities (as defined therein).

4.      General Warranty of Title. Assignor does hereby bind itself and its successors and assigns to warrant and forever defend all and singular title conveyed as of the date hereof to the Conveyed Interests unto Assignee and Assignee's successors and assigns, against every Person whomsoever lawfully claiming or to claim the same or any part thereof. Further, Assignee is specifically assigned, and subrogated to, warranties of title which Assignor may have from Assignor's predecessors in interest (other than Affiliates of Assignor) to the extent applicable with respect to the Conveyed Interests and to the extent Assignor may legally assign such rights and grant such subrogation.

4

Instrument
201100007779 OR    Book Page
77   750

5. Limitations on Representations and Warranties.

**5.1 EXCEPT FOR THE EXPRESS AND SPECIFIC REPRESENTATIONS AND WARRANTIES OF ASSIGNOR IN THE CONTRIBUTION AGREEMENT, IN ANY OTHER TRANSACTION DOCUMENTS, AND EXCEPT FOR THE GENERAL WARRANTY OF TITLE CONTAINED IN THIS ASSIGNMENT, ASSIGNEE ACKNOWLEDGES THAT ASSIGNOR HAS NOT MADE, AND ASSIGNOR HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND ASSIGNEE HEREBY EXPRESSLY WAIVES, ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, INCLUDING THOSE RELATING TO (a) PRODUCTION RATES, RECOMPLETION OPPORTUNITIES, DECLINE RATES, GAS BALANCING INFORMATION, OR THE QUALITY, QUANTITY OR VOLUME OF THE RESERVES OF HYDROCARBONS, IF ANY, ATTRIBUTABLE TO THE PROPERTIES OR ASSIGNOR'S INTEREST THEREIN, (b) THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY RECORDS, INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) NOW, HERETOFORE OR HEREAFTER FURNISHED TO ASSIGNEE BY OR ON BEHALF OF ASSIGNOR, AND (c) THE ENVIRONMENTAL OR OTHER CONDITION OF THE PROPERTIES.**

**5.2 EXCEPT FOR THE EXPRESS AND SPECIFIC REPRESENTATIONS AND WARRANTIES OF ASSIGNOR IN THE CONTRIBUTION AGREEMENT, ANY OTHER TRANSACTION DOCUMENTS, AND EXCEPT FOR THE GENERAL WARRANTY OF TITLE CONTAINED IN THIS ASSIGNMENT, AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ASSIGNOR EXPRESSLY DISCLAIMS AND NEGATES, AND ASSIGNEE HEREBY WAIVES, AS TO PERSONAL PROPERTY, EQUIPMENT, INVENTORY, MACHINERY AND FIXTURES CONSTITUTING A PART OF THE PROPERTIES (a) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (b) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, (c) ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, (d) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM DEFECTS, WHETHER KNOWN OR UNKNOWN, (e) ANY AND ALL IMPLIED WARRANTIES EXISTING UNDER APPLICABLE LAW, AND (f) ANY IMPLIED OR EXPRESS WARRANTY REGARDING ENVIRONMENTAL LAWS, THE RELEASE OF SUBSTANCES, WASTES OR MATERIALS INTO THE ENVIRONMENT, OR PROTECTION OF THE ENVIRONMENT OR HEALTH, IT BEING THE EXPRESS INTENTION OF ASSIGNEE AND ASSIGNOR THAT, EXCEPT AS SET FORTH IN THE CONTRIBUTION AGREEMENT, ANY OTHER TRANSACTION DOCUMENTS, AND EXCEPT FOR THE GENERAL WARRANTY OF TITLE CONTAINED IN THIS ASSIGNMENT, THE PERSONAL PROPERTY, EQUIPMENT, INVENTORY, MACHINERY AND FIXTURES IN WHICH ASSIGNOR HAS ANY INTEREST ARE BEING ACCEPTED BY ASSIGNEE, "AS IS, WHERE IS, WITH ALL FAULTS" AND IN THEIR PRESENT CONDITION AND STATE OF REPAIR.**

**5.3 ASSIGNOR AND ASSIGNEE AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN WARRANTIES CONTAINED IN THIS SECTION 5 ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSES OF ANY APPLICABLE LAW, RULE OR ORDER.**

6. Miscellaneous.

6.1. Cooperation. In addition to this Assignment, Assignor shall execute, acknowledge, and deliver to Assignee, in a timely manner and without further consideration, any documents or instruments that Assignee may reasonably require, including, without limitation, further assignments or conveyances required by any state or federal authority, deeds, and consents to further evidence the assignment and conveyance of the Conveyed Interests by Assignor to Assignee.

6.2. Choice of Law. This Assignment will be interpreted, construed, and enforced in accordance with the laws of the State of Ohio, without giving effect to any rules or principles of conflicts of law that might otherwise refer to the laws of another jurisdiction.

00161

Instrument          Book Page
201100007779 OR       77  751

6.3.    Successors and Assigns. This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

6.4.    Counterparts. This Assignment may be executed in multiple counterparts, each of which will be an original instrument, but all of which will constitute one assignment

6.5.    Effect of Amendment and Restatement. This Amended and Restated Assignment, Bill of Sale and Conveyance modifies, amends, restates and replaces, without duplication, that certain Assignment, Bill of Sale and Conveyance from Assignor to and in favor of Assignee signed November 1, 2011 (the "Prior Assignment") that was filed of record under Document No. 201100007432 in Volume 76 at Page 3827 of the deed records of Carroll County, Ohio.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGES FOLLOW]

00162

Instrument          Book Page
201100007779 OR      77  752

IN WITNESS WHEREOF, Assignor has executed this instrument on the date of the acknowledgment annexed hereto, but effective for all purposes as of the Effective Time.

## ASSIGNOR:

CHESAPEAKE EXPLORATION, L.L.C.,
an Oklahoma limited liability company

By: _____
Douglas J. Jacobson
Executive Vice President

CHESAPEAKE APPALACHIA, L.L.C.,
an Oklahoma limited liability company

By: _____
Douglas J. Jacobson
Executive Vice President

CHESAPEAKE AEC ACQUISITION, L.L.C.,
an Oklahoma limited liability company

By: _____
Douglas J. Jacobson
Executive Vice President

OHIO BUCKEYE ENERGY, L.L.C.,
an Ohio limited liability company

By: _____
Douglas J. Jacobson
Executive Vice President

## ASSIGNOR ACKNOWLEDGMENT

STATE OF OKLAHOMA          §
                           §
COUNTY OF OKLAHOMA         §

The foregoing instrument was acknowledged before me this December $2$_, 2011 by Douglas J. Jacobson, Executive Vice President of Chesapeake Exploration, L.L.C., an Oklahoma limited liability company, Chesapeake Appalachia, L.L.C., an Oklahoma limited liability company, Chesapeake AEC Acquisition, L.L.C., an Oklahoma limited liability company and Ohio Buckeye Energy, L.L.C., an Ohio limited liability company, on behalf of said limited liability companies.

_____
Notary Public

My Commission Expires: 6·11·15
Commission Number: 08008905

LINN D. YOUSEY
NOTARY
# 03008905
EXP. 06/11/15
PUBLIC
STATE OF OKLAHOMA

```
Instrument          Book Page
201100007779 OR      77  753
```

IN WITNESS WHEREOF, Assignee has executed this instrument on the date of the acknowledgment annexed hereto, but effective for all purposes as of the Effective Time.

**ASSIGNEE:**

CHK UTICA, L.L.C.,
a Delaware limited liability company

By: CHESAPEAKE EXPLORTION, L.L.C.,
its sole managing member

By: _____
Douglas J. Jacobson
Executive Vice President

## ASSIGNEE ACKNOWLEDGMENT

STATE OF OKLAHOMA     §
                             §
COUNTY OF OKLAHOMA    §

The foregoing instrument was acknowledged before me this December $\underline{2}$ 2011 by Douglas J. Jacobson, Executive Vice President of Chesapeake Exploration, L.L.C., an Oklahoma limited liability company, the sole managing member of CHK Utica, L.L.C., a Delaware limited liability company, on behalf of said limited liability company.

_____
Notary Public

My Commission Expires: 6·11·15
Commission Number: 03008905

This instrument was prepared by
CHK Utica, L.L.C.
6100 N. Western Avenue
Oklahoma City, OK 73118

Book Page
77  754

Instrument
20110007779  OR

Attached to and made a part of that certain Assignment, Bill of Sale and Conveyance
dated effective November 1, 2011 from Chesapeake Exploration, L.L.C., Chesapeake
Appalachia, L.L.C., Chesapeake AEC Acquisition, L.L.C., and Ohio Buckeye Energy,
L.L.C., as Assignor to CHK Utica, L.L.C., as Assignee

| Property Number | Well Name | Location | County | State | API # |
|---|---|---|---|---|---|
| 833636 | Bailey 35-12-4 6H | 35-12N-4W | Carroll | OH | 3401922089 |
| 833124 | Bucey 3H | 21-14N-4W | Carroll | OH | 3401922074 |
| 833530 | Burgett 7-15-6 8H RS | 7-15N-6W | Carroll | OH | 3401922085 |
| 833017 | Calvin Mangun 8H | 22-15N-5W | Carroll | OH | 3401922073 |
| 833516 | Coniglio 7-14-4 6H | 7-14N-4W | Carroll | OH | 3401922084 |
| 833130 | Harvey 8H | 16-14N-5W | Carroll | OH | 3401922076 |
| 833129 | Neider 3H | 10-14N-5W | Carroll | OH | 3401922075 |
| 833486 | Shaw 20-14-5 5H | 20-14N-5W | Carroll | OH | 3401922081 |
| 833867 | Tanner 24-12-4 10H | 23-12N-4W | Carroll | OH | 3401922090 |
| 833490 | West 4-15-5 3H | 4-15N-5W | Carroll | OH | 3401922082 |
| 833353 | White 17-13-5 8H | 17-13N-5W | Carroll | OH | 3401922088 |

EXHIBIT "A"

Attached to and made a part of that certain Assignment, Bill of Sale and Conveyance dated effective November 1, 2011 from Chesapeake Exploration, L.L.C., Chesapeake Appalachia, L.L.C., Chesapeake AEC Acquisition, L.L.C., and Ohio Buckeye Energy, L.L.C., as Assignor to CHK Utica, L.L.C., as Assignee

| Lease Number | Lessor | Lessee | Lease Date | Township | Book | Page | Instrument | County | State |
|---|---|---|---|---|---|---|---|---|---|
| 34-000117-000 | LEONARD A. LATTIN AND VERONICA S. LATTIN, HUSBAND AND WIFE | KENYON ENERGY, LLC | 7/14/2010 | PERRY | 61 | 2353 | 201000002699 | CARROLL | OH |
| 34-000119-000 | RICHARD L TOALSTON AND LAURA TOALSTON, HUSBAND AND WIFE | KENYON ENERGY, LLC | 6/5/2010 | EAST | 61 | 578 | 201000002313 | CARROLL | OH |
| 34-000124-000 | LONNIE D. LUCAS AND JENNIFER M. LUCAS, HUSBAND AND WIFE | KENYON ENERGY LLC | 7/14/2010 | CENTER | 61 | 2359 | 201000002700 | CARROLL | OH |
| 34-000126-000 | MARK R. FRITZ AND MICHELLE E. FRITZ, HUSBAND AND WIFE | KENYON ENERGY, LLC | 7/27/2010 | AUGUSTA | 62 | 176 | 20100002896 | CARROLL | OH |
| 34-000127-000 | FRITZ DAIRY FARMS, LLC | KENYON ENERGY, LLC | 7/27/2010 | AUGUSTA WASHINGTON | 62 | 163 | 201000002894 | CARROLL | OH |
| 34-000131-000 | WARREN H. WEFLER, A SINGLE MAN | KENYON ENERGY, LLC | 5/17/2010 | AUGUSTA | 60 | 1515 | 201000001864 | CARROLL | OH |
| 34-000136-000 | JERRY G LEGGETT AND MILDRED M LEGGET, HUSBAND AND WIFE | KENYON ENERGY LLC | 6/16/2010 | PERRY | 61 | 2376 | 201000002703 | CARROLL | OH |
| 34-000243-000 | RAYMOND F. HAYLEY AND SHIRLEY M. HAYLEY, HUSBAND AND WIFE | OHIO BUCKEYE ENERGY, L.L.C. | 8/23/2010 | PERRY | 62 | 1826 | 201000003253 | CARROLL | OH |

Page 269

Instrument 201100007779 DR

Book Page 77 1023

00166

STATE OF OHIO, CARROLL COUNTY ss:
I, PATRICIA J. DYER, Recorder within and for the county of
Carroll and the State of Ohio, do hereby certify that the
Foregoing is truly taken and copied from the original, now
on file in said Recorders Office. IN TESTIMONY WHEREOF, I
have subscribed my name and affixed the official seal at
Carrollton, Ohio

this _10th_ day of _January_, 20 _13_
PATRICIA J. DYER, RECORDER
_Cheryl Hatter_ DEPUTY

Instrument      Book Page
201200001233 OR    79 3025

201200001233 -mail
Filed for Record in
CARROLL COUNTY, OHIO
PATRICIA J. DYER, RECORDER
02-09-2012 At 02:41 PM.
ASSIGN LEAS      244.00
OR Book      79 Page 3025 - 3030

## ASSIGNMENT OF OIL AND GAS LEASES

STATE OF OHIO            )
                         )  §
COUNTY OF CARROLL        )

**KNOW ALL MEN BY THESE PRESENTS:**

**THAT,** the undersigned, **Kenyon Energy LLC,** with an address of 1425 S. Main Street, North Canton, Ohio, 44720, hereinafter referred to as Assignor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, does hereby sell, assign, transfer and set over and convey, without warranty of title either expressed or implied, unto **Chesapeake Exploration, L.L.C.,** 6100 N. Western Ave., Oklahoma City, Oklahoma, 73118, hereinafter referred to as Assignee, all right, title and interest in and to the oil and gas leases set forth on **Exhibit "A" attached hereto and made a part hereof** reference to which is hereby made for all purposes, together with the rights and interest thereto and the personal property thereon, appurtenant thereto or used or obtained in connection therewith.

**IN WITNESS WHEREOF,** the undersigned has executed this instrument on the date of the acknowledgment annexed hereto, but with respect to each oil and gas lease described on the Exhibit "A", effective for all purposes as of the date of such oil and gas lease or, if applicable, such later date on which such oil and gas lease or interest therein was acquired by Assignor.

Kenyon Energy LLC,
an Oklahoma limited liability company

By: _____
Philip M. Lowry - President

### CORPORATE ACKNOWLEDGEMENT

STATE OF OKLAHOMA        )
                         )  SS:
COUNTY OF OKLAHOMA       )

On this the _8th_ day of _February_, 20 _12_, before me the undersigned, a Notary Public in and for said state, personally appeared Philip M. Lowry, personally known to me (or satisfactorily proven), who acknowledged himself to be the President of Kenyon Energy LLC., and that he as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the limited liability company by himself as such President.

In witness thereof, I hereunto set my hand and official seals.

My Commission Expires on:

_____
Notary Public

Prepared by and Return to:  Kenyon Energy LLC, 1425 S. Main St., North Canton, OH 44720.

EXHIBIT "A"

Attached and made a part of that certain Assignment of Oil Gas Leases from Kenyon Energy, LLC to Chesapeake Exploration, L.L.C. dated February 7, 2012.

| LEASE NUMBER | LEASE NAME | LESSEE | PARCEL ID | LEGAL DESCRIPTION | COUNTY | STATE | TOWNSHIP | LEASE DATE | BOOK/PAGE |
|---|---|---|---|---|---|---|---|---|---|
| 34-000075-000 | ROBERT A. MOSER, A SINGLE MAN | KENYON ENERGY, LLC | 01-0000354.000<br>01-0000355.000<br>01-0000356.000 | 015N-005W, 19<br>015N-005W, 19<br>015N-005W, 19 | CARROLL | OH | AUGUSTA<br>AUGUSTA<br>AUGUSTA | 05/14/2010 | 60/1511 |
| 34-000131-000 | WARREN H. WEFLER, A SINGLE MAN | KENYON ENERGY, LLC | 01-0000428.000<br>01-0000429.000<br>01-0000430.000<br>01-0000431.000<br>01-0000432.000<br>01-0000433.000 | 015N-005W, 20<br>015N-005W, 20<br>015N-005W, 20<br>015N-005W, 20<br>015N-005W, 20<br>015N-005W, 20 | CARROLL | OH | AUGUSTA<br>AUGUSTA<br>AUGUSTA<br>AUGUSTA<br>AUGUSTA<br>AUGUSTA | 05/17/2010 | 60/1515 |
| 34-000087-000 | REPELLA INVESTMENTS, LLC | KENYON ENERGY, LLC | 33-0001105.000 | 014N-006W, 02 | CARROLL | OH | UNION | 05/14/2010 | 60/1519 |
| 34-000044-000 | D. LYNN DUNLAP AND ELLYN J. DUNLAP, CO-TRUSTEES OF THE D. LYNN DUNLAP AND ELLYN J. DUNLAP REVOCABLE LIVING TRUST DATED 12/12/2002 | KENYON ENERGY, LLC | 17-0000168.000<br>17-0000169.000<br>17-0000825.000<br>17-0000826.001<br>17-0000826.003 | 013N-005W, 05<br>013N-005W, 05<br>013N-005W, 05<br>013N-005W, 05<br>013N-005W, 05 | CARROLL | OH | LEE<br>LEE<br>LEE<br>LEE<br>LEE | 05/05/2010 | 60/1523 |
| 34-001552-000 | ROSS A. MILLS, JR. AND RUTH A. MILLS, HUSBAND AND WIFE | KENYON ENERGY, LLC | 01-0000344.000<br>01-0000431.000<br>01-0000433.000<br>01-0000428.000 | 015N-005W, 20<br>015N-005W, 20<br>015N-005W, 20<br>015N-005W, 20 | CARROLL | OH | AUGUSTA<br>AUGUSTA<br>AUGUSTA<br>AUGUSTA | 05/25/2010 | 60/1528 |
| 34-000037-000 | KENNETH E. BOOTH AND NANCY C. BOOTH, HUSBAND AND WIFE | KENYON ENERGY, LLC | 28-0000147.000<br>28-0000274.000<br>28-0000276.000<br>324836293<br>324836386 | 012N-005W, 36<br>012N-005W, 23<br>012N-005W, 22<br>012N-005W, 22<br>012N-005W, 36 | CARROLL | OH | PERRY<br>PERRY<br>PERRY<br>PERRY<br>PERRY | 06/09/2010 | 61/573 |

Instrument
201200001232 OR

Book Page
79 3026

00168

EXHIBIT "A"

Attached and made a part of that certain Assignment of Oil Gas Leases from Kenyon Energy, LLC to Chesapeake Exploration, L.L.C. dated February 7, 2012.

| LEASE NUMBER | LEASE NAME | LESSEE | PARCEL ID | LEGAL DESCRIPTION | COUNTY | STATE | TOWNSHIP | LEASE DATE | BOOK/PAGE |
|---|---|---|---|---|---|---|---|---|---|
| 34-000119-000 | RICHARD L. TOALSTON AND LAURA TOALSTON, HUSBAND AND WIFE | KENYON ENERGY, LLC | 11-0000375.000<br>11-0000377.001<br>11-0000374.000<br>11-0000519.000<br>11-0000520.000<br>11-0000377.000 | 014N-004W, 29<br>014N-004W, 32<br>014N-004W, 32<br>014N-004W, 32<br>014N-004W, 32<br>014N-004W, 32 | CARROLL | OH | EAST<br>EAST<br>EAST<br>EAST<br>EAST<br>EAST | 06/05/2010 | 61/578 |
| 34-000036-000 | GEORGE K. BUTLER, A WIDOWER | KENYON ENERGY, LLC | 12-0000097.000<br>12-0000098.000<br>11-0000057.000 | 013N-004W, 30<br>013N-004W, 24<br>014N-004W, 32 | CARROLL | OH | FOX<br>FOX<br>EAST | 06/05/2010 | 61/948 |
| 34-000052-000 | PEGGY J. FELTON, A WIDOW | KENYON ENERGY, LLC | 34-0000433.000 | 014N-005W, 18 | CARROLL | OH | WASHINGTON | 06/23/2010 | 61/954 |
| 34-000082-000 | RONALD P. PERDUE AND HELEN E. PERDUE, HUSBAND AND WIFE | KENYON ENERGY, LLC | 34-0000010.000 | 014N-005W, 22 | CARROLL | OH | WASHINGTON | 06/15/2010 | 61/959 |
| 34-000026-000 | WILLARD F. ALLMON AND ANITA M. ALLMON, TRUSTEES OF THE W.F. ALLMON FAMILY TRUST U/A DTD. 3/1/1993 | KENYON ENERGY, LLC | 01-0000004.000<br>01-0000005.000<br>01-0000026.009<br><br>01-0000407.000 | 015N-005W, 31<br>015N-005W, 31<br>015N-005W, 29<br>015N-005W, 30<br>015N-005W, 31 | CARROLL | OH | AUGUSTA<br>AUGUSTA<br>AUGUSTA<br>AUGUSTA<br>AUGUSTA | 07/10/2010 | 61/1791 |
| 34-000086-000 | RICHARD POWELL, A WIDOWER | KENYON ENERGY, LLC | 09-0000217.000 | 014N-005W, 19 | CARROLL | OH | CENTER | 07/22/2010 | 61/2348 |
| 34-000117-000 | LEONARD A. LATTIN AND VERONICA S. LATTIN, HUSBAND AND WIFE | KENYON ENERGY, LLC | 28-0000847.000<br>28-0000848.000 | 013N-005W, 31<br>012N-005W, 36 | CARROLL | OH | PERRY<br>PERRY | 07/14/2010 | 61/2353 |
| 34-000124-000 | LONNIE D. LUCAS AND JENNIFER M. LUCAS, HUSBAND AND WIFE | KENYON ENERGY, LLC | 09-0000975.000 | 014N-005W, 32 | CARROLL | OH | CENTER | 07/14/2010 | 61/2359 |
| 34-000105-000 | THEODORE R. SUMMER, JR. AND KAZUKO SUMMER, HUSBAND AND WIFE AND TRUSTEES OF THE SUMMER FAMILY REVOCABLE LIVING TRUST | KENYON ENERGY, LLC | 34-0000032.000<br>34-0000225.002 | 014N-005W, 04<br>014N-005W, 09 | CARROLL | OH | WASHINGTON<br>WASHINGTON | 07/26/2010 | 61/2364 |

Instrument
201200001233 OR

Book Page
79 3027

00169

EXHIBIT "A"

Attached and made a part of that certain Assignment of Oil Gas Leases from Kenyon Energy, LLC to Chesapeake Exploration, L.L.C. dated February 7, 2012.

| LEASE NUMBER | LEASE NAME | LESSEE | PARCEL ID | LEGAL DESCRIPTION | COUNTY | STATE | TOWNSHIP | LEASE DATE | BOOK/PAGE |
|---|---|---|---|---|---|---|---|---|---|
| 34-000028-000 | JOHN H. BARBER AND CHERYL L. BARBER, HUSBAND AND WIFE | KENYON ENERGY, LLC | 12-0000020.000<br>12-0000891.000 | 013N-004W, 18<br>013N-004W, 18 | CARROLL | OH | FOX<br>FOX | 07/01/2010 | ' 61/2370 |
| 34-000136-000 | JERRY G. LEGGETT AND MILDRED M. LEGGET, HUSBAND AND WIFE | KENYON ENERGY, LLC | 28-0000772.000<br>28-0000771.000<br>28-0000930.000 | 013N-006W, 05<br>013N-006W, 05<br>013N-006W, 05 | CARROLL | OH | PERRY<br>PERRY<br>PERRY | 06/16/2010 | 61/2376 |
| 34-000101-000 | HOWARD W. SPAHR AND DONNA L. SPAHR, HUSBAND AND WIFE | KENYON ENERGY, LLC | 09-0000732.000 | 015N-006W, 03 | CARROLL | OH | CENTER | 07/29/2010 | 61/2604 |
| 34-000066-000 | GORDON V. ISENHOUR AND PATRICIA R. ISENHOUR, HUSBAND AND WIFE | KENYON ENERGY, LLC | 12-0000134.000 | 013N-004W, 05 | CARROLL | OH | FOX | 07/27/2010 | 62/150 |
| 34-000127-000 | FRITZ DAIRY FARMS, LLC | KENYON ENERGY, LLC | 01-0000063.000<br>34-0000296.009<br>34-0000296.010 | 015N-005W, 29<br>014N-005W, 29<br>014N-005W, 29 | CARROLL | OH | AUGUSTA<br>WASHINGTON<br>WASHINGTON | 07/27/2010 | 62/163 |
| 34-000056-000 | JEFFREY E. FRAME AND PENNY L. FRAME, HUSBAND AND WIFE | KENYON ENERGY, LLC | 28-0001127.000<br>28-0001127.002<br>28-0001127.003<br>28-0001127.004 | 012N-005W, 23<br>012N-005W, 23<br>012N-005W, 23<br>012N-005W, 23 | CARROLL | OH | PERRY<br>PERRY<br>PERRY<br>PERRY | 08/04/2010 | 62/169 |
| 34-000126-000 | MARK R. FRITZ AND MICHELLE E. FRITZ, HUSBAND AND WIFE | KENYON ENERGY, LLC | 01-0000427.001<br>01-0000108.000 | 015N-005W, 30<br>015N-005W, 30 | CARROLL | OH | AUGUSTA<br>AUGUSTA | 07/27/2010 | 62/176 |
| 34-000064-000 | WALTER C. HUNT AND ANNA L. HUNT, HUSBAND AND WIFE | KENYON ENERGY, LLC | 17-0000322.000<br>17-0000324.000<br>17-0000325.000<br>17-0000326.000 | 013N-005W, 09<br>013N-005W, 09<br>013N-005W, 09<br>013N-005W, 09 | CARROLL | OH | LEE<br>LEE<br>LEE<br>LEE | 07/23/2010 | 62/182 |
| 34-001442-001 | JEANNINE LOUISE AND LEE JOBES, WIFE AND HUSBAND | KENYON ENERGY, LLC | 11-0000419.000<br>11-0000420.000 | 015N-005W, 25<br>015N-005W, 25 | CARROLL | OH | EAST<br>EAST | 08/17/2010 | 62/1790 |

Page 3

Instrument<br>201200001233 OR<br>Book Page<br>79 3028<br>00170

EXHIBIT "A"

Attached and made a part of that certain Assignment of Oil Gas Leases from Kenyon Energy, LLC to Chesapeake Exploration, L.L.C. dated February 7, 2012.

| LEASE NUMBER | LEASE NAME | LESSEE | PARCEL ID | LEGAL DESCRIPTION | COUNTY | STATE | TOWNSHIP | LEASE DATE | BOOK/PAGE |
|---|---|---|---|---|---|---|---|---|---|
| 34-001442-001 | JEANNINE LOUISE JOBES A/K/A JEANNINE LOUISE BRINKER A/K/A JEANNINE LOUISE BRINKER JOBES AND LEE JOBES, WIFE AND HUSBAND | KENYON ENERGY, LLC | 11-0000419.000 11-0000420.000 | 015N-005W, 25 015N-005W, 25 | CARROLL | OH | EAST EAST | 8/17/2010 | 63/1251 |
| 34-000546-002 | JEANNINE LOUISE AND LEE JOBES, WIFE AND HUSBAND | KENYON ENERGY, LLC | 11-0000153.000 11-0000153.001 | 015N-005W, 36 015N-005W, 36 | CARROLL | OH | EAST EAST | 08/17/2010 | 62/1794 |
| 34-000546-002 | JEANNINE LOUISE JOBES A/K/A JEANNINE LOUISE BRINKER A/K/A JEANNINE LOUISE BRINKER JOBES AND LEE JOBES, WIFE AND HUSBAND | KENYON ENERGY, LLC | 11-0000153.001 | 015N-005W, 36 | CARROLL | OH | EAST | 8/17/2010 | 63/1257 |
| 34-001442-003 | MARY KATHLEEN AND BILLY CARL RAY, WIFE AND HUSBAND | KENYON ENERGY, LLC | 11-0000419.000 11-0000420.000 | 015N-005W, 25 015N-005W, 25 | CARROLL | OH | EAST EAST | 08/17/2010 | 62/1798 |
| 34-001442-003 | MARY KATHLEEN RAY A/K/A MARY KATHLEEN BRINKER RAY AND BILLY CARL RAY, WIFE AND HUSBAND | KENYON ENERGY, LLC | 11-0000419.000 11-0000420.000 | 015N-005W, 25 015N-005W, 25 | CARROLL | OH | EAST EAST | 8/17/2010 | 63/1240 |
| 34-000546-004 | MARY KATHLEEN AND BILLY CARL RAY, WIFE AND HUSBAND | KENYON ENERGY, LLC | 11-0000153.000 11-0000153.001 | 015N-005W, 36 015N-005W, 36 | CARROLL | OH | EAST EAST | 08/17/2010 | 62/1802 |
| 34-000546-004 | MARY KATHLEEN RAY A/K/A MARY KATHLEEN BRINKER A/K/A MARY KATHLEEN BRINKER RAY AND BILLY CARL RAY, WIFE AND HUSBAND | KENYON ENERGY, LLC | 11-0000153.001 | 015N-005W, 36 | CARROLL | OH | EAST | 8/17/2010 | 63/1246 |
| 34-001442.004 | JAMES WILLIAM AND RONDA KAY BRINKER, HUSBAND AND WIFE | KENYON ENERGY, LLC | 11-0000419.000 11-0000420.000 | 015N-005W, 25 015N-005W, 25 | CARROLL | OH | EAST EAST | 8/17/2010 | 62/1806 |

Instrument 201200001233 OR

Book Page 79 3029

00171

EXHIBIT "A"

Attached and made a part of that certain Assignment of Oil Gas Leases from Kenyon Energy, LLC to Chesapeake Exploration, L.L.C. dated February 7, 2012.

| LEASE NUMBER | LEASE NAME | LESSEE | PARCEL ID | LEGAL DESCRIPTION | COUNTY | STATE | TOWNSHIP | LEASE DATE | BOOK/PAGE |
|---|---|---|---|---|---|---|---|---|---|
| 34-001442-004 | JAMES WILLIAM BRINKER AND RONDA KAY BRINKER A/K/A RHONDA KAY BRINKER, HUSBAND AND WIFE | KENYON ENERGY, LLC | 11-0000419.000 11-0000420.000 | 015N-005W, 25 015N-005W, 25 | CARROLL | OH | EAST EAST | 8/17/2010 | 63/1274 |
| 34-000546-003 | JAMES WILLIAM AND RONDA KAY BRINKER, HUSBAND AND WIFE | KENYON ENERGY, LLC | 11-0000153.000 11-0000153.001 | 015N-005W, 36 015N-005W, 36 | CARROLL | OH | EAST EAST | 8/17/2010 | 62/1810 |
| 34-000546-003 | JAMES WILLIAM BRINKER AND RONDA KAY BRINKER A/K/A RHONDA KAY BRINKER, HUSBAND AND WIFE | KENYON ENERGY, LLC | 11-0000153.001 | 015N-005W, 36 | CARROLL | OH | EAST | 8/17/2010 | 63/1280 |
| 34-001442-002 | MERCH ROBERT BRINKER, III AND SHERILYNN, HUSBAND AND WIFE | KENYON ENERGY, LLC | 11-0000419.000 11-0000420.000 | 015N-005W, 25 015N-005W, 25 | CARROLL | OH | EAST EAST | 8/17/2010 | 62/1814 |
| 34-001442-002 | MERCH ROBERT BRINKER III AND SHERRILYNN BRINKER, HUSBAND AND WIFE | KENYON ENERGY, LLC | 11-0000419.000 11-0000420.000 | 015N-005W, 25 015N-005W, 25 | CARROLL | OH | EAST EAST | 8/17/2010 | 63/1268 |
| 34-000546-001 | MERCH ROBERT BRINKER, III AND SHERILYNN, HUSBAND AND WIFE | KENYON ENERGY, LLC | 11-0000153.000 11-0000153.001 | 015N-005W, 36 015N-005W, 36 | CARROLL | OH | EAST EAST | 8/17/2010 | 62/1818 |
| 34-000546-001 | MERCH ROBERT BRINKER, III AND SHERILYNN BRINKER, HUSBAND AND WIFE | KENYON ENERGY, LLC | 11-0000153.000 11-0000153.001 | 015N-005W, 36 015N-005W, 36 | CARROLL | OH | EAST EAST | 8/17/2010 | 63/1262 |
| 34-000546-005 | LINDA JOYCE AND ROBERT CROUSE, HUSBAND AND WIFE | KENYON ENERGY, LLC | 11-0000153.000 11-0000153.001 | 015N-005W, 36 015N-005W, 36 | CARROLL | OH | EAST EAST | 8/17/2010 | 62/1822 |
| 34-000546-005 | LINDA JOYCE CROUSE F/K/A LINDA J. GRIMM AND ROBERT CROUSE, WIFE AND HUSBAND | KENYON ENERGY, LLC | 11-0000153.001 | 015N-005W, 36 | CARROLL | OH | EAST | 8/17/2010 | 63/1235 |

Instrument 201200001233 OR

Book Page 79 3030

00172

STATE OF OHIO, CARROLL COUNTY ss
I, PATRICIA J. OYER, Recorder in the county of
Carroll [illegible] Court of Common Please for the
[illegible]
[illegible]
[illegible]                                WHEREOF, I
[illegible]
[illegible]
Carrollton Ohio
this  10th  day of  January  13

Instrument        Book Page
201200003777 OR      82  2502

201200003777
Filed for Record in
CARROLL COUNTY, OHIO
PATRICIA J. OYER, RECORDER
05-04-2012 At 10:50 am.
ASSIGN LEAS    19780.00
OR Book      82 Page 2502 - 2834√

4221

## ASSIGNMENT, BILL OF SALE AND CONVEYANCE

STATE OF OHIO           §
                        §
COUNTY OF CARROLL       §

THIS ASSIGNMENT, BILL OF SALE AND CONVEYANCE (this "Assignment"), dated effective as of November 1, 2011 at 7:00 a.m. Central Time (the "Effective Time"), is made by **CHESAPEAKE EXPLORATION, L.L.C.**, an Oklahoma limited liability company, with a notice address of 6100 North Western Avenue, Oklahoma City, Oklahoma 73118 ("Assignor"), to **TOTAL E&P USA, INC.**, a Delaware corporation, with a notice address of 1201 Louisiana, Suite 1800, Houston, Texas 77002 ("Assignee"). This Assignment is executed and delivered in connection with and pursuant to the terms of that certain Purchase and Sale Agreement dated December 30, 2011 (the "Agreement"), by and among Assignor, EnerVest Energy Institutional Fund IX, L.P., EnerVest Energy Institutional Fund IX-WI, L.P., EnerVest Energy Institutional Fund XI-A, L.P., EnerVest Energy Institutional Fund XI-WI, L.P., CGAS Properties, L.P., Belden and Blake Corporation, and Assignee.

1.    Assignment.  For and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby **GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER AND DELIVER** unto Assignee, the Assignee's Proportionate Share (as hereinafter defined) of all of Assignor's (including the right, title and interest of Chesapeake AEC Acquisition, L.L.C. and Ohio Buckeye Energy, L.L.C., each of whom has been merged into Assignor) and its Affiliates' right, title and interest as of the Effective Time (or, with respect to the Contract PSA Leases, as of December 30, 2011 (the "Closing Date")) in and to the following in the Utica Area (but excluding Assignor's Excluded Assets) subject to the terms and reservations hereof:

1.1    All oil, gas and mineral leases, leasehold interests, operating rights, working interests and net revenue interests, and other rights to crude oil, natural gas, casinghead gas, condensate, sulfur, natural gas liquids, and other gaseous hydrocarbons (collectively, "Hydrocarbons"), including those interests and rights described in Exhibit "A" attached hereto and made a part hereof, which are owned by (i) Assignor (including the right, title and interest of Chesapeake AEC Acquisition, L.L.C. and Ohio Buckeye Energy, L.L.C., each of whom has been merged into Assignor) or any of its Affiliates as of the Effective Time or (ii) Assignor (including the right, title and interest of Chesapeake AEC Acquisition, L.L.C. and Ohio Buckeye Energy, L.L.C., each of whom has been merged into Assignor) or any of its Affiliates with respect to the Contracted PSA Leases as of the Closing Date, in each case, whether producing or non-producing; and the lands covered by the leases and interests, including those described in Exhibit "A" even though such rights might be omitted from or incorrectly described on Exhibit "A" (collectively, the "Lands");

00173

1.2    (i) All of the oil and gas wells listed in Exhibit "A" (the "Wells"), (ii) all Lease Owned well heads, casing, tubing, pumps, motors, gauges, valves, heaters and treaters constituting part of or connected to the Wells or located on the PSA Leases, (iii) Lease Owned automation equipment constituting part of or connected to the Wells or located on the PSA Leases, (iv) all Lease Owned gathering lines and improvements, water lines, vessels, tanks, boilers, separators, treating equipment, compressors and other equipment used in connection with the Wells or PSA Leases, (v) all Lease Owned power lines, telephone and communication lines used in connection with the Wells or PSA Leases, (vi) all Lease Owned injection wells and water disposal facilities, and (vii) all other Lease Owned appurtenances owned and used in connection with the production, treating, storing, transportation or marketing of Hydrocarbons from the Wells or PSA Leases (the property described in subsections (ii) through (vii) of this subpart 1.2 being collectively, the "Equipment");

1.3    All presently existing unitization, pooling and/or communitization agreements, declarations or designations and contractually, statutorily, judicially or administratively created drilling, spacing and/or production units, insofar as the same are attributable or allocated to the Lands, and all of Assignor's and its Affiliates' interest in and to the properties covered or units created thereby (collectively, "Unitization Acreage");

1.4    All presently existing and valid Hydrocarbon sales agreements, operating agreements (excluding any operating rights or duties), gathering agreements, transportation agreements, farmout and farmin agreements, unitization, pooling and communitization agreements, purchase agreements, exploration agreements, area of mutual interest agreements, exchange and processing contracts and agreements and any other contracts, agreements and instruments insofar as the above agreements cover, are attributable to or relate to the Lands or the Wells or any interests pooled, communitized or unitized therewith, including those contracts and agreements described on Exhibit "C-1" attached to the Agreement (collectively, the "Contracts");

1.5    All Hydrocarbons in, on, under or produced from or attributable to the Lands or the Unitization Acreage from and after the Effective Time and the proceeds thereof and inventory purchased from Assignor or its Affiliates pursuant to Section 2.5(a) of the Agreement;

1.6    All easements, surface leases, servitudes, rights of way and all other rights and appurtenances situated on or used in connection with the production of Hydrocarbons from the Lands or the Unitization Acreage, including leases, easements or rights-of-way with respect to surface fee interests included in Assignor's Excluded Assets and (i) used or held for use for the location of or access to Wells or Equipment or (ii) necessary for the development or operation of any of the Properties (collectively, the "Easements");

1.7    Subject to the rights and restrictions of Third Parties, copies of Assignor's books, records and files, including all Contracts and any and all title files, lease files, land files, wells files, including Geological and Geophysical Information which is not an Excluded Asset of Assignor and which is not covered by the Seismic License delivered by Assignor to Assignee on the Closing Date, well logs and other well data, maps, division order files, abstracts, production files, technical, engineering and maintenance files, environmental and safety records and information to the extent related to the items listed in subparts 1.1 through 1.6 hereof, and, to the extent available, in an industry standard or already existing electronic format as reasonably requested by Assignee, excluding, except to the extent of current ad valorem and severance Tax returns, accounting and tax records for all periods prior to the Effective Time; and

1.8    Rights and interests in proceeds under any policy or agreement of insurance or rights and interests under any agreement of indemnity (including any rights, claims or causes of action of Assignor or its Affiliates against Third Parties under any indemnities or hold harmless agreements and any indemnities received in connection with Assignor's or its Affiliates' prior acquisition of any of the Properties) to the extent and only to the extent such rights and interests relate to losses, damages, claims, liabilities, debts, obligations or expenses that are Assumed Obligations under the Agreement.

All rights, titles and interests transferred and assigned to Assignee pursuant to this Section 1 being collectively called the "Conveyed Interests". It is the intent of Assignor to convey and this Assignment hereby conveys to Assignee, subject to the reservations and conditions herein contained, the Conveyed Interests, regardless of errors in description, any incorrect or misspelled names, or any transcribed or incorrect recording references. As used in this Assignment, the term "Assignee's Proportionate Share" shall mean an undivided 89.2857%.

TO HAVE AND TO HOLD all and singular the Conveyed Interests together with all rights, titles, interests, estates, remedies, powers, and privileges thereunto appertaining unto Assignee and Assignee's successors and assigns forever.

2.    Development Agreement.  The Conveyed Interests are subject to the Development Agreement.

3.    Special Warranty of Defensible Title. Assignor does hereby bind itself and its successors and assigns to warrant and forever defend all and singular Defensible Title to the Conveyed Interests unto Assignee and Assignee's successors and assigns, against every Person whomsoever lawfully claiming or to claim the same or any part thereof, by, through, or under Assignor, but not otherwise. This special warranty of Defensible Title will continue after the delivery of this Assignment for a period of five (5) years and shall thereafter be of no further force or effect except with respect to any claim under such special warranty of Defensible Title that has been asserted prior to the end of such five (5) year period, which shall survive until such claim with respect thereto is resolved. The intended effect of such termination is to bar, from and after the date of termination, any claim or cause of action with respect to such special warranty of Defensible Title. Further, Assignee is specifically assigned, and subrogated to, the rights or actions on title warranties given or made by Assignor's or its Affiliate's predecessors in title, with respect to the Conveyed Interests and to the extent Assignor may legally assign such rights and grant such subrogation.

4.    Special Retained Liabilities. Reference is hereby made to that certain (i) Amended and Restated Royalty Agreement dated as of December 1, 2011, by and among Assignor, CHK Utica, L.L.C. ("CHK Utica"), Chesapeake Appalachia L.L.C., Chesapeake AEC Acquisition, L.L.C., Ohio Buckeye Energy, L.L.C. (collectively, the "Chesapeake Parties") and Utica Royalty Partners, LP (the "Royalty Company I") and (ii) Royalty Agreement dated as of December 1, 2011, by and among the Chesapeake Parties and Utica Royalty Partners II LP ("Royalty Company II" and such agreements collectively, the "Royalty Agreements"). Assignor does hereby acknowledge and agree that the Conveyed Interests shall not be burdened by the Royalty Agreements or any overriding royalty interests or other rights granted to the Royalty Company I or Royalty Company II pursuant thereto, including, without limitation, the overriding royalty interests and other rights assigned pursuant to the Conveyances of Overriding Royalty Interest described in Exhibit "B" attached hereto (collectively, the "Special Retained Liabilities"), and that such interests and rights shall exclusively burden and be carved out of Assignor's rights, titles and interests in the Properties that do not constitute Conveyed Interests. Furthermore, Assignor does hereby agree to pay, defend, indemnify, reimburse and hold harmless Assignee for, from and against any loss, damage, diminution in value, claim, liability, debt, obligation or expense (including interest, reasonable legal fees, and expenses of litigation and attorneys fees in enforcing this indemnity) incurred, suffered, paid by or resulting to Assignee and which result from, arise out of or in connection with, is based upon, or exist by reason of, any claims made against Assignee pursuant to or on account of the Royalty Agreements or the Special Retained Liabilities.

5.    Limitations on Representations and Warranties.

**5.1    EXCEPT FOR THE EXPRESS AND SPECIFIC REPRESENTATIONS AND WARRANTIES OF ASSIGNOR IN THE AGREEMENT AND ASSIGNOR'S CERTIFICATE DELIVERED AT CLOSING PURSUANT THERETO AND EXCEPT FOR THE SPECIAL WARRANTY OF DEFENSIBLE TITLE CONTAINED IN THIS ASSIGNMENT, ASSIGNEE ACKNOWLEDGES THAT ASSIGNOR HAS NOT MADE, AND ASSIGNOR HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND ASSIGNEE HEREBY EXPRESSLY WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO (i) PRODUCTION RATES, RECOMPLETION OPPORTUNITIES, DECLINE RATES, GAS BALANCING INFORMATION, OR THE QUALITY, QUANTITY OR VOLUME OF THE RESERVES OF HYDROCARBONS, IF ANY, ATTRIBUTABLE TO THE PROPERTIES, (ii) THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY RECORDS, INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) NOW, HERETOFORE OR HEREAFTER FURNISHED TO ASSIGNEE BY OR ON BEHALF OF ASSIGNOR, AND (iii) THE ENVIRONMENTAL CONDITION OF THE PROPERTIES.**

**5.2    EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES OF ASSIGNOR IN THE AGREEMENT AND ASSIGNOR'S CERTIFICATE DELIVERED AT CLOSING PURSUANT THERETO AND EXCEPT FOR THE SPECIAL WARRANTY OF DEFENSIBLE TITLE CONTAINED IN THIS ASSIGNMENT, AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ASSIGNOR EXPRESSLY DISCLAIMS AND NEGATES, AND ASSIGNEE HEREBY WAIVES, AS TO PERSONAL PROPERTY, EQUIPMENT, INVENTORY, MACHINERY AND FIXTURES CONSTITUTING A PART OF THE PROPERTIES, (i) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (ii) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, (iii) ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, (iv) ANY RIGHTS OF PURCHASERS UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION OR RETURN OF THE PURCHASE PRICE, (v) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM DEFECTS, WHETHER KNOWN OR UNKNOWN, (vi) ANY AND ALL IMPLIED WARRANTIES EXISTING UNDER APPLICABLE LAW, AND (vii) ANY IMPLIED OR EXPRESS WARRANTY REGARDING ENVIRONMENTAL LAWS, THE RELEASE OF SUBSTANCES, WASTES OR MATERIALS INTO THE ENVIRONMENT, OR PROTECTION OF THE ENVIRONMENT OR HEALTH, IT BEING THE EXPRESS INTENTION OF ASSIGNEE AND ASSIGNOR THAT THE PERSONAL PROPERTY, EQUIPMENT, INVENTORY, MACHINERY AND FIXTURES IN WHICH ASSIGNOR HAS ANY INTEREST ARE BEING ACCEPTED BY ASSIGNEE, SUBJECT TO THE TERMS OF THE AGREEMENT, "AS IS, WHERE IS, WITH ALL FAULTS" AND IN THEIR PRESENT CONDITION AND STATE OF REPAIR.**

**5.3    ASSIGNOR AND ASSIGNEE AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN WARRANTIES CONTAINED IN THIS SECTION 5 ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSES OF ANY APPLICABLE LAW, RULE OR ORDER.**

6.    Miscellaneous.

6.1.    Cooperation. In addition to this Assignment, Assignor shall execute, acknowledge, and deliver to Assignee, in a timely manner and without further consideration, any documents or instruments that Assignee may reasonably require, including, without limitation, further assignments or conveyances required by any state or federal authority, deeds, and consents to further evidence the assignment and conveyance of the Conveyed Interests by Assignor to Assignee.

6.2.    Counterparts. This Assignment may be executed in multiple counterparts, each of which will be an original instrument, but all of which will constitute one instrument; provided, however, that to facilitate recording or filing of this Assignment, each recorded or filed counterpart may contain only a portion of Exhibit "A" as provided in Section 6.4 of this Assignment.

6.3.    Successors and Assigns. This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

6.4.    Recording of Assignment. To facilitate recording or filing of this Assignment, the counterpart filed with a county agency or office may contain only that portion of Exhibit "A" that describes property under the jurisdiction of that agency or office. Assignor, on the one hand, and Assignee, on the other hand, have each retained a counterpart of this Assignment containing a full description of all of the Conveyed Interests.

6.5.    Capitalized Terms. Except as otherwise defined herein, all capitalized terms used in this Assignment which are defined in the Agreement will have the same meanings herein as defined in the Agreement; *provided, however, that*, notwithstanding any provision of this Assignment, CHK Utica will not be considered an "Affiliate" of the Assignor for purposes of this Assignment.

6.6.    Conflicts. If there is a conflict between the provisions of the Agreement and this Assignment, the provisions of the Agreement shall control.

6.7.    Choice of Law. THIS ASSIGNMENT AND THE LEGAL RELATIONS AMONG THE PARTIES SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF OHIO.

6.8.    Arbitration. Any disputes, claims, counterclaims, demands, causes of action, controversies and other matters in question between the parties hereto arising out of or relating to this Assignment or the alleged breach hereof, regardless of whether (a) allegedly extra-contractual in nature, (b) sounding in contract, tort or otherwise, (c) provided for by Law or otherwise, or (d) seeking damages or any other relief, whether at Law, in equity or otherwise, shall be resolved through final and binding arbitration in accordance with Section 13 of the Agreement, the terms of which are incorporated by reference as if set out in full herein.

[SIGNATURE PAGES FOLLOW]

Instrument         Book Page
201200003777 OR      82 2507

IN WITNESS WHEREOF, each of Assignor and Assignee has executed this instrument on the date of its respective acknowledgment annexed hereto, but effective for all purposes as of the Effective Time.

**ASSIGNOR:**

CHESAPEAKE EXPLORATION, L.L.C.,
an Oklahoma limited liability company

By: _____
    Douglas J. Jacobson
    Executive Vice President

**ASSIGNEE:**

TOTAL E&P USA, INC.,
a Delaware corporation

By: _____
    Fabien Colmet Daage
    Vice President Business Development & Strategy

This instrument was prepared by:

Jeremy A. Mouton
Commercial Law Group, P.C.
5520 North Francis Avenue
Oklahoma City, OK 73118

00178

Instrument            Book Page
201200003777 OR        82 2509

## ASSIGNEE ACKNOWLEDGMENT

STATE OF OKLAHOMA        §
                        §
COUNTY OF OKLAHOMA       §

This instrument was acknowledged before me on this 30th day of December, 2011, by Fabien Colmet Daage, as Vice President Business Development & Strategy of Total E&P USA, Inc., a Delaware corporation, as the act and deed and on behalf of such corporation.

_____
Notary Public

My Commission Expires: 6·11·15
Commission Number: 03008905

LINN D. YOUSEY
NOTARY
# 03008905
EXP. 06/11/15
PUBLIC
STATE OF OKLAHOMA

00179

Book Page
82 2695

Instrument
201200003777

**EXHIBIT "A"**

Attached to and made a part of that certain Assignment, Bill of Sale and Conveyance dated effective November 1, 2011 from Chesapeake Exploration, L.L.C., as Assignor to Total E&P USA, Inc., as Assignee

| Lease No | Lessor | Lessee | Lease Date | Township | County | State | Book | Page | Entry |
|----------|--------|--------|------------|----------|--------|-------|------|------|-------|
| 34-000066-000 | GORDON V ISENHOUR AND PATRICIA R ISENHOUR, HUSBAND AND WIFE | KENYON ENERGY LLC | 7/27/2010 | FOX | CARROLL | OH | 62 | 150 | 201000002892. |
| 34-000075-000 | ROBERT A. MOSER | KENYON ENERGY, LLC | 5/14/2010 | AUGUSTA | CARROLL | OH | 60 | 1511 | 201000001863 |
| 34-000082-000 | RONALD P. PERDUE AND HELEN E. PERDUE, HUSBAND AND WIFE | KENYON ENERGY, LLC | 6/15/2010 | WASHINGTON | CARROLL | OH | 61 | 959 | 201000002391 |
| 34-000086-000 | RICHARD POWELL, A WIDOWER | KENYON ENERGY, LLC | 7/22/2010 | CENTER | CARROLL | OH | 61 | 2348 | 201000002698 |
| 34-000087-000 | REPELLA INVESTMENTS, LLC | KENYON ENERGY, LLC | 5/14/2010 | UNION | CARROLL | OH | 60 | 1519 | 201000001865 |
| 34-000101-000 | HOWARD W SPAHR AND DONNA L SPAHR, HUSBAND AND WIFE | KENYON ENERGY LLC | 7/29/2010 | CENTER | CARROLL | OH | 61 | 2604 | 201000002766 |
| 34-000105-000 | THEODORE R. SUMMER, JR. AND KAZUKO SUMMER, HUSBAND AND WIFE AND TRUSTEES OF THE SUMMER FAMILY REVOCABLE LIVING TRUST | KENYON ENERGY, LLC | 7/26/2010 | WASHINGTON | CARROLL | OH | 61 | 2364 | 201000002701 |
| 34-000117-000 | LEONARD A. LATTIN AND VERONICA S. LATTIN, HUSBAND AND WIFE | KENYON ENERGY, LLC | 7/14/2010 | PERRY | CARROLL | OH | 61 | 2353 | 201000002699 |
| 34-000119-000 | RICHARD L TOALSTON AND LAURA TOALSTON, HUSBAND AND WIFE | KENYON ENERGY, LLC | 6/5/2010 | EAST | CARROLL | OH | 61 | 578 | 201000002313 |
| 34-000124-000 | LONNIE D. LUCAS AND JENNIFER M. LUCAS, HUSBAND AND WIFE | KENYON ENERGY LLC | 7/14/2010 | CENTER | CARROLL | OH | 61 | 2359 | 201000002700 |
| 34-000126-000 | MARK R. FRITZ AND MICHELLE E. FRITZ, HUSBAND AND WIFE | KENYON ENERGY, LLC | 7/27/2010 | AUGUSTA | CARROLL | OH | 62 | 176 | 20100002896 |
| 34-000127-000 | FRITZ DAIRY FARMS, LLC | KENYON ENERGY, LLC | 7/27/2010 | AUGUSTA WASHINGTON | CARROLL | OH | 62 | 163 | 201000002894 |
| 34-000131-000 | WARREN H. WEFLER, A SINGLE MAN | KENYON ENERGY, LLC | 5/17/2010 | AUGUSTA | CARROLL | OH | 60 | 1515 | 201000001864 |

Page186    IT IS THE INTENTION OF THE ASSIGNOR TO CONVEY THE LEASES INSOFAR AND ONLY INSOFAR AS THE LEASE IS LOCATED WITHIN THE DESCRIBED TOWNSHIP.



Align top of FedEx Express® Shipping Label here.

ORIGIN ID: PHDA
UNITED STATES US

SHIP DATE: 14JAN13
ACTWGT: 2.3 LB
CAD: /POS1322
DIMS: 0x0x0 IN

BILL SENDER

TO GERI M SMITH CLERK OF CTS
US SIXTH NORTH DISTR CT
2 SOUTHG MAIN ST
C/O JOHN F SEIBERLING FED BLVD
AKRON OH 44308
(000) 000-0000 REF:
INV:
PO: DEPT:

FedEx Express

E

TRK# 0200 8022 8973 6965

TUE - 15 JAN A2
PRIORITY OVERNIGHT

64 CAKA

44308
OH-US CLE

Recipient's Copy

Package Service

Packages up to 150 lbs.

2 or 3 Business Days

FedEx 2Day A.M.

FedEx 2Day

FedEx Express Saver

FedEx Pak*

FedEx Box

FedEx Tube

Other

Packaging and Delivery Signature Options

Direct Signature

Indirect Signature

ORIGIN ID: PHDA

SHIP DATE: 14JAN13
ACTWGT: 2.3 LB
CAD: /POS1322
DIMS: 0x0x0 IN

BILL SENDER

UNITED STATES US

TO GERI M SMITH CLERK OF CTS
US SIXTH NORTH DISTR CT
2 SOUTHG MAIN ST
C/O JOHN F SEIBERLING FED BLVD
AKRON OH 44308

(000) 000-0000
PO:                    REF:

DEPT:

FedEx
Express

E



**FedEx** Express   **NEW** Package **US Airbill**

FedEx Tracking Number   8022 8973 6965

**1 From**

Date

Sender's Name    Phone

Company

Address

City    State   ZIP

**2 Your Internal Billing Reference**

**3 To**

Recipient's Name    Phone

Company

Address

Address

City    State   ZIP

fedex.com 1800.GoFedEx 1800.463.3339

8022 8973 6965

0200

Recipient's Copy

**4 Express Package Service**

Next Business Day

FedEx First Overnight
FedEx Priority Overnight
FedEx Standard Overnight

2 or 3 Business Days

FedEx 2Day A.M.
FedEx 2Day
FedEx Express Saver

**5 Packaging**

FedEx Envelope   FedEx Pak   FedEx Box   FedEx Tube   Other

**6 Special Handling and Delivery Signature Options**

SATURDAY Delivery

No Signature Required   Direct Signature   Indirect Signature

Does this shipment contain dangerous goods?

No   Yes   Yes   Dry Ice   Cargo Aircraft Only

**7 Payment** Bill to:

Sender   Recipient   Third Party   Credit Card   Cash/Check

Total Packages   Total Weight   Credit Card Auth.

644



TRK# 8022 8973 6965
0200

TUE - 15 JAN A2
PRIORITY OVERNIGHT

**64 CAKA**

44308
OH-US   CLE



Align bottom of **Peel and Stick Airbill** 00182